# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

BOYNTON BEACH FIREFIGHTERS'
PENSION FUND on behalf of itself and all
others similarly situated,

                Plaintiff,

        v.

HCP, INC.; HCR MANORCARE, INC.;
LAURALEE MARTIN; TIMOTHY SCHOEN;
PAUL A. ORMOND; and STEVEN M.
CAVANAUGH,

                Defendants.

Civ. A. No.

## CLASS ACTION

**COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES
LAWS**

JURY TRIAL DEMANDED

**ECF CASE**

Plaintiff Boynton Beach Firefighters' Pension Fund ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged based upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (a) regulatory filings made by HCP, Inc. ("HCP") with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued by and disseminated by HCP; (c) analyst reports concerning HCP; and (d) other public information concerning HCP and HCR ManorCare, Inc. ("ManorCare").

## I.    INTRODUCTION

1.    This securities class action is brought on behalf of all persons or entities that purchased HCP's common stock from March 30, 2015 through February 8, 2016, inclusive (the "Class Period") and were damaged thereby. The claims asserted herein are alleged against HCP, ManorCare, and certain of HCP's and ManorCare's executive officers (collectively,

"Defendants"), and arise under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      HCP is a real estate investment trust ("REIT") focused on the healthcare industry. Throughout the Class Period, HCP was highly dependent upon the operations of ManorCare, a nursing home operator with facilities in Ohio and elsewhere, which served as HCP's most significant client.   Indeed, HCP routinely referred to ManorCare as its "partner" in its communications to investors.

3.      Prior to the start of the Class Period, HCP invested directly in ManorCare, purchasing substantially all of ManorCare's real estate facilities (which were then leased back to ManorCare) and taking a 10% equity stake in ManorCare.   As a result of that transaction, ManorCare had a significant impact on several aspects of HCP's operations and was highly important to HCP investors.   ManorCare was HCP's largest tenant, with *30%* of HCP's revenue derived from its leases with ManorCare during the Class Period.   Indeed, nearly 40% of HCP's real estate assets were subject to long-term leases with ManorCare.   Accordingly, ManorCare's operations and business were critically important to HCP and its investors.

4.      Throughout the Class Period, Defendants misrepresented ManorCare's financial performance, and falsely assured investors that HCP's ManorCare assets and revenue stream from its leases with ManorCare were secure and unimpaired.   According to statements issued by both ManorCare and HCP, ManorCare appeared to be in a strong financial condition that made it a reliable "partner" for HCP.   As ordered by the SEC, beginning on May 24, 2013, HCP separately disclosed ManorCare's own audited financial results in HCP's filings with the SEC, and represented that ManorCare's financial results were prepared in accordance with U.S. generally accepted accounting principles ("GAAP").   Moreover, HCP and ManorCare represented that

ManorCare had "a long history of compliance with regulations," and that ManorCare's billing practices had been "audited" in the past and were "to the standard one would want."

5.      In truth, throughout the Class Period, Defendants were aware or recklessly ignored that ManorCare was engaged in rampant billing fraud, which allegedly generated **over $6 billion dollars** in false claims for "reimbursement" submitted to government programs.  Specifically, to ensure that it would receive a daily reimbursement rate from Medicare at the highest possible "Ultra High" level, ManorCare submitted false claims for reimbursement for therapeutic services that did not meet the requisite criteria.

6.      Moreover, in order to maximize reimbursement payments from government programs, ManorCare systematically forced patients to remain in therapy for longer than necessary and subjected patients to unnecessary, unreasonable, and even harmful treatment.  One of the most effective ways to increase therapy time was to combine patients and subject them to unnecessary group therapy.  For example, in 2008 an Eastern Division Regional Rehabilitation Manager at ManorCare instructed a subordinate Director of Rehabilitation to maximize revenue by increasing group therapy time for Medicare patients, writing: ***"group the crap out of every Medicare A [patient] you have which will at least boost that number …."***

7.      ManorCare's billing fraud subjected ManorCare to three whistleblower lawsuits, which were filed under seal in the U.S. District Court for the Eastern District of Virginia in 2009 and 2011, and an investigation by the United States Department of Justice ("DOJ"), which culminated in the DOJ's decision to intervene in the whistleblower lawsuits in April 2015.  The DOJ's intervention resulted in public disclosure of the whistleblower complaints on April 20, 2015.

8.      ManorCare's billing fraud rendered HCP's and ManorCare's statements to investors materially misleading in several respects.   HCP's and ManorCare's disclosures concerning ManorCare's financial condition were materially false, because ManorCare's reported earnings and revenues included fraudulently-obtained reimbursements.   Moreover, both HCP and ManorCare represented that ManorCare was in compliance with regulations, and once the whistleblower actions and DOJ action were revealed, denied that any wrongdoing had occurred. In addition, HCP downplayed the impact of those claims on HCP's financial condition, including the value of HCP's ManorCare assets and the equity stake in ManorCare that HCP owned.   In reality, ManorCare was rapidly deteriorating due to the exposure of its billing fraud, which put HCP's revenue stream from its ManorCare leases at risk, and called into question the value of HCP's equity stake in ManorCare, and the ManorCare real estate assets that HCP owned.

