UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


Boynton Beach Firefighters'
Pension Fund,                                                Case No. 3:16-cv-1106

                        Plaintiff

            v.                                              MEMORANDUM OPINION


HCP, Inc., et al.,

                        Defendants


       This case is before me to determine the most appropriate lead plaintiff for this purported class action and to approve that plaintiff's choice of lead counsel. Three people, entities, or groups have moved for appointment as lead counsel: (1) Albert J. Belle (Doc. No. 19); (2) Société Générale Securities Services GmbH ("SGSS Germany") and the City of Birmingham Retirement and Relief System (Doc. No. 20); and (3) the Public Employees' Retirement System of Mississippi (Doc. No. 23). The matter has been fully briefed. (Doc. Nos. 37, 38, 41, 43, 49, & 67-71). Belle subsequently filed a notice of non-opposition to the competing motions for appointment as lead plaintiff. (Doc. No. 26). On September 13, 2016, I held a hearing on the remaining two motions and took the matter under advisement. (Doc. No. 56 at 79).

       For the reasons that follow, Belle's and Mississippi PERS' motions for appointment as lead plaintiff and approval of counsel are denied. (Doc. Nos. 19 & 23). The motion of SGSS Germany and Birmingham for appointment as co-lead plaintiffs and approval of counsel is granted. (Doc. No. 20).

**BACKGROUND**

Plaintiff Boynton Beach Firefighters' Pension Fund brings this action on behalf of all persons or entities that purchased Defendant HCP's common stock from March 30, 2015 through February 8, 2016, inclusive. (Doc. No. 1 at ¶ 1). Plaintiff alleges all Defendants violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5. (*Id.* at ¶¶ 77-85). Plaintiff also alleges Defendant HCP and the individual defendants violated § 20(a) of the 1934 Exchange Act, 15 U.S.C. § 78t(a). (*Id.* at ¶¶ 86-89).

HCP is a real estate investment trust, and Defendant HCR ManorCare was its "most significant client." (*Id.* at ¶ 2). Because of HCP's investment in ManorCare, HCP derived approximately thirty percent of its revenue from its leases with ManorCare during the class period. (*Id.* at ¶ 3). Additionally, HCP leased nearly half of its real estate assets to ManorCare. (*Id.*). During the class period, Defendants allegedly misrepresented ManorCare's financial performance, falsely assuring investors "that HCP's ManorCare assets and revenue stream from its leases with ManorCare were secure and unimpaired." (*Id.* at ¶ 4).

But during that time ManorCare was allegedly engaged in billing fraud, generating over six billion dollars in false claims for reimbursement. (*Id.* at ¶ 5). This behavior eventually led to three whistleblower lawsuits, filed under seal in 2009 and 2011, and an investigation by the United States Department of Justice. (*Id.* at ¶ 7). The DOJ eventually intervened in the lawsuits, resulting in their public disclosure on April 20, 2015. (*Id.*). HCP issued corrective disclosures the following day. (*Id.* at ¶ 10). But HCP allegedly continued to mislead its investors by downplaying the severity of the situation. (*Id.*).

HCP subsequently disclosed two impairment charges relating to its business dealings with ManorCare but continued to assure investors of ManorCare's profitability. (*Id.* at ¶¶ 11-12). Each disclosure brought with it a decline of less than three percent in HCP's stock. (*Id.*). Finally, on February 9, 2016, HCP disclosed, among other things, that it had taken an $836 million non-cash

impairment on its ManorCare lease assets and that ManorCare could no longer be relied upon to pay its rent. (*Id.* at ¶ 13). HCP's stock price declined seventeen percent that day. (*Id.*).

Plaintiff filed this action on May 9, 2016. (Doc. No. 1). On May 10, 2016, Plaintiff published notice of the pendency of this action, giving purported class members until July 11, 2016, to move for appointment as lead plaintiff. (Doc. No. 14 at 1-2). Three class members or groups of class members timely filed motions seeking to be appointed lead plaintiff and to have their choice of counsel approved. (Doc. Nos. 19, 20, & 23). One of those movants, Albert J. Belle, reviewed the competing motions and subsequently filed a notice of non-opposition, recognizing he does not appear to have the largest financial interest in this action. (Doc. No. 36 at 1). This leaves Mississippi PERS and the group comprised of SGSS Germany and Birmingham.

## STANDARD

The Private Securities Litigation Reform Act of 1995 governs the appointment of a lead plaintiff "in each private action arising under [the Securities Exchange Act of 1934] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(1). Any purported class member may move to be appointed lead plaintiff within sixty days after the publication of notice of the purported plaintiff class. *Id.* § 78u-4(a)(3)(A)(i). The court must then "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members." *Id.* The most adequate plaintiff is presumed to be "the person or group of persons" who has moved for appointment, "has the largest financial interest in the relief sought by the class," and satisfies the requirements of Federal Rule of Civil Procedure 23. *Id.* § 78u-4(a)(3)(B)(iii)(I). This presumption may be rebutted by proof "that the presumptively most adequate plaintiff . . . will not fairly and adequately protect the interests of the class [or] is subject to unique defenses that render such plaintiff incapable of adequately representing the class." *Id.* § 78u-4(a)(3)(B)(iii)(II). "The most

adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." *Id.* § 78u-4(a)(3)(B)(v).