9.      In sum, the true facts, which Defendants knew (or recklessly disregarded) but misrepresented or concealed from investors, were that:  (a) ManorCare was actively engaged in reimbursement billing fraud, in violation of federal and state laws; (b) as a result of ManorCare's billing fraud, ManorCare's reported revenue and earnings were false and ManorCare's consolidated financial statements did not comply with GAAP; and (c) ManorCare's billing fraud and the DOJ's action against ManorCare put HCP's lease revenue stream from ManorCare in jeopardy, and called into question the value of HCP's ManorCare real estate assets and HCP's equity stake in ManorCare.  As a result of Defendants' false statements and fraudulent course of conduct, HCP's stock traded at artificially inflated prices during the Class Period.

10.      The truth was revealed through a series of corrective disclosures, beginning on April 21, 2015, when HCP disclosed that the DOJ had intervened in the whistleblower lawsuits and filed a consolidated complaint.  In connection with the DOJ's intervention, the DOJ and

whistleblower complaints were unsealed, and those allegations were made public for the first time. HCP's stock declined by 1.1% in response to these disclosures. Defendants, however, continued to conceal from investors the full truth by downplaying the DOJ's actions, and denying the truth of the DOJ's claims against ManorCare.

11.      On May 5, 2015, HCP disclosed that it had recorded a non-cash impairment charge of $478 million related to certain of its lease arrangements with ManorCare, and stated that this impairment reduced the carrying value of HCP's ManorCare assets from $6.6 billion to $6.1 billion. HCP's stock declined by 2.9% in response to this news. However, Defendants continued to falsely assure investors that the DOJ's intervention in the whistleblower lawsuits would not impact ManorCare's profitability, and denied that ManorCare had engaged in any wrongdoing.

12.      On November 3, 2015, HCP disclosed an impairment charge of $27 million related to its 9% equity interest in ManorCare. HCP's stock declined by 2.6% in response to this news. However, HCP falsely attributed the impairment to admissions trends, and failed to disclose the rampant billing fraud and mounting pressure from the DOJ and whistleblower lawsuits, which put HCP's ManorCare investments at serious risk.

13.      Finally, on February 9, 2016, HCP disclosed that its equity stake in ManorCare had been written down to zero, and that it had taken an $836 million non-cash impairment on its ManorCare lease assets and placed all of its ManorCare real estate assets on a "Watch List." HCP further revealed that HCP could no longer rely on ManorCare to pay its rent, and, as a result, had changed the way it accounted for lease revenue from ManorCare to a "cash only" basis. HCP also disclosed skyrocketing legal costs incurred by ManorCare in defending against the whistleblower and DOJ lawsuits. In response to this news, HCP's stock price declined by 17% in one day, from a close of $33.99 on February 8, 2016 to a close of $28.33 on February 9, 2016.

## II.     JURISDICTION AND VENUE

14.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  ManorCare maintains its headquarters in this District and many of the acts and conduct that constitute the violations of the law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.  In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of national securities markets.

## III.    PARTIES

16.     Plaintiff Boynton Beach Firefighters' Pension Fund manages public pension assets for current and retired firefighters in Boynton Beach, Florida.  Plaintiff purchased shares of HCP common stock on the New York Stock Exchange during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

17.     Defendant HCP, Inc. is a real estate investment trust incorporated in Maryland. HCP maintains its principal offices in Irvine, California.  HCP's common stock trades on the New York Stock Exchange, which is an efficient market, under the ticker symbol "HCP."  As of March 7, 2016, HCP had over 466 million shares of common stock outstanding.  HCP owns and operates properties in this District, including SNFs of Defendant HCR ManorCare, Inc.

18.     Defendant Lauralee E. Martin ("Martin") is and was at all relevant times during the Class Period, HCP's Chief Executive Officer and President.

6

19.     Defendant Timothy Schoen ("Schoen") is, and was at all relevant times during the Class Period, HCP's Executive Vice President and Chief Financial Officer.  On March 28, 2016, HCP announced that Schoen would resign, effective May 22, 2016.

20.     Defendants Martin and Schoen are collectively referred to herein as the "HCP Executive Defendants."

21.     Defendant HCR ManorCare, Inc. ("ManorCare"), is a Delaware corporation with its principal place of business in Toledo, Ohio.  From January 1, 2006 through April 7, 2011, ManorCare, through its subsidiaries, owned, operated, and managed approximately 281 SNFs in 30 states, over a dozen of which were located in Ohio.  On April 7, 2011, ManorCare sold substantially all of its real estate assets to HCP.  Following the sale of the properties to HCP, ManorCare, through its subsidiaries, continued to manage almost all of the 281 SNFs.