## DISCUSSION

The PSLRA's sequential process demands that I consider potential lead plaintiffs one at a time, beginning with the movant who has the greatest financial interest in the action. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). But before I get to that point, Mississippi PERS is challenging SGSS Germany's standing to bring claims on behalf of the funds REIT Nordamerika 1, Aktien Nordamerika 2, and PT-MASTER. (Doc. Nos. 38 at 13-16 & 43 at 5-9). Mississippi PERS also challenges the propriety of SGSS Germany and Birmingham forming a lead plaintiff group. (Doc. Nos. 38 at 7-12 & 56 at 8-10). I address these issues first.

**Standing**

Article III of the United States Constitution confines the jurisdiction of federal courts to the resolution of cases and controversies. U.S. Const., art. III, § 2, cl. 1. To have constitutional standing, a plaintiff must establish an injury in fact, causation, and redressability. *Sprint Commc'ns Co., LP v. APCC Servs., Inc.*, 554 U.S. 269, 273-74 (2008). Generally, the injury-in-fact element requires the plaintiff to have personally suffered injury. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). But this rule is not absolute, as the Supreme Court has recognized "circumstances where it is necessary to grant a third party standing to assert the rights of another." *Kowalski v. Tesmer*, 543 U.S. 125, 129-30 (2004). The parameters of this exception require "the party asserting the right to have a close relationship with the person who possesses the right" and "a hindrance to the possessor's ability to protect his own interests." *Id.* at 130 (internal quotation marks omitted). Likewise, an injured party may assign her claims to another, thus giving the assignee standing to pursue those claims. *Vt. Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 773 (2000).

Mississippi PERS challenges SGSS Germany's Article III standing for lack of an injury in fact. (Doc. No. 38 at 13). SGSS Germany claims the prudential exception to the injury-in-fact requirement of standing and further claims that if it does not qualify for this exception, it has standing because it obtained assignments from its affected investors. (Doc. No. 41 at 4-8).

**Prudential Exception**

SGSS Germany claims it meets the requirements of the prudential exception. (Doc. No. 41 at 4). To help me determine whether it qualifies for this exception, SGSS Germany submitted the declaration of Christopher A. Kern, a tenured professor of law in Germany. (Doc. No. 42-1 at ¶ 1). Kern analyzed the German Investment Code, German procedural law, and general principles of German law and policy to provide me with a better understanding of the authority granted investment management companies in relation to the funds they operate and their investors. (*Id.*).

As an initial matter, I note Mississippi PERS' objection to my consideration of Kern's declaration. (Doc. No. 49 at 6-7). Mississippi PERS faults Kern for failing to "analyze[] the salient facts of this case," choosing instead to focus solely on the overall operation of German law. (*Id.* at 6). Federal Rule of Civil Procedure 44.1 authorizes me, in determining foreign law, to "consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." *See also Johnson v. Ventra Grp., Inc.*, 191 F.3d 732, 742 (6th Cir. 1999). I could even engage in my "own research and consider any relevant material thus found." Fed. R. Civ. P. 44.1 advisory committee's note. So it is appropriate for me to consider Kern's analysis of the operation of German law and then apply that to the facts of this case.

Now I must determine whether, under German law, SGSS Germany has a close relationship with the funds and the investors who were ultimately harmed by Defendants' alleged misconduct and whether those funds and investors are hindered in protecting their own interests. *See Kowalski*, 543 U.S. at 30.

SGSS Germany is an investment management company, in German a Kapitalverwaltungsgesellschaft ("KVG"). (Doc. Nos. 41 at 5 & 56 at 33). SGSS Germany sets up and controls funds in which organizations may invest. (Doc. No. 56 at 34). In this case, SGSS Germany established the funds REIT Nordamerika 1, Aktien Nordamerika 2, and PT-Master. (*Id.* at 34-35). These are the funds SGSS Germany identified in its certification. (Doc. No. 21-2 at 4-5). Each of the three funds has a sole investor. The sole investor in the fund PT-Master is Daimler Pension Trust e.V. (Doc. Nos. 41 at 7; 42-8 at ¶ 17; 43-2 at 5; and 56 at 34). The sole investor in both Nordamerika 1 and 2 is Kirchliche Zusatzversorgungskasse des Verbandes der Diözesen Deutschlands AdöR, the pension fund of the Catholic Church in Germany. (Doc. Nos. 42-8 at ¶ 16; 43-2 at 3-4; & 56 at 34). The church invests in the Nordamerika funds through its wholly owned Funds of Funds Capri, Melba, and Bali. (Doc. Nos. 42-8 at ¶ 16; 43-2 at 3-4; & 56 at 34).

Under German law, two types of investment funds are the trust form and the joint ownership form. (Doc. No. 42-1 at ¶ 5). SGSS Germany's Nordamerika and PT-Master funds are of the joint ownership form, meaning the investors in those funds own a pro-rata share of the funds' assets. (*Id.*). And while the funds are considered separate estates, they are not independent legal entities. (*Id.*). The investment management company, here SGSS Germany, manages the assets. (*Id.*). The investors may not transfer or dispose of the funds' assets. (*Id.* at ¶ 6). They may only transfer or redeem investment fund units. (*Id.*). The investment management company is also invested with authority to sue in its own name for damages suffered by investors of its funds. (*Id.* at ¶ 8-9). The investors have no such authority. (*Id.* at ¶ 9).