22.     Defendant Paul A. Ormond  ("Ormond") is, and was at all relevant times during the Class Period, the Chief Executive Officer, Chairman of the Board, and President of ManorCare.  Defendant Ormond resides in Ottawa Hills, Ohio.

23.     Defendant Steven M. Cavanaugh ("Cavanaugh") is, and was at all relevant times during the Class Period, the Chief Financial Officer and Vice President of ManorCare.  Defendant Cavanaugh resides in Holland, Ohio.

24.     Defendants Ormond and Cavanaugh are collectively referred to herein as the "ManorCare Executive Defendants."  HCP, the HCP Executive Defendants, ManorCare, and the ManorCare Executive Defendants are hereinafter collectively referred to as "Defendants."

## IV.    BACKGROUND

### A.    ManorCare's Business And HCP's Financial Interests In ManorCare

25.     ManorCare's revenue is principally derived from reimbursements for eligible therapeutic services that it obtains from government programs, such as Medicare and Medicaid.

7

Specifically, ManorCare's "skilled nursing facilities" or "SNFs" provide rehabilitation services to patients. Medicare pays SNFs a daily rate to provide reasonable and necessary skilled nursing and skilled rehabilitation therapy services to qualifying Medicare patients.

26. On April 7, 2011, HCP acquired substantially all of the real estate assets of ManorCare for approximately $6 billion. As part of that deal, HCP exercised its option to and acquired a 9.9% equity interest in ManorCare for $95 million.

27. In connection with the April 2011 closing, HCP and ManorCare entered into a triple net Master Lease governing 268 SNF facilities, among others, that HCP acquired from ManorCare. Under the terms of that lease, ManorCare was obligated to pay HCP minimum rent in the first year of $472.5 million. This rental revenue was significant to HCP. For example, HCP had earned total rental and related revenues of approximately $1 billion as of the year-ended December 31, 2010. Rental revenue paid to HCP from ManorCare constituted nearly 30% of HCP's total revenue during the Class Period.

### B. ManorCare's Fraudulent Billing Scheme

28. As alleged in the whistleblower and DOJ complaints, which were not made public until April 2015, ManorCare SNFs were eligible for "reimbursements" from Medicare for providing rehabilitation therapy to patients. The highest possible "Ultra High" level of reimbursement applies to patients who require skilled rehabilitation therapy for a minimum of 720 minutes per week from at least two therapy disciplines.

29. From 2006 through 2012, ManorCare ensured that it could bill Medicare at the "Ultra High" rate by subjecting patients to unnecessary and even harmful therapy. For example, as alleged in the whistleblower and DOJ complaints, Patient C was an 84-year old admitted to an SNF ManorCare facility in Illinois. After 30 days at ManorCare, his health began to dramatically decline. As a result, his physician ordered palliative care and comfort treatment only. In order to

meet the "Ultra High" billing targets at ManorCare, ManorCare therapists ignored Patient C's physician's order and Patient's C's protests, and attempted to provide him with therapy services up until the day he died, thereby improperly increasing ManorCare's revenues.

30.     Another way that ManorCare maintained the "Ultra High" rate was to force patients to remain in therapy for longer than necessary.  ManorCare had policies in place to maximize the length of patients' SNF stays, regardless of the patients' actual needs.  For example, before discharging a beneficiary who had been in an SNF for at least 35 days, therapists were required to contact their Regional Rehabilitation Manager to discuss how they could keep the patient in the SNF for a longer period of time.  ManorCare also required the approval of one of its "Medicare Operations Specialists" prior to discharging a Medicare beneficiary, a policy that was specifically designed "[t]o assure that you maximize coverage for each resident/patient…."  As a therapist who left ManorCare in 2007 put it in a complaint to ManorCare: ***You're ripping off the patients and families with absolutely [sic] concern as to how your keeping patients as long as possible is financially impacting the families. …  Your practices border on fraud and you need to be investigated by Medicare.***

31.     Therapists who voiced such complaints suffered serious repercussions, including termination of employment.  Indeed, ManorCare did not tolerate employees who refused to comply with the ManorCare "Ultra High" billing scheme.  For example, as alleged in the DOJ's consolidated complaint, ManorCare's Division Rehabilitation Director Rick Grahn sent an email to ManorCare's Vice President of Reimbursement, Barry Lazarus, dated March 10, 2009, stating: ***"If therapists suggest planned levels of therapy delivery that are anything other than ultra high, they are labeled as 'uncooperative.'"***

9

32.     As a result of ManorCare's fraudulent reimbursement practices, the number of rehabilitation days that ManorCare billed at the "Ultra High" level dramatically increased.  For example, as alleged in the whistleblower and DOJ complaints, in October 2007, HCR ManorCare's Arlington, Virginia SNF billed 33.6% of its Rehab days at the Ultra High level.  By April 2010, this facility had increased its Ultra High percentage to 85%.  Overall, ManorCare generated over *$6 billion* in false claims from Medicare from 2006 through 2012.