Courts' application of the prudential exception to investment management companies and investment managers has varied. *See, e.g.*, *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir. 2008); *In re Vivendi Universal, S.A. Sec. Litig.*, 605 F. Supp. 2d 570 (S.D.N.Y. 2009). Particularly on point is *Vivendi*, in which the court analyzed whether German investment management companies, such as SGSS Germany, qualify for the prudential exception. *See Vivendi*,

605 F. Supp. 2d at 578. The plaintiffs' expert in that case provided the same breakdown of German law as Kern has in this case. (*See* Doc. No. 42-1); *Vivendi*, 605 F. Supp. 2d at 577-78. Finding the investors lacked control over the fund assets, lacked authority to fire the investment management companies, and lacked authority to sue on behalf of the funds, the court held "that plaintiffs who are [German investment management companies] qualify under the *Huff* [prudential] exception." *Vivendi*, 605 F. Supp. 2d at 578.

Here, as in *Vivendi*, the law applicable to companies such as SGSS Germany gives the investment companies exclusive authority to sue on behalf of their funds. The funds are not considered legal entities and so cannot bring suit on their own behalf. Nor may investors in the funds bring suit. The investors do not even have the ability to transfer or dispose of fund assets. Management of the funds is left to the investment companies. I am therefore persuaded SGSS Germany has a close relationship with its funds and investors. I also find there is a barrier to the funds and investors bringing suit. As such, SGSS Germany falls within the prudential exception to constitutional standing and may bring these claims on behalf of its funds and investors. *See Kowalski*, 543 U.S. at 30.

### Assignment of Claims

Even if SGSS Germany did not qualify under the prudential exception, the company claims it has standing because it obtained assignments of its investors' claims. (Doc. No. 41 at 6). Mississippi PERS objects to this as an alternative argument, claiming SGSS Germany "cannot have it both ways." (Doc. No. 49 at 4). As is customary for arguments in the alternative, SGSS Germany's execution of assignments and alternative reliance upon them is a fail-safe. (Doc. No. 41 at 6). Had I found SGSS Germany did not have standing pursuant to the prudential exception, I would have found the investors had standing to pursue these claims, thus giving them the authority to assign those claims. So I will consider this alternative theory of standing.

The Supreme Court has held "that the assignee of a claim has standing to assert the injury in fact suffered by the assignor." *Vt. Agency of Natural Res.*, 529 U.S. at 773. The assignee of another's claim has constitutional standing to pursue that claim, "even when the assignee has promised to remit the proceeds of the litigation to the assignor." *Sprint Commc'ns*, 554 U.S. at 271. Mississippi PERS does not dispute this but instead claims the assignments are invalid. (Doc. No. 43 at 5).

Before getting to the question of validity, however, I must first determine whether Ohio or German law applies to the formation of the assignments. In federal question cases, I must follow federal choice-of-law principles. *Med. Mut. of Ohio v. deSoto*, 245 F.3d 561, 570 (6th Cir. 2001) (*citing Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 25-26 (1st Cir. 2000)). Federal courts have adopted the Second Restatement's most-significant-relationship approach to conflict of laws. *Id.* Ohio has also adopted the Restatement Second's approach. *Ohayon v. Safeco Ins. Co. of Illinois*, 747 N.E.2d 206, 220 (Ohio 2001).

This approach asks which State "has the most significant relationship to the transaction and the parties," also taking into consideration general choice-of-law principles. Restatement (Second) of Conflict of Laws: Law Governing in Absence of Effective Choice by the Parties § 188. I must determine the most significant relationship using five points of contact, evaluating them "according to their relative importance with respect to the particular issue." *Id.* § 188(2). I must consider (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties. *Id.* Underlying the analysis of these points of contact are general choice-of-law principles, including (1) the needs of the interstate and international systems; (2) the relevant policies of the forum; (3) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (4) the protection of justified expectations; (5) the basic policies underlying the particular field of law; (6) certainty, predictability, and uniformity of result; and (7) ease in the determination and

application of the law to be applied.  Restatement (Second) of Conflict of Laws:  Choice-of-Law Principles § 6(2).

Here, German law has the most significant relationship to the assignments and to the parties who executed those assignments.  *See* Restatement (Second) of Conflict of Laws:  Law Governing in Absence of Effective Choice by the Parties § 188(2)(a)-(e).  All three assignments were executed in Unterföhring, Germany.  (Doc. No. 43-2 at 3-5).  The funds are in Germany and are governed by German law.  (*Id.*).  SGSS Germany and the investors Kirchliche Zusatzversorgungskasse des Verbandes der Diözesen Deutschlands AdöR and Daimler Pension Trust e.V. are also located in Germany.  All of these factors weigh in favor of applying German law to the assignments.  The only factor weighing in favor of Ohio law is that SGSS Germany is acting upon these assignments in this forum.  The assignments give SGSS Germany the authority to litigate this suit in the place of the funds' investors.  (*Id.*).  But given that the issue before me is the validity of the assignments, this is not enough to outweigh the other factors, which overwhelmingly weigh in favor of the application of German law.

The application of German law also satisfies the Restatement Second's general choice-of-law principles.  *See* § 6(2).  It is important to respect and preserve the operation of other State's laws, in this case to guard against unnecessarily undermining Germany's principles of contract.  *See id.* § 6(2)(a).  And Germany has the greater interest in the determination of the issue of validity of the assignments.  *See id.* § 6(2)(c).  Germany has an interest in contracts executed by its citizens, particularly when those contracts are formed pursuant to German law and concern matters governed by German law.  Ohio has no dog in this fight.  Furthermore, it is reasonable for German citizens, contracting in Germany concerning matters governed by German law, to expect that their contracts will be validated and interpreted pursuant to German law.  *See id.* § 6(2)(d).  In that same vein, to hold that German law applies under these circumstances is an easy determination that furthers the Restatement Second's goals of promoting certainty, predictability, and uniformity of

result.  *See id.* § 6(2)(f).  As such, I find German law applies to the assignments at issue here.