**C.**     **The Close Relationship Between HCP And Its "Partner" ManorCare**

33.     By April 7, 2011 when HCP's acquisition of substantially all of ManorCare's real estate assets and its 10% equity interest in ManorCare closed, HCP had engaged in due diligence of ManorCare.  That due diligence would have revealed the sealed whistleblower complaints filed against ManorCare in 2009 and 2011 concerning ManorCare's reimbursement billing fraud.  As then-CEO James F. Flaherty III stated on HCP's December 14, 2010 earnings conference call:

> We have been in on-again/off-again and on-again/off-again discussions for well over a year at this point. … *At this point, we know each other very well.  We are very well versed in terms of the company's [ManorCare's] business strategy, business model, our respective teams.*  I am not sure there has been more than a couple weeks where there haven't been some significant interactions. … [I]t has been a 15-month plus dialogue.

34.     Moreover, following its acquisition of ManorCare in 2011, HCP emphasized the close relationship with its "partner" ManorCare in its statements to investors.  For example, on HCP's February 14, 2012 earnings conference call for the fourth quarter of 2011 and year-ended December 31, 2011, then-CEO Flaherty stated: "our primary post-acute care partner, [ManorCare], continued to perform well."  On the same call, Flaherty stated: "we feel obviously very, very good with the operating partner that is [ManorCare].  And, we work with them very, very closely."

35.     On the same February 14, 2012 conference call, then-CEO Flaherty further emphasized the close relationship between HCP and ManorCare, and the direct impact of

ManorCare's financial performance on HCP: "[ManorCare] has been proven over many cycles to be the low cost provider for a wide variety of post acute care patients requiring short-term rehabilitation, that augers well for that platform. And, by extension our real estate portfolio. And, by extension our [equity] investment in [ManorCare]." Similarly, on July 31, 2012, during HCP's conference earnings call for the second quarter of 2012, then-CEO Flaherty reiterated: "[ManorCare] is … the partner[] we want to align ourselves with."

36.     HCP also acknowledged the importance of ManorCare to HCP's shareholders in its communications and filings with the SEC.  For example, in a letter to the SEC dated May 3, 2013, HCP explained that "given the significance of [HCP's] relationship with [ManorCare]," HCP provided its investors with supplemental information packages that included HCP's aggregate investments with ManorCare and other ManorCare financial performance metrics.  HCP further acknowledged that such information was "the principal focus of questions we receive from investors and analysts on our earnings calls."

37.     Due to the importance of ManorCare to HCP's business and operations, the SEC in May 2013 directed HCP to go beyond the summary information concerning ManorCare's earnings that HCP had historically provided, and provide its investors audited financial statements of ManorCare.  The SEC observed with respect to HCP that ManorCare "is a significant lessee of properties under a long-term triple-net lease," and ordered HCP to amend its annual filing with the SEC to provide audited financial statements for ManorCare.  As ordered by the SEC, beginning on May 24, 2013, HCP separately disclosed ManorCare's own audited financial results in HCP's annual financial statements.

38.     Defendant Martin continued to tout HCP's close relationship with its business partner ManorCare when she took over for Flaherty in October 2013 and throughout the Class

Period.  For example, during HCP's earnings conference call on October 29, 2013, Martin stated: "our relationship with HCR management is solid, characterized by open communication and alignment for our mutual business success."

39.     Defendant Martin similarly stated at HCP's May 11, 2015 Investor Day, "we worked closely [over the last 12 months] with our two largest operators, [including] HCR ManorCare …."  On the same call, Defendant Cavanaugh reiterated, "we [ManorCare] couldn't be happier to have them [HCP] as a partner."

## V.     OVERVIEW OF THE FRAUD

### A.     Defendants Materially Misrepresent ManorCare's Financial Condition, And That HCP's ManorCare Assets And Revenue Stream Are Secure

40.     The Class Period begins on March 30, 2015, the day that HCP disclosed in its Form 8-K and press release that HCP had amended its lease with ManorCare to ensure that ManorCare would be able to meet its lease obligations to HCP.  HCP represented:  "This amendment not only results in improved lease coverage, but positions [ManorCare] for growth by ensuring that adequate capital is available to advance their strategic business initiatives, including continued investment in our real estate portfolio."