Mississippi PERS does not contest the application of German law.  (Doc. No. 43 at 7 n. 4).

Under the German Civil Code, a person may assign his or her claim to another via contract,

and "[w]hen the contract is entered into, the new obligee steps into the shoes of the previous

obligee."  Bürgerliches Gesetzbuch [BGB] [Civil Code], Jan. 2, 2002, Bundesgesetzblatt [BGBL], as

amended, § 398, *official English translation available at* https://www.gesetze-im-

internet.de/englisch_bgb/englisch_bgb.html#p1459.  All the Code requires for written contracts is

that the document contain the signatures of all contracting parties, unless multiple counterparts to

the contract are drawn up.  *Id.* § 126(2).  There are no further requirements listed.

Mississippi PERS cites to *Keoseian v. Von Kaulbach*, 763 F. Supp. 1253 (S.D.N.Y. 1991) for the

proposition that German law "requires all binding contracts to be supported by consideration or, in

the absence of consideration, to be notarized by a specialized German legal professional."  (Doc.

No. 43 at 6 n. 3).  But that was not quite the conclusion reached in *Keoseian*.  The court-appointed

German law expert explained that "an assignment contract in general does not require notarization

in order to be effective."  *Keoseian*, 763 F. Supp. at 1257.  Instead, when the assignment is offered to

satisfy "a gratuitous promise of a gift," classified as a donation under German law, then the

assignment would require notarization.  *Id.*; BGB § 518(1).  And any defect in the form of the

contract could be cured by performance of the promise.  BGB § 518(2).  So the conclusion the court

in *Keoseian* came to was that "a promise of a gift must be notarized to be enforceable, absent

performance of the promise."  *Keoseian*, 763 F. Supp. at 1257.  This is not the type of assignment at

issue here.

When notarization is required, as it is for contracts "by which performance is promised as a

donation" and contracts governing the transfer of real property, that requirement is spelled out in a

code provision relating to that particular type of contract.  *Id.* §§ 311b & 518.  There is no such

requirement for assignment contracts.  And the assignment contracts in this case do not concern

donations or gifts, like the promise of a painting in *Keoseian*, or the transfer of real property. *See Keoseian*, 763 F. Supp. at 1257. The investors assigned their claims to SGSS Germany to pursue these claims on their behalf. (Doc. No. 43-2 at 3-5). The investors made clear they were not simply signing over any anticipated recovery, but signing over the responsibility of fighting for recovery for the investors and the funds. (*Id.*). So in this case, no notarization is required.

It is true, as Mississippi PERS points out, that these assignments do not explicitly reflect any consideration given (Doc. No. 43 at 6-7), but German law does not require written assignment contracts to spell out the consideration given. The one requirement that applies to contracts across the board is that the parties sign the same document. BGB § 126. These assignments satisfy that requirement. (Doc. No. 43-2 at 3-5).

Mississippi PERS also challenges the assignments for being untimely, for being styled as declarations, for lacking an official seal, and for being executed by questionable signatories. (Doc. No. 43 at 5-9). First, Mississippi PERS takes fault with SGSS Germany not providing the assignments with its motion for appointment as lead plaintiff and claims that submitting the assignments four weeks later precludes SGSS Germany from curing its standing issue. (*Id.* at 5). I do not share this view.

In its certification, filed concurrently with its motion for lead plaintiff, SGSS Germany swore it was "duly authorized to institute legal action on behalf of [itself] and the Funds' behalf," thereby putting myself and the parties on notice that it was acting on behalf of the funds it operates. (Doc. No. 21-2 at 2). SGSS Germany was not required under the PSLRA to include this in its certification. *See* 15 U.S.C. § 78u-4. Mississippi PERS made no statements reflecting its standing in its certification. (Doc. No. 23-4 at 2-4). The parties were only required to provide a list of relevant transactions, which both parties did. (Doc. Nos. 21-2 at 4-5 & 23-4 at 3-4).

Once the initial motions for appointment were filed, I set a briefing schedule requiring movants to simultaneously file responses and replies. (Doc. No. 32). By virtue of this schedule, when Mississippi challenged SGSS Germany's standing in its response, SGSS Germany could only respond to that challenge in its reply brief. I then granted Mississippi PERS permission to file a sur-reply. (Doc. No. 48). And though submitted after the motion for appointment as lead plaintiff, the assignments were timely executed. Two were executed on July 4, 2016, and the other on June 27, 2016. (Doc. No. 43-2 at 3-5). So, as I stated during oral argument, I do not consider SGSS Germany's timing suspicious. (Doc. No. 56 at 29). Nor do I consider their assignments untimely. (*Id.*). Earlier submission was not required, they were timely executed, and SGSS Germany submitted them in time to be part of the record informing my decision concerning the appointment of a lead plaintiff.

Second, the assignments are labeled declarations, but they are more specifically labeled "Declaration[s] of Assignment." (Doc. No. 43-2 at 3-5). At their core, they are written manifestations of agreements between the investors and SGSS Germany, by which the investors assigned their claims to SGSS Germany to pursue on their behalf. (*See id.*). I find no reason to invalidate the assignments based on the inclusion of the word "declaration."

Third, Mississippi PERS, referencing the Articles of Association for the German Catholic Church pension fund, claims the assignments are not binding because they lack an official seal. (Doc. Nos. 43 at 8 n. 5 & 43-4 at 4). The assignments do not appear to have an official seal affixed to them, but the assignments do explicitly bind the pension fund by the result of the lead plaintiff motion and the lawsuit overall. (Doc. No. 43-2 at 3-4). At this stage, I am satisfied this is sufficient.