41.     The statements in ¶40 above were false and misleading, and omitted material facts. In truth, ManorCare's reimbursement billing fraud and the DOJ investigation into ManorCare put ManorCare's growth and HCP's lease revenue stream from ManorCare at serious risk, and called into question the value of HCP's real estate assets and HCP's equity stake in ManorCare.

42.     HCP also reported the value of its equity stake in ManorCare and ManorCare real estate assets during the Class Period.  Specifically, in its Forms 10-Q issued during the Class Period, HCP reported the carrying value of its equity stake in ManorCare.  The values assigned by

HCP to its equity stake in ManorCare throughout the Class Period are summarized in the chart below:

| Date | Filing | HCP's Equity Stake In ManorCare (dollars in thousands) | HCP's Percentage Ownership in ManorCare |
|---|---|---|---|
| 5/5/2015 | HCP Form 10-Q Q1 2015 | $51,649 | 9.4% |
| 8/4/2015 | HCP Form 10-Q Q2 2015 | $50,958 | 9.0% |
| 11/3/2015 | HCP Form 10-Q Q3 2015 | $21,238 | 9.0% |

43.  The statements set forth in ¶42 above were materially false and misleading, and omitted material facts.  In truth, the value of HCP's equity stake in ManorCare was overstated due to ManorCare's billing fraud and the risks presented by the whistleblower and DOJ allegations against ManorCare.  Moreover, HCP reported the value of its equity stake in ManorCare in order to falsely assure investors that ManorCare's financial condition was secure and that ManorCare would be able to meet its lease obligations to HCP.  In reality, ManorCare was rapidly deteriorating due to the exposure of its billing fraud and mounting pressure from the whistleblower and DOJ allegations, which called the value of HCP's investment in ManorCare into question and put HCP's revenue stream from its ManorCare leases at serious risk.

44.  In addition, throughout the Class Period, HCP reported the value of its post-acute/skilled nursing real estate assets in ManorCare.  A chart reflecting the value of such assets during the Class Period is included below:[1]

---

[1] Rather than reporting the dollar value of its ManorCare post-acute/skilled nursing assets, HCP reported its total post-acute/skilled nursing assets, and then separately reported the percentage of those assets represented by ManorCare.  For example, in HCP's Form 10-Q for the first quarter of 2015, HCP reported that 79% of its total post-acute/skilled nursing assets of $6,488,822,000 was comprised of ManorCare assets, thus conveying to investors that the value of those assets was $5,126,169,000.

| Date | Filing | HCP's ManorCare Post-Acute/Skilled Nursing Assets (in thousands) |
|---|---|---|
| 5/5/15 | HCP Form 10-Q Q1 2015 | $5,126,169 |
| 8/4/15 | HCP Form 10-Q Q2 2015 | $5,144,093 |
| 11/3/15 | HCP Form 10-Q Q3 2015 | $5,221,812 |

45.     The statements set forth in ¶44 above were false and misleading.  In truth, the value of HCP's ManorCare assets was overstated due to ManorCare's billing fraud and the risks presented by the whistleblower and DOJ allegations against ManorCare. Moreover, HCP reported the value of ManorCare real estate assets in order to falsely assure investors that ManorCare's financial condition was secure and that ManorCare would be able to meet its lease obligations to HCP.  In reality, ManorCare was rapidly deteriorating due to the exposure of its billing fraud and mounting pressure from the whistleblower and DOJ allegations, which called the value of HCP's ManorCare real estate assets into question and put HCP's revenue stream from its ManorCare leases at serious risk.

46.     In addition to reporting the value of its own real estate assets and equity stake in ManorCare, HCP reported information about ManorCare's earnings and revenue, directly.  Due to the importance of ManorCare to HCP's business and operations, the SEC in May 2013 directed HCP to go beyond the summary information concerning ManorCare's earnings that HCP had historically provided, and provide its investors audited financial statements of ManorCare.

47.     Moreover, throughout the Class Period, HCP disclosed ManorCare's unaudited financial results in its quarterly filings with the SEC.  Specifically, on May 5, 2015, in its Form 10-Q for the first quarter of 2015, HCP stated, as part of "[ManorCare's] summarized consolidated financial information," that ManorCare's revenue was $1,054 million for the first quarter of 2015.