Finally, during the briefing phase, Mississippi PERS highlighted the confusion surrounding the structure of SGSS and the interplay between the affected funds and investors. (Doc. No. 43 at 7-9). This confusion seems to have contributed to Mississippi PERS' concerns regarding the signatories to the assignments. (Doc. No. 43 at 7-9). Mississippi PERS reads the assignments as

having been signed by SGSS Germany as both assignee and assignor. (*Id.* at 8). Mississippi PERS also notes the lack of signatures from representatives for the funds Capri, Melba, Bali, REIT Nordamerika 1, Aktien Nordamerika 2, and PT-Master. (*Id.* at 7-8).

As discussed earlier in this opinion, SGSS Germany established and operates the Nordamerika and PT-Master funds. (Doc. No. 56 at 34-35). So it signed the assignments as assignor, acknowledging it is acting on behalf of its funds. (Doc. No. 43-2 at 3-5). Representatives for the sole investor in each of those funds – the German Catholic Church pension fund and Daimler Pension Trust e.V. – executed the assignments as assignors. (*Id.*). The representatives for the church pension fund also signed on behalf of the Funds of Funds Capri, Melba, and Bali, as they established in the first paragraphs of the assignments. (Doc. No. 43-2 at 3-4). Both SGSS Germany and its affected investors properly signed the assignments.

Accordingly, I find the assignments valid and hold that SGSS Germany has standing to maintain its claims against Defendants.

**Lead Plaintiff Group**

Next, Mississippi PERS objects to SGSS Germany and Birmingham coming together as a lead plaintiff group and aggregating their losses, claiming they lacked a relationship prior to this litigation. (Doc. No. 38 at 8). The PSLRA anticipates the appointment of groups as lead plaintiffs. 15 U.S.C. § 78u-4(a)(3)(B)(i) (directing district courts to "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members). But courts have grappled with and disagreed on criteria for appointing groups as lead plaintiff, particularly when considering whether groups are required to have had a relationship prior to the litigation. *See, e.g., In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001); *In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d 803 (N.D. Ohio 1999); *Eshe Fund v. Fifth Third Bancorp*, No. 08-cv-421 (S.D. Ohio Dec. 16, 2008).

A court's goal under the PSLRA is to choose the most appropriate lead plaintiff to "represent the class" and to "drive the litigation." S. Rep. No. 104-98, at 10 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 689. To that end, the PSLRA sets forth factors designed to guide courts in choosing the plaintiff with the most incentive and ability to pursue the relief sought by the class. *See* 15 U.S.C. § 78u-4(a)(3)(B). But the PSLRA does not contain within it a requirement that groups serving as co-lead plaintiffs have had a pre-existing relationship. *In re Cendant*, 264 F.3d at 266. What it does require is that the lead plaintiff "fairly and adequately protect the interests of the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa). And to meet this requirement, no prior relationship is required. So I find that the lack of a pre-existing relationship between the members of a group seeking to be appointed lead plaintiff will not automatically preclude that group from appointment.

But the nature or lack of a pre-existing relationship is relevant in determining whether a group will fairly and adequately protect the interests of the class. In the case of SGSS Germany and Birmingham, the two entities were introduced by lawyers, possibly even by the Robbins Geller firm, which the group seeks to have approved as co-counsel. (Doc. No. 56 at 30-31). This raises a red flag, because an explicit goal of the PSLRA is to avoid "hav[ing] counsel choose the plaintiff." S. Rep. No. 104-98, at 11 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 691. My concerns are assuaged, however, by representations that after the two entities were introduced, representatives for each engaged in multiple conversations concerning their goals and how they plan to work together and move forward. (Doc. Nos. 21-4 at ¶ 5 & 56 at 31). SGSS Germany and Birmingham also stress to me that they are "committed to working together to vigorously prosecute" this action on behalf of the class. (Doc. No. 21-4 at 5). So despite having no pre-existing relationship, I find they have presented sufficient information to show they are actively working together in the best interests of the class.

**Presumptive Most Adequate Plaintiff**

The PSLRA dictates that the plaintiff with the largest financial interest in the relief sought by the class who also satisfies the requirements of Federal Rule of Civil Procedure 23 is presumptively the most adequate plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). The PSLRA gives no guidance on how to determine which plaintiff has the greatest loss. *Johnson v. Dana Corp.*, 236 F.R.D. 349, 351 (N.D. Ohio 2006). Courts have previously identified two methods for calculating loss – first in, first out ("FIFO") and last in, first out ("LIFO"). *Id.* at 351-52. "Under FIFO, a plaintiff's sales of defendant's shares during the class period are matched first against any pre-existing holdings of shares," and "[t]he net gains or losses from those transactions are excluded from damage calculations." *Id.* Under LIFO, a plaintiff's sales of the defendant's shares during the class period "are matched first against the plaintiff's most recent purchase of defendant's shares and gains or losses from those transactions are considered in damage calculations." *Id.* In this district, LIFO has been held to be the appropriate method for calculating losses at this stage. *Id.* at 353. Additionally, Mississippi PERS, SGSS Germany, and Birmingham agree LIFO is the most appropriate method. (Doc. No. 56 at 6 & 26-27). Also undisputed here are the claimed losses by each proposed lead plaintiff and that SGSS Germany and Birmingham combined have the largest LIFO losses. (Doc. Nos. 23-5 at 4, 37 at 4, & 56 at 6-7). So having already found the aggregation of losses appropriate, I now find SGSS Germany and Birmingham, together, have the greatest loss.