14

In the same Form 10-Q, HCP represented that ManorCare's financial statements complied with GAAP, stating: "The accompanying unaudited consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") for interim financial information."  An identical statement that ManorCare's financial statements complied with GAAP was included in HCP's Forms 10-Q for the second quarter of 2015, dated August 4, 2015 and the third quarter of 2015, dated November 3, 2015.  The revenue for ManorCare reported by HCP in each quarter during the Class Period, and the date on which ManorCare's revenue was reported is summarized in the chart below:

| Date | Filing | Reporting Period | ManorCare's Reported Revenue (in millions) |
|---|---|---|---|
| 5/5/15 | HCP Form 10-Q for Q1 2015 | 3 months ended March 31, 2015 | $1,054.0 |
| 8/4/15 | HCP Form 10-Q for Q2 2015 | 3 months ended June 30, 2015 | $1,027.5 |
| 11/3/15 | HCP Form 10-Q for Q3 2015 | 3 months ended Sept. 30, 2015 | $1,009.6 |

48.     The statements set forth in ¶47 above were false and misleading.  In truth, ManorCare's "revenue" was not properly booked as "revenue" under the relevant accounting rules and GAAP.  Specifically, GAAP requires that revenue be realized or realizable and earned, and revenue is earned "when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues."  FASB No. 5, ¶ 83(b); *see also* ASC 605-10-52-1. Revenue obtained from ManorCare's fraudulent billing practices were thus not "earned" and not properly recognized as revenue, rendering HCP's statements concerning ManorCare's "revenue" and compliance with GAAP false when made.

### B. __The Truth Is Revealed__

49.     On April 10, 2015, the DOJ intervened in the whistleblower lawsuits and filed a consolidated complaint.  On April 20, 2015, the Court unsealed the DOJ consolidated complaint and the previously filed whistleblower complaints, and those allegations were made public for the first time.  In a Form 8-K and press release filed prior to the start of trading on April 21, 2015, HCP stated: "The United States intervened against [ManorCare] in the parts of the civil actions alleging that they submitted claims to Medicare for therapy services that were not covered by the skilled nursing facility benefit, were not medically reasonable and necessary, were not skilled in nature, and therefore not entitled to Medicare reimbursement."   On this news, HCP's stock declined from close of $43.33 on April 20, 2015, to close of $42.85 on April 21, 2015.

50.     HCP, however, downplayed the DOJ's actions, assuring investors that ManorCare "intends to vigorously defend the DOJ's civil action."  HCP further stated that ManorCare was not the only SNF-operator subject to investigation by the DOJ: "The government's case against [ManorCare] is one of several brought in the past few years against skilled nursing facility operators alleging the provision of unnecessary rehabilitation therapy."

51.     On an April 21, 2015 posting on ManorCare's website, ManorCare similarly asserted with regard to the DOJ action: "We believe this lawsuit is unjust, and we will vigorously defend ourselves in Court."   On the same website posting, ManorCare represented that in connection with the DOJ investigation, ManorCare had "produc[ed] information that we believe refutes the basic claims contained in the lawsuit."  ManorCare further stated that it "vehemently disagree[d]" with the allegations in the DOJ lawsuit, and "in no instance is HCR ManorCare accused of billing or receiving reimbursement for services it did not provide."

52.     The statements set forth in ¶¶50-51 above were false and misleading.  In truth, ManorCare was actively engaged in reimbursement billing fraud, in violation of federal and state

laws; and ManorCare's billing fraud and the DOJ's action against ManorCare put HCP's revenue stream from ManorCare at serious risk, and called into question the value of HCP's real estate assets and HCP's equity stake in ManorCare.

53.     Analysts concerned about the impact of the DOJ's intervention and the substance of the DOJ's allegations were assuaged by HCP's and ManorCare's assurances.  For example, in an analyst report dated April 21, 2015, UBS Research reported: "[ManorCare] plans to fight the DOJ lawsuit and posted a letter on its website saying the complaint is 'unjust.'"

54.     On May 5, 2015, prior to the start of the trading day, HCP disclosed that it had recorded a non-cash impairment charge of $478 million related to certain of its lease arrangements with ManorCare.  HCP stated that this impairment reduced the carrying value of HCP's ManorCare investments from $6.6 billion to $6.1 billion.  On this news, HCP's stock declined by 2.9% from $40.75 at close on May 4, 2015, to $39.55 at close on May 5, 2015.

55.     Nonetheless, during HCP's May 5, 2015 earnings conference call, HCP reported that ManorCare had "completed a very positive first quarter," and that ManorCare's "results were also ahead of their 2015 budget."   HCP further stated that the DOJ's intervention in the whistleblower lawsuits would not impact ManorCare's profitability.  For example, during the May 5, 2015 earnings conference call, Defendant Martin represented: "we do not anticipate a significant impact to HCR's profitability in the near future."   Similarly, in response to analysts who were concerned about such impact, Defendant Martin reiterated that HCP was not aware of "any potential revenue lost that the Company might have going forward."

56.     HCP also continued to represent that ManorCare had not engaged in any wrongdoing.  Specifically, during HCP's conference earnings call on May 5, 2015, Defendant Martin stated:

17

[T]he investigation by the Department of Justice has been ongoing for about three years. HCR has maintained their business practices throughout that time and, in fact, has continued to increase market share and provider relationships who are focused on the outcomes that they achieve in terms of think [sic] about hospital readmissions and so forth. I would also add that -- and we mentioned this on a prior call -- that in conjunction with winning some of those relationships, ***HCR actually had their billing practices*** -- and this was, again, several years ago -- ***audited by a CMS recommended audit firm, passed it, and felt that their practices are definitely to the standard that one would want***.