I next turn to the Rule 23 requirements. "Only two of the four prerequisites, typicality and adequacy, directly address the personal characteristics of class representatives." *Ohio Pub. Emps. Ret. Sys. v. Fannie Mae*, 357 F. Supp. 2d 1027, 1034 (S.D. Ohio 2005). SGSS Germany and Birmingham "need only make a prima facie showing that they meet the typicality and adequacy prerequisites." *Id.* Once they have made a prima facie showing, they will be the presumptively most adequate plaintiffs. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). This presumption "may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff . . . will not

fairly and adequately protect the interests of the class . . . [or] is subject to unique defenses that render such plaintiff incapable of adequately representing the class. *Id.* at § 78u-4(a)(3)(B)(iii)(II).

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." "A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007).

This case is based on Defendants' allegedly misleading statements to HCP's investors, causing these investors to buy common stock at inflated prices during the class period and to thus suffer damages. (Doc. No. 1 at ¶¶ 4-13 & 83). So the typicality of SGSS Germany's and Birmingham's claims rides on whether they purchased HCP common stock at inflated prices during the class period and consequently suffered damages. Both SGSS Germany and Birmingham filed lists of transactions they made of HCP common stock during the class period. (Doc. Nos. 21-2 at 4-5 & 8; 21-3 at 2-3). These lists reflect the purchase dates; quantities of shares bought; prices paid; dates the shares were sold, if applicable; proceeds; and total losses. (Doc. No. 21-3 at 2-3). Through these lists, SGSS Germany and Birmingham demonstrate they purchased HCP common stock during the class period and suffered losses based on those purchases. (*Id.*). Thus, they have made a prima facie showing of typicality.

Rule 23(a)(4) requires me to determine if SGSS Germany and Birmingham "will fairly and adequately protect the interests of the class." This requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). The lead plaintiff must be a member of the purported class "and possess the same interest and suffer the same injury as the class members." *Id.* at 625-26 (internal quotation marks and citation omitted); *Beattie*, 511 F.3d at 562. The lead plaintiff's interests may not be antagonistic to those of other class members. *Beattie*, 511 F.3d at 562-63. I must also assess the

adequacy of the potential lead plaintiff's choice of counsel to determine if counsel is "qualified, experienced and generally able to conduct the litigation." *Id.*

SGSS Germany and Birmingham are institutional investors, both of which have suffered large losses due to Defendants' alleged conduct. (*See* Doc. No. 21-3 at 2-3). They therefore have considerable motivation to litigate this action on behalf of the purported class. As for their choice of counsel, SGSS Germany and Birmingham have chosen the firms Robbins Geller Rudman & Dowd LLP and Motley Rice LLC. (Doc. No. 21-4 at ¶ 6). There is no question both firms are experienced and able to handle this type of litigation. (Doc. Nos. 21-5 & 21-7). So I find SGSS Germany and Birmingham have made a prima facie showing of adequacy and therefore find they are the presumptively most adequate co-plaintiffs.

In rebuttal, Mississippi PERS claims SGSS Germany and Birmingham are atypical and inadequate due to SGSS Germany's lack of standing, as well as its complex structure. (Doc. Nos. 38 at 13-17 & 43 at 10-13). I have already found SGSS Germany to have standing, but as Mississippi PERS points out, the matter can be raised again by Defendants at a later stage. (Doc. No. 43 at 11). Mississippi PERS cautions me that appointing SGSS Germany as co-lead plaintiff will burden the class with "a needless litigation sideshow." (Doc. Nos. 38 at 15 & 43 at 11). So Mississippi PERS asks that I avoid future trouble by denying lead plaintiff status to SGSS Germany. (Doc. No. 43 at 11-12).

I do not share these concerns. I do not find SGSS Germany's structure that complex. And though Defendants may raise the standing issue later, I do not find that matter so complex or involved as to derail this litigation. I have, in this opinion, already addressed the matter of standing, so the groundwork is laid for addressing any future challenge. And I am neither the first judge, nor will I be the last, to analyze German law.

Mississippi PERS further claims SGSS Germany and Birmingham are inadequate and atypical, because they have retained conflicted counsel. (Doc. No. 38 at 17). Mississippi PERS

claims, and SGSS Germany and Birmingham do not deny, that Motley Rice, Robbins Geller, and Sturman LLC[1] are currently litigating claims against SGSS Germany's ultimate parent and sister subsidiary in at least three different cases.[2]  (Doc. Nos. 38 at 18 & 42-8 at ¶¶ 10-12).  But SGSS Germany and Birmingham are only seeking to have Motley Rice and Robbins Geller approved as counsel (Doc. No. 20-1 at 6), so these are the only firms I will analyze for conflicts.  This challenge is also relevant to my decision whether to approve SGSS Germany and Birmingham's choice of counsel, so I will address both issues together.  *See* 15 U.S.C. § 78u-4(a)(3)(B)(v) (providing that the most adequate plaintiff "shall, subject to the approval of the court, select and retain counsel to represent the class").   SGSS Germany is the wholly-owned subsidiary of Société Générale Securities Services Holding SA.  (Doc. No. 42-8 at ¶ 2).  Société Générale Securities Services Holding SA is in turn a wholly-owned subsidiary of Société Générale SA.  (*Id.* at ¶ 4).  This makes Société Générale SA the ultimate parent of SGSS Germany.  Société Générale SA also wholly owns SG Americas Securities Holdings, LLC.  (*Id.*).  SG Americas Securities Holdings, LLC wholly owns SG Americas Securities, LLC.  (*Id.* at ¶ 3).  Like SGSS Germany, SG Americas Securities, LLC's ultimate parent organization is Société Générale SA.  The organizations maintain separate directors, legal departments, finance operations, and trading operations.  (*Id.* at ¶¶ 5-7).  But SGSS Germany and its ultimate parent Société Générale SA share several employees, mostly information technology staff.  (*Id.* at ¶ 6).  Most notably, Société Générale SA employs SGSS Germany's Chief Executive Officer.  (*Id.*).