57.     The statements set forth in ¶¶55-56 above were false and misleading. In truth, ManorCare was actively engaged in reimbursement billing fraud, in violation of federal and state laws; and ManorCare's billing fraud and the DOJ's action against ManorCare put HCP's revenue stream from ManorCare at serious risk, and called into question the value of HCP's real estate assets and HCP's equity stake in ManorCare.

58.     Analysts concerned about the impact of the DOJ lawsuit on ManorCare were again assuaged by HCP's assurances. For example, Evercore ISI reported on May 5, 2015, "Decent quarter, but larger questions still remain …. 1Q results will likely be overshadowed by questions … regarding the Manorcare's investigation by the DOJ …."

59.     On November 3, 2015, in a Form 10-Q for the third quarter of 2015 filed prior to the start of trading, HCP disclosed that it had recorded an impairment charge of $27 million related to its 9% equity interest in ManorCare. In a BMO Capital analyst report dated November 3, 2015, an analyst observed that "HCR ManorCare Impairment [is] a Warning." On this news, HCP's stock declined by 2.6% from close of $37.71 on November 2, 2015, to close of $36.73 on November 3, 2015.

60.     However, in the same Form 10-Q, HCP represented that the impairment was due to "a declining trend in admissions from hospitals and continuing trends in mix and length of stay driven by Medicare Advantage and other managed care plans."

61.     The statement in ¶60 above was false and misleading.  In truth, ManorCare was actively engaged in reimbursement billing fraud, in violation of federal and state laws; and ManorCare's billing fraud and mounting pressure from the DOJ and whistleblower lawsuits put HCP's ManorCare investments at serious risk.

62.     Finally, on February 9, 2016, in its Form 10-K for the year ended December 31, 2015 filed during the trading day, HCP disclosed that it had written its equity interest in ManorCare down to zero, and taken an additional $836 million non-cash impairment on its ManorCare real estate assets.  In total, HCP had written down those assets by over $1.3 billion since May 2015, or roughly 20% of their prior carrying value.  HCP further put its entire ManorCare real estate portfolio on "Watch List" status.  In addition, HCP disclosed a change to the way it accounted for lease revenue from ManorCare to a "cash basis" due to HCP's determination "that the timing and amounts owed under the [ManorCare] [lease] investments are no longer reasonably assured." Lastly, HCP revealed that legal costs from ManorCare's defense against the DOJ action had skyrocketed, reaching upwards of $1 million per month.  In response to this news, HCP's stock declined by 17%, from close of $33.99 on February 8, 2016, to close of $28.33 on February 9, 2016.

63.     In sum, the true facts, which Defendants knew (or recklessly disregarded) but misrepresented or concealed from investors, were that:  (a) ManorCare was actively engaged in reimbursement billing fraud, in violation of federal and state laws; (b) as a result of ManorCare's billing fraud, ManorCare's reported revenue and earnings were false and ManorCare's

consolidated financial statements did not comply with GAAP; (c) as a result of ManorCare's billing fraud, HCP's statements regarding the fair value of HCP's equity stake in ManorCare and the ManorCare assets that HCP owned were overstated; and (d) ManorCare's billing fraud and the DOJ's action against ManorCare put HCP's lease revenue stream from ManorCare at serious risk, and called into question the value of HCP's ManorCare real estate assets and HCP's equity stake in ManorCare.

## VI.    DEFENDANTS ACTED WITH SCIENTER

64.    ManorCare's fraudulent billing practices were well known to ManorCare senior executives, including the ManorCare Executive Defendants, and were mandated from the highest levels of ManorCare.   For example, ManorCare's corporate leadership implemented specific mechanisms to ensure that set billing targets were met, and pressured, tracked, and enforced compliance with these targets.  These allegations give rise to a strong inference that ManorCare knowingly recorded revenue that was generated from ManorCare's fraudulent billing scheme. Accordingly, ManorCare knew that its revenue and earnings that were reported in HCP's financial statements were materially misleading.