---

[1] Deborah M. Sturman of Sturman LLC "represented and counseled" SGSS Germany in filing its motion to be appointed as co-lead plaintiff.  (Doc. No. 21-2 at ¶ 9).

[2] Mississippi PERS originally claimed Robbins Geller is involved in a fourth case that presents a conflict, *Iron Workers Mid-South Pension Fund v. TerraForm Global, Inc.*, No. 16-cv-2270 (N.D. Cal.).  But SGSS Germany and Birmingham's ethics expert Deborah A. Coleman found Robbins Geller was not listed as counsel on the docket for that case; instead, the firm Robbins Arroyo LLP was.  (Doc. N0. 42-7 at ¶ 8(c).  Relying on Coleman's assertion, I will not consider the *Iron Workers* case in this analysis.

Robbins Geller is currently representing plaintiffs in actions in which Société Générale SA and SG Americas Securities, LLC are defendants. (Doc. Nos. 38 at 18 & 42-8 at ¶¶ 10-11); *see Glenview Capital Partners, L.P. v. SunEdison, Inc.*, No. 16-cv-2264-JCS (N.D. Cal.); *Okla. Firefighters Pension & Ret. Sys. v. SunEdison, Inc.*, No. 16-cv-2267 (N.D. Cal.). Motley Rice is representing plaintiffs in an action against Société Générale SA. (Doc. Nos. 38 at 18 & 42-8 at ¶ 12); *see In re Libor-Based Fin. Instruments Antitrust Litig.*, No. 11-cv-2613-NRB (S.D.N.Y.).

Mississippi PERS claims these instances of concurrent representation create a conflict of interest under Ohio Rule of Professional Conduct 1.7, such that I should question the adequacy of SGSS Germany and Birmingham for having retained these firms. (Doc. No. 38 at 17). SGSS Germany and Birmingham believe there is no such conflict. (Doc. Nos. 42-8 at ¶ 13 & 56 at 76). In support, they submitted Coleman's declaration, in which she concludes that Mississippi PERS "does not describe any risk—let alone a substantial risk—that" either Robbins Geller or Motley Rice will be materially limited in their abilities to represent the purported class. (Doc. No. 42-7 at ¶ 19).

Under Rule 1.7(a)(1) of the Ohio Rules of Professional Conduct, an attorney creates a conflict of interest when she accepts or continues representation of a client that "will be directly adverse to another" of the attorney's current clients. An attorney may also create a conflict if in her representation of a client "there is a *substantial* risk that the lawyer's ability to consider, recommend, or carry out an appropriate course of action for that client will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by the lawyer's own personal interests." Ohio Rules of Prof'l Conduct R. 1.7(a)(2) (emphasis in original).

Here, this is not a Rule 1.7(a)(1) conflict. This rule speaks to the situation where there is "concurrent representation of clients whose interests are directly adverse." Ohio Rules of Prof'l Conduct 1.7 cmt. 10. No evidence has been submitted showing that the plaintiffs whom Motley Rice and Robbins Geller represent have interests directly adverse to SGSS Germany and Birmingham or vice versa.

Instead, the plaintiffs whom Motley Rice and Robbins Geller represent have interests directly adverse to SGSS Germany's ultimate parent organization Société Générale SA and sister organization SG Americas Securities, LLC. And the concern is that Motley Rice and Robbins Geller will not be able to adequately represent the class, because they represent parties adverse to, in particular, the company that wholly owns SGSS Germany. (Doc. No. 38 at 18-19). This situation falls under Rule 1.7(a)(2), which asks if there is a substantial risk that Motley Rice and Robbins Geller will consequently be materially limited in their representation of SGSS Germany, Birmingham, and the class.

Mississippi PERS does not point to any specific reason why these firms' concurrent representations will materially limit their abilities in this case. It instead refers generally to the purported class' right to absolute loyalty. (Doc. No. 38 at 19). It points to cases like *Cliffs Sales*, *Cincinnati Bell*, *GSI Commerce Solutions*, and *Honeywell*, but these cases are either readily distinguishable from this case or support a finding that Motley Rice and Robbins Geller are not engaged in conflicting representation. *See Cliffs Sales Co. v. Am. S.S. Co.*, No. 1:07-cv-485, 2007 WL 2907323 (N.D. Ohio Oct. 4, 2007); *Cincinnati Bell v. Anixter Bros., Inc.*, No. C1-93-0871, 1994 WL 1877173 (S.D. Ohio June 27, 1994); *GSI Commerce Solutions, Inc. v. BabyCenter, L.L.C.*, 618 F.3d 204 (2d Cir. 2010); *Honeywell Int'l Inc. v. Philips Lumileds Lighting Co.*, No. 2:07-cv-463-CE, 2009 WL 256831 (E.D. Tex. Jan. 6, 2009).