65.    HCP and the HCP Executive Defendants also knew (or recklessly disregarded) that ManorCare was engaged in reimbursement billing fraud.  For example, HCP performed due diligence in connection with the April 7, 2011 acquisition.   In providing assurances to HCP investors about the ManorCare transaction, then-CEO James F. Flaherty III represented that "we know each other very well."  Moreover, throughout the Class Period, HCP emphasized the close relationship with its "partner" ManorCare in its statements to investors.  For example, at HCP's May 11, 2015 Investor Day, Defendant Martin stated that ManorCare and HCP "worked closely" together.  On the same call, Defendant Cavanaugh reiterated, "we [ManorCare] couldn't be happier to have them [HCP] as a partner."   The due diligence HCP conducted in connection with the

20

ManorCare acquisition, the close relationship between HCP and its "partner" ManorCare, and the extent to which HCP's financial performance depended upon ManorCare, give rise to a strong inference that HCP knew about or acted in reckless disregard of the alleged billing fraud at ManorCare, and the impact of the mounting pressure from the whistleblower complaints and DOJ investigation on ManorCare's financial performance and ability to meet its obligations to HCP.

**VII.    CLASS ACTION ALLEGATIONS**

66.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased HCP's common stock during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of HCP and ManorCare and their families and affiliates.

67.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of March 7, 2016, HCP had over 466 million shares of common stock outstanding.

68.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether Defendants violated the Exchange Act;

(b)    Whether Defendants omitted and/or misrepresented material facts;

(c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

21

(e)     Whether the price of HCP's common stock was artificially inflated;

(f)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)     The extent of damage sustained by Class members and the appropriate measure of damages.

69.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

70.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

71.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VIII.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

72.     The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint.  Many of the statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made.  Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

73.     Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an

executive officer of HCP and/or ManorCare who knew that the statement was materially false or misleading when made.

## IX.  THE PRESUMPTION OF RELIANCE

74.  Plaintiff and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for HCP's common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

75.  Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because during the Class Period:

(a)  HCP stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange (NYSE), a highly efficient and automated market;

(b)  As a registered issuer, HCP filed periodic public reports with the SEC and the NYSE;

(c)  HCP regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)  The market reacted promptly to public information disseminated by HCP;

(e)  HCP securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and customers of their respective firms.  Each of these reports was publicly available and entered the public marketplace;

(f)  The material representations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of HCP common stock; and

(g)    Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiff and other members of the Class purchased or acquired HCP common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

76.    In the alternative, Plaintiff is also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material facts which there was a duty to disclose.

## X.    CAUSES OF ACTION

### COUNT I

### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5
**(Against All Defendants)**

77.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

78.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase HCP common stock at artificially inflated prices.

79.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for HCP common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

80.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

81.     During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that the statements contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

82.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal HCP's true condition from the investing public and to support the artificially inflated prices of HCP's common stock.

83.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for HCP common stock. Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for HCP common stock had been artificially inflated by Defendants' fraudulent course of conduct.

84.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the HCP's common stock during the Class Period.

85.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
### (Against The HCP And ManorCare Executive Defendants And HCP)

86.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

87.     The HCP Executive Defendants acted as controlling persons of HCP within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and awareness of HCP's operations, direct involvement in the day-to-day operations of HCP, and intimate knowledge of HCP's actual performance, and their power to control public statements about HCP, the HCP Executive Defendants had the power and ability to control the actions of HCP and its employees. By reason of such conduct, the HCP Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act.

88.     The ManorCare Executive Defendants acted as controlling persons of ManorCare within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and awareness of ManorCare's operations, direct involvement in the day-to-day operations of ManorCare, and intimate knowledge of ManorCare's actual performance, and their power to control public statements about ManorCare, the ManorCare Executive Defendants had the power and ability to control the actions of ManorCare and its employees. By reason of such conduct, the ManorCare Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act.

89.     HCP acted as a controlling person of ManorCare within the meaning of Section 20(a) of the Exchange Act.  By virtue of its business relationship with ManorCare, HCP had the power and ability to force ManorCare to disclose its audited financial results to HCP investors. By reason of such conduct, HCP is liable pursuant to Section 20(a) of the Exchange Act.

26

XI.     **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)     Awarding such equitable, injunctive, or other further relief as the Court may deem just and proper.

XII.    **JURY DEMAND**

Plaintiff hereby demands a trial by jury of all issues so triable.

DATED:  May 9, 2016

/s/ Scott D. Simpkins
John R. Climaco (0011456)
Scott D. Simpkins (0066775)
**CLIMACO WILCOX PECA TARANTINO**
**& GAROFOLI CO., LPA**
55 Public Square, Suite 1950
Cleveland, OH 44113
Telephone: (216) 621-8484
Facsimile: (216) 771-1632
jrclim@climacolaw.com
sdsimp@climacolaw.com

*Local Counsel for Proposed Lead Plaintiff, Boynton*
*Beach Firefighters' Pension Fund*

Gerald H. Silk
Avi Josefson
Rebecca E. Boon
**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554 1400
Facsimile: (212) 554 1444
jerry@blbglaw.com
avi@blbglaw.com
rebecca.boon@blbglaw.com

*Counsel for Proposed Lead Plaintiff, Boynton
Beach Firefighters' Pension Fund, and
Proposed Lead Counsel for the Class*

NY/984073