The courts in *Cliffs Sales* and *Cincinnati Bell* found the concurrent representations in those cases created conflicts of interest. *Cliffs Sales*, 2007 WL 2907323 at * 4; *Cincinnati Bell*, 1994 WL 1877173 at * 4. In *Cincinnati Bell*, the conflicted firm represented the plaintiff in that case, but it also represented the defendant company's sister subsidiary in another action. 1994 WL 1877173 at * 2. The court ultimately found that the firm's "zealous representation of [the plaintiff] could potentially do harm to" the defendant and its sister subsidiary. *Id.* at * 3. And in *Cliffs Sales*, conflicted counsel simultaneously represented the defendant in that case and the plaintiff's parent corporation in

another case. 2007 WL 2907323 at * 1. Even so, the court in that case found that "rule 1.7 does not require a finding of a *per se* conflict of interest when a law firm accepts representation of a corporate client against the subsidiary of a current corporate client." *Id.* at * 4. Instead, the court found the plaintiff and its parent corporation were so close that the outcome of the case would materially affect the parent corporation, thus creating a conflict of interest. *Id.* And the courts in *Honeywell* and *GSI Commerce Solutions* analyzed the operations of the affiliated companies to determine how closely related they were as a means of determining whether a conflict existed. *Honeywell*, 2009 WL 256831 at * 2-3; *GSI Commerce Solutions*, 618 F.3d at 210-12.

Here, unlike in *Cliffs Sales* and *Cincinnati Bell*, Motley Rice and Robbins Geller do not represent clients related to both plaintiffs and defendants in this same action. The firms represent clients that are adverse to the ultimate parent and sister companies of only SGSS Germany, and those cases are entirely unrelated to this case.

Further, if I were to apply the analysis used in *Honeywell* and *GSI Commerce Solutions*, I would find no conflict exists in light of the separation between SGSS Germany, Société Générale SA, and SG Americas Securities, LLC. The companies do not share directors. (Doc. No. 42-8 at ¶ 5). SGSS Germany and SG Americas Securities, LLC share no executive officers. (*Id.* at ¶ 6). SGSS Germany's CEO is also employed by Société Générale SA (*Id.*), which weighs in favor of finding conflict. But this is mitigated by the complete separation of the companies' legal departments, finance operations, and proprietary trading operations. (*Id.* at ¶¶ 6-8). And neither Société Générale SA nor SG Americas Securities, LLC stand to materially lose or gain anything in this action. (*Id.* at ¶ 7). So without evidence to the contrary, I cannot find there is a substantial risk Motley Rice and Robbins Geller will be materially limited in their representation of the class in this action. *See* Ohio Rules of Prof'l Conduct 1.7(a)(2). Having found no conflict, I find the lead plaintiffs' choice of counsel does not negate their prima facie showing of typicality and adequacy. They remain the most adequate lead plaintiffs.

The inquiry does not, however, end there. I must still decide whether to approve SGSS Germany and Birmingham's choice of counsel. I found no conflict of interest when analyzing the lead plaintiffs' typicality and adequacy, but my role in approving their choice of counsel is "to protect the interests of the plaintiff class." S. Rep. No. 104-98, at 11-12. This casts the net a bit wider than the rules of professional conduct.

One purpose of enacting the PSLRA was to put plaintiffs back in the driver's seat when it comes to litigating class action securities cases. S. Rep. No. 104-98, at 10. The PSLRA "is intended to empower investors so that they, not their lawyers, control securities litigation." S. Rep. No. 104-98, at 6. And so the Committee on Banking, Housing and Urban Affairs included "several provisions to transfer primary control of private securities litigation from lawyers to investors." *Id.* So the question is not just whether chosen counsel is experienced and capable. The question is also whether the representation of parties adverse to Société Générale SA and SG Americas Securities, LLC by Motley Rice and Robbins Geller changes the balance of power in the relationship between these firms and the lead plaintiffs. Will the involvement of these firms in the cases pending against SGSS Germany's ultimate parent and sister subsidiary influence the lead plaintiffs' decisionmaking on behalf of the class? Based on the evidence before me, I think it unlikely.

To begin, SGSS Germany is a co-lead plaintiff, so it will not be the only decisionmaker. And there is no evidence before me suggesting Birmingham has a relationship with SGSS Germany's affiliates. Further, SGSS Germany and Birmingham have both served or are serving as lead plaintiffs in other securities class actions. (Doc. Nos. 68-1 and 41 at 10). They have represented to me that they "fully appreciate and understand the Lead Plaintiff's role under the PSLRA" and are prepared to execute their responsibilities accordingly. (Doc. Nos. 21-4 at ¶ 6 & 42-8 at ¶ 7). SGSS Germany has also declared that its independent legal department will be the internal corporate division overseeing the litigation and making decisions on its behalf. (Doc. No. 42-8). Neither Société Générale SA nor SG Americas Securities, LLC will be involved in this case. (*Id.*). Thus, I

am assured that SGSS Germany and Birmingham fully understand their obligations to actively represent the class and that they are prepared to vigorously pursue recovery on behalf of all the class members.

Having already found Robbins Geller and Motley Rice experienced and capable, I now approve them as the lead plaintiffs' choice of counsel.

## CONCLUSION

Accordingly, Belle's and Mississippi PERS' motions for appointment as lead plaintiff and approval of counsel are denied. (Doc. Nos. 19 & 23). The motion of SGSS Germany and Birmingham for appointment as co-lead plaintiffs and approval of counsel is granted. (Doc. No. 20).

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge