UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

WESTERN DIVISION

| | |
|---|---|
| BOYNTON BEACH FIREFIGHTERS' PENSION FUND, on Behalf of Itself and All Others Similarly Situated, | No. 3:16-cv-01106-JJH |
| | Judge Jeffrey J. Helmick |
| Plaintiff, | CLASS ACTION |
| vs. | |
| HCP, INC., LAURALEE E. MARTIN, TIMOTHY SCHOEN, DARREN A. KOWALSKE, HCR MANORCARE, INC., PAUL ORMOND and STEVEN M. CAVANAUGH, | |
| Defendants. | DEMAND FOR JURY TRIAL |

**CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ....................1

II. JURISDICTION AND VENUE ....................6

III. THE PARTIES ....................7

IV. FACTUAL BACKGROUND ....................10

A. ManorCare's Early Years: A Homegrown Toledo Success Story ....................10

B. ManorCare Is Acquired by The Carlyle Group ....................12

C. ManorCare Defrauds the Medicare System by Seeking Reimbursements for Unreasonable, Unnecessary, and/or Unskilled Therapeutic Services ....................13

1. Rehabilitation Therapy Must Be Reasonable and Necessary Under Medicare Part A's Skilled Nursing Facility Benefit Criteria ....................14

2. ManorCare's Corporate Leadership Pressured Therapists to Provide Unnecessary Services to Increase Profits ....................16

a. Use of "Medicare Power Ratings" to Encourage Overbilling of Medicare Patients ....................17

b. Medicare Entitlement Training ....................19

c. Goals for Ultra High RUGs ....................20

d. Group Therapy ....................21

e. Use of Modalities to Inflate Minutes ....................23

f. Improperly Maximizing Patients' Length of Stay ....................24

g. Action Plans ....................26

h. Employee Performance Evaluations ....................27

i. Operations Staff's Involvement in Therapy Decisions ....................27

j. Failure to Prevent Unnecessary, Unreasonable, and/or Unskilled Therapy ....................28

3. As a Result of These Pressure Tactics, ManorCare Therapists Were Forced to Provide Thousands of Hours of Unnecessary, Unreasonable, and/or Unskilled Therapy ....................31

a. Corporate Pressure Forced Therapists to Provide Unnecessary, Unreasonable, and/or Unskilled Therapy Throughout ManorCare's Regional Divisions ....................31

**Page**


b. Corporate Pressure Led to Dramatically Increased Levels of Improper Ultra High Billing at ManorCare's Regional SNFs....36

c. ManorCare's Provision of Unnecessary, Unreasonable, and/or Unskilled Therapy Did Not Improve Therapeutic Outcomes....37

D. Former Employees Blow the Whistle on ManorCare's Fraudulent Billing Practices, Sparking DOJ Investigation....38

E. ManorCare Sells All of Its Real Estate Assets and 10% of Its Equity to HCP – and Takes on More Debt....39

F. No Longer Able to Depend on the Revenue from Its Fraudulent Billing Practices, ManorCare Becomes Financially Unviable....41

G. The DOJ Intervenes in the Whistleblower Actions....46

V. DEFENDANTS' MATERIAL MISREPRESENTATIONS DURING THE CLASS PERIOD....47

A. Defendants' False and Misleading Statements....47

1. Defendants' March 30, 2015 False and Misleading Statements....49

2. Defendants' April 21, 2015 False and Misleading Statements....51

3. Defendants' May 5, 2015 False and Misleading Statements....54

4. Defendants' May 11, 2015 False and Misleading Statements....57

5. Defendants' August 4, 2015 False and Misleading Statements....60

6. Defendants' September 17, 2015 False and Misleading Statements....62

7. Defendants' November 3, 2015 False and Misleading Statements....63

8. The Truth Revealed....66

B. SOX Certifications Executed Throughout the Class Period....69

C. Defendants' Accounting Violations....72

1. Defendants HCP, Martin, and Schoen Violated GAAP by Materially Misstating the Value of HCP's ManorCare Investments....74

2. In Violation of GAAP and SEC Rules, Defendants HCP, Martin, and Schoen Overstated HCP's GAAP EPS and Non-GAAP FFO....75

**Page**


3. HCP's Financial Statements Violated FASB ASC 323 (Investments – Equity Method and Joint Ventures), ASC 310 (Receivables), ASC 450 (Contingencies), ASC 820 (Fair Value Measurements), and SEC Rules....82

a. GAAP Applicable to HCP's Equity Ownership Investment....83

b. GAAP Applicable to HCP's DFL Investment....84

c. Defendants HCP, Martin, and Schoen Failed to Comply with GAAP and SEC Rules....85

VI. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER....91

A. HCP's In-Depth Due Diligence in Connection with Its 2011 Acquisition of ManorCare's Real Estate Assets Supports an Inference of Scienter....92

B. The Individual Defendants Were Directly Involved in and Aware of Matters Directly Related to the Alleged Misleading Information, Which Concerned the Most Critical and Highly Scrutinized Aspects of Both HCP and ManorCare's Businesses....94

C. Defendants Martin and Schoen's SOX Certifications Are Probative of Scienter....98

D. HCP and ManorCare Are Legally Responsible for the Conduct of the HCP Executive Defendants and ManorCare Executive Defendants....100

E. Defendants Were Motivated to Conceal ManorCare's Fraudulent Billing Practices and the True State of ManorCare's Financial Outlook in Order to Sell $1.4 Billion of New Securities Through HCP's 2015 Offerings....101

F. The Departure of Multiple Key Executives Supports a Strong Inference of Scienter....102

G. The Underlying Merits of the DOJ Action Support an Inference of Scienter....103

VII. LOSS CAUSATION....103

VIII. RELEVANT POST-CLASS PERIOD DEVELOPMENTS FROM THE DOJ ACTION....107

IX. THE PRESUMPTION OF RELIANCE....109

X. CLASS ACTION ALLEGATIONS....110

COUNT I....112

COUNT II....114

**Page**

PRAYER FOR RELIEF ........................................................................................................116

JURY DEMAND ...............................................................................................................116

Lead Plaintiffs Société Générale Securities Services GmbH ("Société Générale") and the City of Birmingham Retirement and Relief System ("Birmingham") (collectively, Société Générale and Birmingham are referred to herein as "Lead Plaintiffs"), individually and on behalf of all others similarly situated, allege the following based upon the investigation of their counsel, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge.[1] Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. This is a securities fraud class action brought on behalf of all persons and entities who purchased or otherwise acquired the common stock of HCP, Inc. ("HCP" or the "Company") between March 30, 2015 and February 8, 2016, inclusive (the "Class Period").

2. HCP is a real estate investment trust ("REIT") that invests primarily in real estate serving the healthcare industry in the United States. The claims in this action are asserted against HCP, its former tenant HCR ManorCare, Inc. ("ManorCare") and several current and former executives of HCP and ManorCare (collectively, "Defendants"). The claims in this action arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

3. Throughout the Class Period, HCP was heavily dependent upon revenue derived from two substantial investments the Company had made in ManorCare prior to the Class Period. Specifically, on April 7, 2011, HCP paid $6 billion to acquire substantially all of ManorCare's brick-

[1] Lead Plaintiffs' investigation included, but was not limited to, review and analysis of: (i) public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) reports issued by securities and financial analysts; (iii) transcripts of HCP conference calls and industry conferences; (iv) publicly available presentations; (v) releases and media reports; (vi) HCP securities pricing data; (vii) documents and information from the public records in other civil litigation; (viii) consultations with relevant experts, industry consultants, and counsel in related civil litigation; (ix) interviews of persons with knowledge relevant to the claims herein; and (x) other publicly available material and data.

and-mortar real estate assets (334 skilled nursing and/or assisted living facilities), which HCP then immediately leased back to ManorCare through a direct finance lease agreement (the "DFL Investment"). At the same time, HCP also paid $95 million to acquire a 9.9% equity ownership interest in ManorCare (the "Equity Ownership Investment").[2] Following the transactions, ManorCare's operations represented HCP's largest and most important revenue source, accounting for approximately 30% of HCP's total revenue, while no other source accounted for more than 8%. As a result, ManorCare's financial performance and prospects were critically important to HCP and its investors.

4. At the time HCP made the ManorCare Investments in 2011, ManorCare's operations were heavily dependent upon revenue generated by unlawful and unsustainable billing practices. Specifically, for at least five years prior to HCP making the ManorCare Investments, ManorCare had inflated its profits by using a variety of tactics to pressure its employees to improperly overbill the federal government for Medicare reimbursements related to services that were ineligible for reimbursement under the Medicare program because such services were unnecessary, unreasonable, and/or unskilled. The specific mechanisms ManorCare used to carry out its fraudulent billing scheme included:

- A proprietary "Medicare Power Ratings" accounting system designed to "***maximize revenue***" derived from Medicare reimbursements by pressuring therapists to bill ManorCare's patients at the highest levels of therapy ***without regard*** for the patients' actual medical needs or the reasonableness of the treatment provided;

- Pressuring ManorCare's therapists to "***group the crap out of every Medicare [Part] A***" by requiring the therapists to deliver 25% of their therapy in non-individualized group therapy sessions – thereby billing up to four hours of therapy for a single hour of generic group therapy – and improperly inflating ManorCare's Medicare reimbursement revenue as a result;

[2] The Equity Ownership Investment and the DFL Investment are collectively referred to herein as the "ManorCare Investments."

- Designing and implementing a corporate directive known as "Project Reset," which pressured ManorCare's therapists to maximize patients' length of stay – ***without regard for patients' actual clinical needs*** – in order to drive Medicare revenue; and

- Placing ManorCare employees on "Action Plans" and strict "performance evaluations," which were expressly designed to exert pressure on therapists to increase their Medicare billing rates and incorporated severe consequences "***up to and including termination***" for non-compliance.

5. ManorCare's fraudulent billing scheme dramatically increased the revenue it was able to generate from Medicare reimbursements. Indeed, through its unlawful practices, ManorCare was able to drive the number of days it billed at Medicare's "Ultra High" level (the highest, and therefore most profitable, level of therapy under the Medicare system) ***from 38.8% in October 2006 to 81.3% by February 2010 – an increase of more than 100%***. This meteoric rise in ManorCare's Ultra High billing rates was ***not*** reflective of any material change in ManorCare's patient population, which remained generally consistent during the same period; ***nor*** was it driven by a desire to improve the outcomes of ManorCare's patients, which also remained generally the same during that time. Instead, ManorCare's unlawful overbilling of the federal government for Medicare reimbursements was intended to, and did, achieve only one purpose: to significantly and fraudulently increase ManorCare's reported profits.

6. Between 2009 and 2011, three former ManorCare therapists filed under seal separate *qui tam* complaints on behalf of the United States asserting False Claims Act ("FCA") claims against ManorCare and several related entities relating to the fraudulent billing practices described above.[3] As a result, the United States Department of Justice ("DOJ") undertook an extensive investigation of ManorCare's billing practices, which sprawled several years, involved more than 260 civil investigative interviews and culminated with the DOJ's decision to intervene and formally take

[3] The three separate actions were captioned: *United States ex rel. Ribik v. HCR ManorCare, Inc.*, No. 01:09-cv-00013 (E.D. Va.) ("Ribik Action" or "DOJ Action"); *United States ex rel. Slough v. HCR ManorCare*, No. 1:14-cv-01228 (E.D. Va.) (the "Slough Action"); and *United States ex rel. Carson v. HCR Manor Care, Inc.*, No. 1:11-cv-01054 (E.D. Va.) (the "Carson Action") (collectively, the "Whistleblower Actions").

control of the Whistleblower Actions in December 2014, a decision that was not made public until April 2015.

7. When HCP made the ManorCare Investments in 2011, it conducted thorough due diligence of ManorCare's operations. As a result, ManorCare's fraudulent billing practices, which had driven improper and unsustainable growth of ManorCare's profits for the majority of the prior decade, were readily available to HCP in connection with its due diligence, and continued after HCP made the ManorCare Investments.

8. ManorCare's ability to rely on the revenue generated from its fraudulent billing scheme, however, soon came to an end. On January 2, 2013, the DOJ served a Civil Investigative Demand ("CID") on ManorCare's corporate headquarters, which confirmed that the DOJ was investigating the company's fraudulent Medicare billing practices. As a result, the implication to ManorCare and HCP was obvious: ManorCare would have to curtail its fraudulent billing practices, which had driven its performance prior to 2013. Importantly to Defendants, this eliminated a significant and highly profitable source of revenue that ManorCare had heavily relied upon for years. Without the fraudulently generated revenue from its improper Medicare billing practices, ManorCare struggled mightily. By the start of 2015, ManorCare was no longer financially viable, and even though Defendants continued to represent to investors that everything was fine, the value of the ManorCare Investments was significantly impaired.

9. The Class Period begins on March 30, 2015, when HCP filed with the SEC a Form 8-K announcing that the Company had amended its lease with ManorCare to ensure that ManorCare would be able to meet its lease obligations to HCP. Among other things, HCP stated that the amended lease "***position[ed] [ManorCare] for growth***." It did not. The truth, which Defendants concealed, was that, without the revenue from the improper Medicare billing practices ManorCare

had previously relied upon, ManorCare was experiencing rapidly deteriorating prospects and was no longer financially viable. As a result, the ManorCare Investments were significantly impaired.

10. Less than two weeks later, on April 10, 2015, the complaint in the DOJ Action was filed under seal. On April 20, 2015, the DOJ's allegations regarding ManorCare's fraudulent billing practices were made public. The following day, on April 21, 2015, ManorCare posted a message on its website, which asserted, among other things, that the DOJ Action was "***unjust***" and that "[w]hen we have identified billing issues through our controls and compliance activities, ***we have taken appropriate action***." Contrary to those assertions, however, the true facts were that, for the majority of the prior decade, ManorCare had knowingly engaged in a deliberate and pervasive billing fraud scheme.

11. Throughout the Class Period, Defendants made numerous other false and misleading statements regarding ManorCare's financial viability, the value of the ManorCare Investments, and the underlying merits of the DOJ Action, all of which concealed the truth regarding the facts described above. Among other things, Defendants used the overstated value of the ManorCare Investments to mislead investors by overstating HCP's earnings per share ("EPS") and funds from operations ("FFO") – two critical measures of HCPs' financial performance – ***by as much as 700%***. In addition, Defendants used their material false and misleading statements to sell ***more than $1.4 billion*** of newly issued securities to unsuspecting investors, while also causing HCP common stock to trade at artificially inflated prices throughout the Class Period.

12. Defendants' misconduct was revealed through a series of disclosures that occurred over the course of the ten-month Class Period, culminating on February 9, 2016, with HCP's disclosure in its 2015 Form 10-K that the Company had written down the Equity Ownership Investment to ***zero***, and taken an ***$817 million non-cash impairment*** on the DFL Investment. In total, HCP was compelled to write down the value of its ManorCare Investments by ***over $1.3 billion***

over a ten-month period. At the same time, HCP put its entire ManorCare real estate portfolio on "Watch List" status, and finally disclosed that "the timing and amounts owed under the [DFL Investment] are no longer reasonably assured" – a fact that Defendants knew or recklessly disregarded throughout the Class Period. As a result of the last of these disclosures, HCP's stock price plummeted ***nearly 20%*** from a closing price of $33.99 per share on February 8, 2016 to a closing price of $27.21 on February 10, 2016, causing substantial harm to Lead Plaintiffs and the members of the Class.

## II. JURISDICTION AND VENUE

13. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated under the Exchange Act.

14. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and §27 of the Exchange Act, 15 U.S.C. §78aa.

15. Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b) and (c). ManorCare maintains its headquarters in this District and many of the acts and conduct that constitute violations of the law complained of herein, including the preparation and dissemination of materially false and misleading information, occurred in and/or were issued in substantial part in this District.

16. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges.

## III. THE PARTIES

17. Lead Plaintiff Société Générale is an institutional investor based in Unterföhring, Germany, that oversees approximately $4.3 billion in assets on behalf of thousands of beneficiaries. As set forth in the Certification previously submitted to the Court (ECF No. 21-2), SGSS Funds Aktien Nordamerika 2, PT-MASTER, and REIT Nordamerika 1 purchased HCP common stock at artificially inflated prices during the Class Period and suffered damages as a result of the wrongdoing alleged herein.

18. Lead Plaintiff Birmingham is a public pension fund that was organized for the benefit of current and retired public employees of the City of Birmingham, Alabama. The Fund oversees pension assets valued at approximately $1 billion on behalf of over 7,000 participants. As set forth in the Certification previously submitted to the Court (ECF No. 21-2), City of Birmingham purchased HCP common stock at artificially inflated prices during the Class Period and suffered damages as a result of the wrongdoing alleged herein.

19. Defendant HCP, Inc. is a REIT incorporated in Maryland. The Company maintains its principal offices in Irvine, California, and its common stock trades on the New York Stock Exchange ("NYSE"), which is an efficient market, under the ticker symbol "HCP." As of January 29, 2016, there were more than 465 million shares of HCP common stock outstanding. HCP has operated as a REIT for every year beginning with the year ended December 31, 2015. As a REIT, at least 95% of the Company's gross income in any year must be derived from qualifying sources and it must make distributions to its stockholders aggregating annually at least 90% of its REIT taxable income, excluding net capital gains. HCP invests primarily in real estate serving the healthcare industry in the United States. Its portfolio is comprised of investments in the following segments: (i) senior housing; (ii) post-acute/skilled nursing; (iii) life science; (iv) medical office; and (v)

hospital. The post-acute/skilled nursing segment accounted for approximately 24% of HCP's total revenues for the year ended December 31, 2015.

20. Defendant Lauralee E. Martin ("Martin") was, at all relevant times during the Class Period, HCP's Chief Executive Officer ("CEO") and President. On July 11, 2016, HCP announced that Defendant Martin had left the Company and its Board of Directors and was being replaced by an interim President and CEO.

21. Defendant Timothy Schoen ("Schoen") was, at all relevant times during the Class Period, HCP's Executive Vice President ("EVP") and Chief Financial Officer ("CFO"). In this role, Defendant Schoen reported directly to the CEO, Defendant Martin. On March 28, 2016, HCP announced that Defendant Schoen would resign, effective May 22, 2016.

22. Defendant Darren A. Kowalske ("Kowalske") served as the Senior Vice President ("SVP") of Hospital and Post-Acute at HCP from February 2014 until January 2016, when he was promoted to EVP of Asset Management, Senior Housing and Care. He served as the EVP through the end of the Class Period. In these roles, Defendant Kowalske reported to the CEO, Defendant Martin. Following HCP's spin-off of its ManorCare portfolio of skilled nursing facilities ("SNFs") and assisted living assets into Quality Care Properties, Inc. ("QCP") in late 2016, *see infra*, Defendant Kowalske served as an EVP for QCP from January 2017 through June 2017, at which time his employment with QCP ended.

23. Defendants Martin, Schoen, and Kowalske are collectively referred to herein as the "HCP Executive Defendants." HCP and the HCP Executive Defendants are collectively referred to herein as the "HCP Defendants."

24. Defendant HCR ManorCare, Inc. is a Delaware corporation with its principal place of business in Toledo, Ohio. ManorCare is a healthcare services provider that owns and operates SNFs and rehabilitation centers, assisted living facilities, memory care facilities, hospice and home care

agencies, and outpatient rehabilitation clinics. It relies heavily on government reimbursement programs such as Medicare and Medicaid, with revenues from those two programs totaling $2.8 billion in 2015. From January 1, 2006 through April 7, 2011, ManorCare, through its subsidiaries, owned, operated, and managed approximately 281 SNFs in 30 states, over a dozen of which were located in Ohio. On April 7, 2011, ManorCare sold substantially all of its real estate assets to HCP. Following the sale of the properties to HCP, ManorCare, through its subsidiaries, continued to manage almost all of the SNFs. As of December 31, 2015, ManorCare accounted for 80% of HCP's post-acute/skilled nursing revenues.

25. Defendant Paul A. Ormond ("Ormond") was, at all relevant times during the Class Period, the CEO, Chairman of the Board, and President of ManorCare. On September 25, 2017, ManorCare announced that Defendant Ormond had resigned from his role as CEO, Chairman of the Board, and President. Defendant Ormond resides in Ottawa Hills, Ohio.

26. Defendant Steven M. Cavanaugh ("Cavanaugh") was, at all relevant times during the Class Period, the CFO and Vice President of ManorCare. In this role, Defendant Cavanaugh reported directly to ManorCare's CEO, Defendant Ormond. On September 25, 2017, ManorCare announced that Defendant Cavanaugh had been appointed President and CEO. Defendant Cavanaugh resides in Holland, Ohio.

27. Defendants Ormond and Cavanaugh are collectively referred to herein as the "ManorCare Executive Defendants." ManorCare and the ManorCare Executive Defendants are collectively referred to herein as the "ManorCare Defendants." The HCP Executive Defendants and the ManorCare Executive Defendants are collectively referred to herein as the "Individual Defendants."

## IV. FACTUAL BACKGROUND

### A. ManorCare's Early Years: A Homegrown Toledo Success Story

28. Toledo, Ohio-based Owens-Illinois, Inc. ("O-I") entered the healthcare field in 1929, but the company's first foray into nursing home ownership and management began in 1982 with its investment in Health Group Inc., a Nashville, Tennessee hospital management group.

29. After a string of successful acquisitions in the skilled nursing sector, O-I had become a major skilled nursing provider with 135 facilities and more than 17,500 beds. In 1991, O-I created Health Care and Retirement Corporation ("HCR") to purchase O-I's successful healthcare business. That same year, the company went public on the NYSE under the ticker symbol "HCR."

30. Manor Care, Inc. was founded in 1959, when Stewart W. Bainum, Sr. opened the company's first nursing home in Wheaton, Maryland. By 1969, the company had gone public and continued to grow into one of the largest providers of long-term care and services in the United States. By 1994, Manor Care was the third largest nursing home operator in the United States, with facilities in 28 states.

31. HCR acquired Manor Care, Inc. in 1998, adding to its portfolio 171 skilled nursing centers, 42 assisted living facilities, and an acute care hospital. As a result of this acquisition, the company, which was renamed HCR Manor Care, Inc., became the largest skilled nursing provider in the industry, with annual revenues exceeding $2 billion, while continuing to maintain its headquarters in Toledo.

32. Over the next decade, the company began divesting nursing centers that no longer fit the company's strategic direction, and instead concentrated more strongly on skilled nursing and dementia-assisted living facilities. ManorCare also began to sell its non-core businesses, including the company's vision business, medical transcription business, and urgent care centers.

33. In 2003, ManorCare reported annual revenues of $3 billion. ManorCare became a leading provider of short-term, post-hospital services and long-term care, and continued to grow and focus on opening and/or acquiring skilled nursing centers and assisted living facilities throughout the country.

34. At all times relevant to this action, ManorCare obtained its revenue primarily from reimbursements paid by private insurers and government programs, such as Medicare and Medicaid, for the provision of purportedly eligible therapeutic services. For example, in the final Form 10-K that ManorCare filed as a public company (for the period ending December 31, 2006), it stated that "[o]ur revenues are derived from private and governmental third-party payors" and that "[i]n 2006, 39 percent of our long-term care and rehabilitation revenues were derived from Medicare, 28 percent from Medicaid and 33 percent from commercial insurers, managed care plans, workers' compensation payors and other private pay revenue sources."

35. In ManorCare's Form 10-K for the period ended December 31, 2006, it explicitly acknowledged the importance of Medicare and Medicaid revenues:

> [T]he reimbursement process may affect our financial condition and results of operations. In fact, we are subject to periodic audits by the Medicare and Medicaid programs, and the paying agencies for these programs have various rights and remedies against us if they assert that we have overcharged the programs or failed to comply with program requirements. These payment and government agencies can reopen previously filed and reviewed cost reports and require us to repay any overcharges, as well as make deductions from future amounts due to us.

36. On July 3, 2007, *The Wall Street Journal* noted that ManorCare was a desirable takeover target for The Carlyle Group because it owns most of its real estate and because "about 73% of its revenue comes from higher-paying Medicare and private-pay residents, compared with as little as 53% at some competitors."

37. As of year-end 2015, ManorCare operated approximately 240 SNFs, 55 assisted living facilities, 109 hospice and home health offices, and 92 outpatient therapy clinics, located in 28

states, primarily in Florida, Illinois, Michigan, Ohio, and Pennsylvania. ManorCare's SNFs purport to provide patients skilled rehabilitation services that are both medically necessary and reasonable. In exchange for ManorCare's provision of such services to qualifying Medicare patients, Medicare reimburses ManorCare at a daily rate that is dependent upon the specific services provided, as further detailed *infra*.

38. According to its corporate website:

> ManorCare is a leading provider of short-term, post-hospital services and long-term care with a network of more than 500 skilled nursing and rehabilitation centers, memory care communities, assisted living facilities, outpatient rehabilitation clinics, and hospice and home health care agencies. These locations operate primarily under the respected names of Heartland, ManorCare Health Services and Arden Courts.

**B. ManorCare Is Acquired by The Carlyle Group**

39. In December 2007, ManorCare – at the time the largest nursing home chain in the United States – was taken private by The Carlyle Group in a deal valued at approximately $6.3 billion. The Carlyle Group invested approximately $1.3 billion of equity in the overall transaction. The buyout was further financed with $4.6 billion in debt, including a $1 billion mezzanine loan from HCP, commercial mortgage-backed securities, and other debt financing.[4]

40. As part of the closing of the mezzanine loan, HCP issued a release in which it stated:

> As the leading provider of a diversified range of post acute care services, HCR ManorCare, which operates under such well-respected names as Heartland, Arden Courts and ManorCare Health Services, primarily differentiates itself from its competitors by focusing on Medicare and managed care patients who have shorter lengths of stay and require intensive rehabilitative services. For the first nine months of 2007, HCR ManorCare's portfolio had an impressive quality mix, which represents the percentage of revenues from Medicare and private pay sources, of

[4] HCP's $1 billion mezzanine loan bore interest on the face amount at a floating rate of one-month London Interbank Offered Rate plus 4.0%, was scheduled to mature in January 2013 and was purchased at a discount for approximately $900 million. The loan was secured by an indirect pledge of the equity ownership in 339 facilities located in 30 states, was to be payable at any time subject to yield maintenance during the first 12 months, and was mandatorily pre-payable in January 2012, unless the borrower satisfied certain financial conditions. HCP's mezzanine loan was subordinated to $3.6 billion of ManorCare's other debt.

73%, an average occupancy rate of 89% and had achieved strong reimbursement rates across all patient types.

41. As explained in a November 2007 news article, following its acquisition by The Carlyle Group, ManorCare reorganized by "split[ting] the company's real estate holdings from the rest of the business so the properties could be used as collateral to raise funds in credit markets to expand the business," which was purportedly designed to make the company "more streamlined" and "help bring more logical order to a corporation that has grown unwieldy through years of acquisitions."

42. Following the announcement of the deal and reorganization, *The Washington Post* wrote that "critics [said it] could obscure ownership and make it more difficult to regulate care," and included a comment from Toby Edelman of the Center for Medicare Advocacy, who noted it was "'quite troubling because the point . . . is for a company to protect themselves from liability.'"

43. As part of the deal, The Carlyle Group promised to pay $100 million in deferred compensation to Defendant Ormond, which later became a significant point of contention in the 2017 restructuring negotiations between The Carlyle Group and ManorCare's landlord, QCP. Importantly, the deal also imposed certain fixed payments on ManorCare, in the form of debt interest repayments and/or a mandatory return on investment for The Carlyle Group. For example, the deal saddled ManorCare with between approximately $412 million and $440 million in annual interest expense in year one. As would later become apparent, these payments imposed an extraordinary burden on ManorCare and pressured ManorCare to find ways to drive its margins.

### C. ManorCare Defrauds the Medicare System by Seeking Reimbursements for Unreasonable, Unnecessary, and/or Unskilled Therapeutic Services

44. Beginning around 2006 and continuing through at least 2012, ManorCare's ability to grow profits and drive margins became increasingly dependent upon a highly inappropriate revenue source: fraudulent overbilling of the federal government for services that were ineligible for

reimbursement under the Medicare skilled nursing facility benefit because they were unnecessary, unreasonable and/or unskilled.

45. As intended, the revenue from these unlawful practices – which are further detailed below – fueled a dramatic rise in ManorCare's profits. Indeed, by the end of 2012, ManorCare's annual reported revenue had grown to approximately $4.2 billion – an increase of ***more than 20%*** from the approximately $3.4 billion in annual revenue ManorCare had reported in 2005. Due to the fraudulent nature of ManorCare's improper billing practices, however, Defendants knew that such continued growth in ManorCare's revenues could not reasonably or legitimately be counted on for future periods.

### 1. Rehabilitation Therapy Must Be Reasonable and Necessary Under Medicare Part A's Skilled Nursing Facility Benefit Criteria

46. Congress established the Medicare Program in 1965, as Title XVIII of the Social Security Act, to provide health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions. *See* 42 U.S.C. §1395 *et seq*. Medicare is primarily funded through payroll and other taxes, which are held in trust funds and can only be used for Medicare. The Centers for Medicare & Medicaid Services ("CMS"), a branch of the U.S. Department of Health & Human Services, is the federal agency that runs the Medicare program. CMS also monitors Medicaid programs offered by each state.[5]

47. The Medicare program is divided into four "Parts" covering different services entitled to reimbursement under very specific requirements:

---

[5] Medicaid is a joint federal and state program that helps with medical costs for some people with limited income and resources. Medicaid also offers benefits not normally covered by Medicare, like nursing home care and personal care services. Each state has different rules regarding eligibility for Medicaid. According to HCP's 2015 and 2016 Form 10-K filings, approximately 12% of the Company's annualized base rental payments received from tenants and operators was dependent upon Medicaid reimbursement.

- Part A generally covers inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care – such as the services provided by ManorCare's SNFs.

- Part B covers certain doctors' services, outpatient care, medical supplies, and preventive services.

- Part C, also known as "Medicare Advantage," is a type of Medicare health plan offered by a private company that contracts with Medicare to provide Part A and Part B benefits.

- Part D provides prescription drug coverage.

48. In order to be eligible for reimbursement under Medicare Part A, the services provided by a SNF must be both "reasonable" and "necessary." 42 U.S.C. §1395y(a)(1)(A). According to the CMS, reasonable and necessary services are: (1) consistent with the nature and severity of the patient's illness, injury, or particular medical needs; (2) consistent with accepted standards of medical practice; and (3) reasonable in duration and quantity. Medicare Benefit Policy Manual, ch. 8, §30.

49. According to testimony from then-current ManorCare employees – including Vice President of Rehabilitation Services and Support Janet Mastrangelo, Corporate Rehab Consultant Mary Casper, and Vice President of Rehabilitation James Pagoaga ("Pagoaga") – ManorCare's corporate managers responsible for overseeing rehabilitation therapy services understood the meaning of the terms skilled, reasonable, and necessary.

50. ManorCare's Rehabilitation Services corporate managers also understood that CMS requiref the SNF to support the services billed. For example, Mastrangelo testified in 2017 that "I have to put in the documentation why is it that it takes my skills to do it and someone who's unskilled couldn't do it."

51. ManorCare employees regularly reported the amount of therapy minutes provided to patients under Medicare's SNF Prospective Payment System ("PPS"). Based in large part on the

amount of therapy provided, patients were placed in a particular Resource Utilization Group ("RUG"). 63 Fed. Reg. 26,252, 26,262 (May 12, 1998).

52. The PPS contained five rehabilitation RUGs (in order from largest reimbursement to smallest): Ultra High ("RU"), Very High ("RV"), High ("RH"), Medium ("RM"), and Low ("RL"). Under the Social Security Act, the Ultra-High RUG was "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time." 63 Fed. Reg. at 26,258.

53. From 2006 through at least 2012, ManorCare engaged in a nationwide scheme to fraudulently overbill federal healthcare programs at the Ultra High level ***without regard*** for patients' actual medical needs. The unlawful plan – which involved, *inter alia*, imposing corporate pressure upon ManorCare's SNFs to increase Ultra High billing levels and average length of stay for patients based solely on corporate financial considerations, and taking action against employees who either failed to meet corporate financial targets or objected to corporate pressure to obtain Ultra High RUG levels or average length of stay targets – originated in ManorCare's corporate offices and was imposed upon the administrators who ran ManorCare's SNFs and the therapists who treated the patients.

### 2. ManorCare's Corporate Leadership Pressured Therapists to Provide Unnecessary Services to Increase Profits

54. Between 2006 and 2012, ManorCare's corporate leadership pressured and manipulated SNF therapists to provide patients with unnecessary therapy, so that ManorCare could unlawfully seek reimbursement at the Ultra High RUG.

55. According to internal ManorCare data, ManorCare billed Medicare at the Ultra High level for only 38.8% of all days that it billed for rehabilitation therapy in October 2006. But by February 2010, ManorCare was billing ***81.3%*** of its rehabilitation days at the Ultra High level, or ***more than twice the October 2006 percentage***. The increase in Ultra High billing was ***not*** due to a

change in ManorCare's patient population; rather, it resulted from ManorCare's deliberate decision to increase reported revenue through Ultra High overbilling.

56. This dramatic increase in ManorCare's Ultra High level of therapy during this time was carried out through a number of improper practices, as detailed below.

**a. Use of "Medicare Power Ratings" to Encourage Overbilling of Medicare Patients**

57. One of the primary ways that ManorCare pressured its therapists to overbill ManorCare's patients was through the use of "Medicare Power Ratings" – an internal, proprietary accounting tool designed to incentivize ManorCare therapists and managers to overbill their patients. Within the Medicare Power Ratings were "Rehab Power Ratings" ("RPR"), also called "RUG Distribution Reports," which quantified the number of patient-days billed to Medicare's two highest reimbursement levels (Ultra High and Very High). Internal documents produced to the DOJ by ManorCare show that the purpose – and effect – of the Medicare Power Ratings was to pressure ManorCare's SNF staff to bill for more therapy, ***without*** regard for patient need.

58. Proprietary Medicare Power Ratings were one of a variety of pressure tactics used by corporate leadership to place ManorCare personnel and facilities in competition with each other by setting goals and targets for billing Medicare's highest-reimbursing "Ultra High" level of therapy. Power Ratings maximizing Medicare reimbursements were used as criteria for assessing job performance, and these tactics pushed ManorCare therapists into providing Ultra High-level therapy to more patients, regardless of whether the therapy was necessary, reasonable, and skilled.

59. Testimony from ManorCare Therapy Operations Analyst Stephen Cline further reveals that between 2006 and 2012, Power Ratings reports were sent on a monthly basis to ManorCare's Chief Operating Officer ("COO") Stephen Guillard ("Guillard"), as well as ManorCare's Divisional Rehabilitation Directors, Regional Rehabilitation Managers in the Rehabilitation Services department, facility-level Directors of Rehabilitation, and other facility-level

administrators. Divisional Rehabilitation Directors and Regional Rehabilitation Managers also had access to Power Ratings reports in a centralized ManorCare repository.

60. Evidence from the DOJ Action confirms that Divisional Rehabilitation Directors and Regional Rehabilitation Managers regularly used Medicare Power Ratings to pressure facility-level therapy staff to provide patients more therapy. They did so by using each SNF's Power Ratings to measure the SNF's performance, and by pushing SNFs to compete with other ManorCare SNFs, regions, and divisions with higher Power Ratings. Internal ManorCare documents revealed examples of this type of pressure: a facility manager blaming decrease in the Ultra High billing percentage on "a few rogue therapists"; "[Ultra High] grew by .5% to 75.2% ([Corporate Ultra High billing] in September@ 78.6%) 28 centers in the [Midwest] below corporate results"; "GOAL: [Rehab Power Rating]%= 88%."

61. Internal ManorCare documents also reveal that Defendant Cavanaugh knew about Power Ratings and that their purpose was to "maximize revenue." Testifying as a fact witness, Cavanaugh confirmed that he was aware of Power Ratings and "knew people used" them.

62. The agenda of a November 2008 meeting attended by Pagoaga, Guillard, Defendant Cavanaugh, and members of The Carlyle Group left no doubt about the purpose and effect of the Power Ratings, unequivocally stating: "***Medicare Power Rating System [is] in place to maximize revenue***." Clearly, the singular purpose of the Power Ratings was to incentivize ManorCare employees to overbill patients for therapy, ***without regard*** for the reasonableness of such therapy or the patients' actual medical needs – in stark contrast to Medicare's reimbursement guidelines.

63. Documents and testimony also show that Guillard had access to Power Ratings and instructed operations and therapy staff to "verify that . . . power ratings . . . are being used" in ManorCare SNFs. Guillard also included Medicare Power Ratings in a presentation to the

ManorCare Board of Directors, which stated: "PUT IN A PARAGRAPH ON MEDICARE POWER RATINGS AND HOW THIS TOOL IS USED."

**b. Medicare Entitlement Training**

64. "Medicare Entitlement" was another means by which ManorCare encouraged its therapists and managers to bill patients for unreasonable and unnecessary therapy. Specifically, according to internal ManorCare training presentations, rehabilitation managers used a program referred to as Medicare Entitlement Training ("MET") to pressure therapists to "CHALLENGE EACH OTHER" to "[p]rovide the ***maximum amount of therapy that the patient can tolerate***," without regard for the reasonableness or necessity thereof. However, this training was not implemented to address a lack of proper Medicare benefits being administered to patients. Indeed, sworn testimony from Defendant Cavanaugh revealed that, before ManorCare implemented MET, no data, research, or audit had found that any ManorCare patients were not receiving Medicare benefits, or that ManorCare therapy personnel were not notifying patients of services that Medicare would cover. As such, the purpose and effect of MET was to teach ManorCare therapists to find any and all ways to bill patients at the Ultra High RUG, without regard to their actual needs, in direct contrast to Medicare reimbursement rules.

65. ManorCare's internal documents also show that the goal of MET was to train therapists to bill at Ultra High billing rates. Among other things, ManorCare's MET presentations featured a fictional superhero named "Super RU" and instructed therapy supervisors responsible for scheduling therapy to ask "WHY NOT U?" (*i.e.*, why not Ultra High billing?) for every patient. They also stated that "Medicare revenue is EXTREMELY IMPORTANT!!!," while depicting Medicare as a series of credit cards being handed to ManorCare. Deposition testimony from the DOJ Action also indicates that Guillard directed a manager whose division provided less therapy to visit a division that provided more therapy and "learn their entitlement program."

66. Internal ManorCare documents also show that managers told subordinates to scrutinize "any patient not achieving an [Ultra High billing rate] and what can be done to be sure that the patient receives full entitlement," and be "inspired by Medicare Entitlement Training [to look for] Percentage in RU – with a philosophy of why not [Ultra High]??" According to other ManorCare documents, one therapy supervisor reported that after receiving MET presentations, "incredibly[,] 6 out of 8 facilities had [Ultra High billing at] greater than 70%."

**c. Goals for Ultra High RUGs**

67. ManorCare also encouraged its rehabilitation managers to exert overbilling pressure on therapists by setting goals for Ultra High rehabilitation billing, irrespective of the individual patients' actual medical needs. Specifically, Divisional Rehabilitation Directors and Regional Rehabilitation Managers set goals for the percentage of patients billed at the Very High level by facility, region and division. Internal ManorCare documents further reiterated these goals, stating, for example: "This a 9 month trend of not reaching goal of 70% RU" and "Key Focus Areas . . . Increase RUGs by 10%." In addition, internal documents show that "Entitlement Metrics" included increasing "Medicare A [Ultra High billing levels]" to 80% or greater.

68. As part of the overall corporate practice to increase billing reimbursements through Medicare, ManorCare also pursued high mandatory "productivity" requirements, which it knew would facilitate fraudulent, excessive, and improper billing of Medicare. Through various corporate-wide internal policies and procedures, ManorCare therapists were encouraged to maximize profits by getting each patient into the highest RUG classification possible, regardless of the patient's actual clinical needs.

69. In addition, goals for Ultra High billing were used to evaluate the performance of rehabilitation managers, and were incorporated into both action plans and performance improvement

plans for facilities and individual managers, including, for example, internal documentation specifically mandating a goal of increasing Very High billing to 75%.

70. ManorCare's own leadership also acknowledged – and even expressed concerns regarding – the pressure ManorCare placed on its employees to increase Ultra High billings. For example, on March 10, 2009, Divisional Rehabilitation Director Rick Grahn sent the following email to Vice President of Reimbursement Barry Lazarus:

> Barry, Please do not forward or act on this in any way. Below is an example of the pressure that is placed on folks to perform relative to Med[icare Part] A rate. . . . Additionally, it seems that often anything that results in not being above company average is due to excuses. Central division operators have said many times that they refuse to accept the 'excuse' that patients are different. ***If therapists suggest planned levels of therapy delivery that are anything other than ultra-high, they are labeled as 'uncooperative.'***

71. Two days later, Grahn sent another email to Lazarus (copying Pagoaga) to inform Lazarus of a Regional Rehabilitation Manager who had "expressed concern" about "the pressures" that ManorCare's Regional administrators were putting on facility Directors of Rehab to bill all of their Medicare patients at the Ultra High level.

**d. Group Therapy**

72. ManorCare also designed and implemented improper and excessive group therapy sessions – whereby a therapist or assistant would treat up to four patients at a time, performing generic, non-individualized services – for the purpose of artificially inflating ManorCare's Ultra High billings. Specifically, internal ManorCare documents confirm that regional therapy managers prescribed detailed goals for group therapy, such as requiring 25% of therapy billed for group therapy. ManorCare's aggressive group therapy goals were to designed to deliver – and did deliver – unnecessary group therapy to patients that were unrelated to their plans of care. ManorCare's improper use of group therapy is confirmed by internal ManorCare documentation, including, for example, a directive for therapists to "***group the crap out of every Medicare A***."

73. Testimony from former ManorCare Occupational Therapist Shoko Matsuda further confirms that ManorCare therapists were required to provide unnecessary, unreasonable, and unskilled group therapy. Matsuda, for example, was told to be "creative" about how to provide additional minutes of therapy to patients. Former ManorCare therapist Elizabeth Obee also corroborated ManorCare's improper use of group therapy, testifying that "we were pretty much told we had to do groups, yes."

74. In October 2011, CMS enacted new rules prohibiting SNFs from separately billing for each patient in group therapy, meaning that ManorCare could no longer bill four hours of therapy for a single hour of group therapy provided to four patients. 74 Fed. Reg. 40,288, 40,317 (Aug. 11, 2009). The new group therapy rules required SNFs to bill group therapy collectively for all participating patients, so that ManorCare could only bill a total of one hour of therapy for one hour of group therapy provided to four patients. 76 Fed. Reg. 48,486, 48,512 (Aug. 8, 2011).

75. ManorCare directed its therapists to drive up group therapy revenues before the October 2011 rule change went into effect. In response to ManorCare's call to maximize group therapy usage, Directors of Rehabilitation frequently acknowledged to their Regional Rehabilitation Managers that they would increase the use of group therapy within their respective facilities. For example, the Director of Rehabilitation of the Willowbrook SNF, in Houston, Texas reported that he would "[i]ncrease group therapy treatment time to expected expectation [sic] of 15%." Another West Division Director of Rehabilitation similarly stated that he would increase group therapy by requiring a group therapy session for each patient every week. Notably, neither Director of Rehabilitation made any mention of whether these group sessions would be necessary, or whether the sessions would contribute in any way to the treatment of the patient.

76. ManorCare's deliberate efforts to improperly drive group therapy revenues before the October 2011 rule change were successful. Indeed, in May 2010, Vice President of Rehabilitation

Pagoaga reported to COO Guillard that ManorCare provided, on average, ***15.4%*** of its therapy minutes in group settings. But by September 2010, ManorCare had increased that number by ***156%*** to ***39.5%***.

77. The inability to drive revenue by improperly utilizing group therapy resulted in ManorCare's group therapy percentages falling dramatically after the rule change, as ManorCare was no longer able to use its manipulative group therapy practices to inappropriately inflate its revenue. For example, internal documents showed that at ManorCare's Devon Manor SNF, 15% of the therapy minutes billed in June 2009 were devoted to group therapy, with roughly the same percentage of 15.3% a year later. One week before the rule change went into effect, that percentage had fallen ***by 98%*** to 0.23%, consistent with what Divisional Rehabilitation Director Terri Russell described as ManorCare's "transition strategy" away from group therapy. This dramatic – and strategic – drop in the ManorCare's use of group therapy confirms that ManorCare's previous group therapy practices were neither necessary nor reasonable – they were simply another strategy to improperly profit off of the Medicare system, to the detriment of the government, taxpayers, and patients.

#### e. Use of Modalities to Inflate Minutes

78. Modalities are treatments such as electrical stimulation and diathermy that are supposed to be used by therapists in conjunction with therapy exercises or activities to manage pain, or strengthen, relax, or heal muscles. According to internal ManorCare documentation, however, ManorCare, which leased modalities through a company named ACP, used modalities as "minutes insurance" to inflate its number of reported minutes, and thus, reap larger reimbursements. Internal ManorCare documentation also confirmed that ManorCare's managers were directed to "[u]tilize ACP CPM representative to facilitate use of advanced modalities when staff say nothing is working and want to discharge."

79. These inappropriate practices were confirmed by a 2008 exit interview survey from a former ManorCare therapist, which was provided to Pagoaga, and stated the following:

> [D]o not have so much pressure to constantly push [patients] into the highest possible rugs level even if their clinical presentation does not justify it, ***do not push to have every [patient] on modalities for the sole purpose of getting more minutes in order to up the rugs level***. When [patients] are in assessment windows, they should get the same amount of rehab as they do every week as this is what [M]edicare is assuming.

80. ManorCare's strategy to increase the use of modalities, and thus improperly increase Medicare reimbursements included the ordering of unnecessary therapies, such as electrical stimulation and ultrasound that had "no effect" on the patients. For example, unnecessary modalities were scheduled by a Director of Rehabilitation and therapists were then assigned to perform whatever therapy had been scheduled, even though such therapies were often in excess of what was helpful for the patients, and in many cases patients were too sick or too weak for the prescribed treatment.

#### f. Improperly Maximizing Patients' Length of Stay

81. Internal documents show that ManorCare pressured SNF Directors of Rehabilitation and therapists to maximize patients' length of stay in order to increase Medicare revenue. This effort began with Guillard, who instructed divisional operations staff to "help centers focus on how they manage their length of stay" to bring it closer to Central Division's longest average length of stay.

82. In mid-2009, in anticipation of perceived reductions in Medicare payments to SNFs, ManorCare undertook to analyze its "opportunities for enhancing Medicare [length of stay]" in its SNFs and calculated the financial impact of a one-day increase and a two-day increase in length of stay at select SNFs. ManorCare selected target facilities and implemented what it called "Project Reset." One of the express purposes of this project was to extend length of stay. These efforts were undertaken ***without regard*** for whether there was an actual clinical need to keep the patient in the facility.

83. Project Reset was a success, as confirmed by internal ManorCare documentation, including, for example, an "Operations Summary" prepared for ManorCare's January 26, 2010 Board of Directors meeting, which noted that ManorCare's fourth quarter 2009 length of stay for Medicare patients increased by 0.7 days over the fourth quarter of 2008. Similarly, in late-2009, Pagoaga reported to the CEO, Defendant Ormond, and ManorCare's General Managers that 30 of the SNFs at which Project Reset was implemented saw higher revenues, as well as improved Ultra High levels, noting that "[t]he RU% went up another 1% from prior month to 80.3% with YTD at 75.7%."

84. After Guillard began emphasizing length of stay, Divisional Rehabilitation Directors and Regional Rehabilitation Managers pressured facility staff to keep patients in therapy longer before discharge, and criticized facility staff for discharging too soon. For example, internal ManorCare documents show that regional managers and divisional therapy managers required staff to obtain their permission before a patient could be discharged prior to 30 (or, in some cases, 35) days into his or her stay.

85. ManorCare's strategy to increase Medicare patients' length of stay, and thus improperly increase Medicare reimbursements, included a practice by the facilities to get patients ***readmitted*** after their 120 days of covered skilled nursing care had been exhausted. Indeed, it was a common practice at ManorCare to get patients admitted to a new three-day stay at a hospital after they had been at a facility for 120 days, so that the patient's date of injury could be changed, which would allow the patient to receive a "new level of care," and thereby allow ManorCare to bill for an additional 120 days of care. In addition, ManorCare deliberately sought out the most cognitively impaired patients who also happened to be covered by Medicare A, so that these patients could be kept as long as possible – upwards of 100 days.

**g. Action Plans**

86. In order to maximize revenue by pressuring therapists to bill more minutes at Ultra High rates, ManorCare placed managers who fell short of RUG, group therapy, and other goals on "action plans." This practice is confirmed by internal ManorCare documentation stating, for example, that "[w]e must ensure that our patients are receiving the maximum rehabilitation services that they can tolerate. . . . Please complete action plans for your centers and monitor your results weekly. . . . Congratulations to all of you that have reached 70% [RU patient-days]."

87. Documents and testimony confirm that Pagoaga and General Manager Alan Hash called for action plans to support their "revenue strategy" and ranked SNFs by percentage of patients at Ultra High. For instance, in May 2007, ManorCare placed a therapy supervisor in New Jersey on an action plan to "meet the following operational targets . . . [Ultra High billing] 50%+."

88. Documents and testimony further confirm that, in March 2008, ManorCare placed a Florida therapy supervisor on an action plan to "[i]ncrease group therapy from YTD 8.1% to divisional goal of 15%" and "[i]ncrease [Ultra High] delivery by 20%." Internal ManorCare documentation further confirms that ManorCare placed other therapy supervisors on action plans requiring them to increase their respective facilities' RU percentages to greater than 70%.

89. Internal ManorCare documentation also indicates that ManorCare placed therapy supervisors on action plans (sometimes requiring them to email supervisors daily) and required them to identify to Regional Rehabilitation Managers all non-Ultra High patients, so that such patients could be reviewed for alternate strategies to increase their therapy levels. For example, a January 2010 action plan identified as a "problem" the fact that a Director of Rehabilitation was "not demonstrating an effective system to ensure full Medicare Entitlement related to service delivery." In particular, the action plan required, among other things, that the Director of Rehabilitation send a daily email to his supervisor, the Regional Rehabilitation Manager, listing the names of all patients

not receiving Ultra High therapy so that the supervisor could review the number of patients not receiving the highest level in order to develop alternate strategies for increasing their services.

90. The consequences for ManorCare therapists who failed to meet the Ultra High billing requirements mandated by their actions plans were severe – including termination. Indeed, internal ManorCare documentation indicates that ManorCare action plans included signature lines that read as follows: "Failure to meet the agreed upon outcomes in the timeline established, [sic] will lead to disciplinary actions ***up to and including termination***." Internal ManorCare documentation further confirms that ManorCare's Regional Rehabilitation Managers were directed to ensure that Directors of Rehab understood "what the outcome will be if [they] do[] not achieve the goals."

**h. Employee Performance Evaluations**

91. Performance evaluations were another tool that ManorCare used to enforce its ever-increasing goals for Ultra High billing. Internal documents and deposition testimony confirm that therapy managers were evaluated based on the Power Ratings and Ultra High RUG percentage of patient-days at the facilities for which they were responsible, and that Divisional Rehabilitation Directors used RUG levels as the top evaluation criterion. For example, internal ManorCare documents indicate that, among other things, ManorCare's performance reviews directed therapy managers to "Maximize RUG Utilization" and increase RU billing percentages and Rehab Power Ratings by specifically mandated percentages – without regard to actual patient needs – in order to increase ManorCare's reimbursement revenues.

**i. Operations Staff's Involvement in Therapy Decisions**

92. ManorCare's operations staff – who were typically not therapists – also influenced therapy decisions in an effort to increase Ultra High Medicare billing. For example, a Regional Rehabilitation Manager in ManorCare's Midwest Division created an "Administrator Medicare 'Q'

Card," which encouraged facility administrators to pressure therapy staff by asking questions such as, "Is the patient in a Rehab Ultra High (RU) RUG? If not, why not?"

93. Furthermore, ManorCare had no policy in place to prevent its operations staff from influencing therapy decisions. Nor were administrators prohibited from using Power Ratings, even though operations staff had no responsibility for providing patients therapy. Indeed, Defendant Cavanaugh testified with regard to Power Ratings that "operators may have been looking at that and dealing with that."

94. As a result, ManorCare's operations staff used Medicare Power Ratings, as well as Ultra High RUG and length-of-stay goals to pressure therapy staff to provide patients unnecessary therapy. One internal communication asked: "When does the new Regional Rehab [Mangers] start? I have a number of facilities running below corporate averages [in Power Ratings]"; another document stated: "We are running about 17% [lower in length of stay] than the company as a division . . . . We are running about 10 percentage points [in RU billing] below the company average."

95. When asked whether operators pressured therapists, Pagoaga testified at his deposition: "Never say never. You know, they – I don't know – I can't say that they don't. All right?"

#### j. Failure to Prevent Unnecessary, Unreasonable, and/or Unskilled Therapy

96. Internal ManorCare documentation confirms ManorCare therapy managers' understanding that the aforementioned corporate practices created undue pressure for ManorCare's therapists to provide therapy that was unreasonable, unnecessary, and unskilled. For example, in a July 2008 presentation to Guillard about Medicare Power Ratings, Divisional Rehabilitation Director Rick Grahn noted that ManorCare's Power Ratings had the effect of setting "targets or minimum levels of performance" that would "compel inaccurate or inappropriate behavior."

97. Similarly, ManorCare was aware that the training tool MET encouraged therapists to bill Medicare for Ultra High therapy. According to the MET presentations, a commonly asked question was: "Our company does this training just to make more money, don't they?"

98. ManorCare was also aware that therapists frequently complained about pressure. For example, in January 2008, Grahn notified Pagoaga of a "troublesome trend" of an increasing number of resignations of facility-level therapists. Exit interview data showed numerous complaints of pressure, including, but not limited to the following:

- "Your 'Medicare entitlement' philosophy is nothing more than institutionalized gouging";
- "Do not force 'group therapy" onto therapists. It is sometimes not appropriate. Do not push for extended stays. It's unethical to purposely extend a stay when it's appropriate and safe for someone to go home";
- "[T]he rehab director has received questionable speech therapy orders. When the physicians were called to confirm these orders, they stated that they did not order the patients to have speech therapy";
- "Question such strong focus on productivity and meeting certain RUG levels from corporate";
- "During my employment[], I have had to compromise my ethics and morals";
- "I honestly felt that my license could be in jeopardy because the manager was pressuring me to treat inappropriate patients; it just felt wrong";
- "I was told to basically show up and shut up. Too many inappropriate requirements 15% groups, 30% ACP [modalities], unethical length of stay and RUG levels all for the sake of a buck";
- "Hire management with morals. I was asked to perform unethical procedures and bullied into billing addt'l units. My job was threatened when I didn't want to sacrifice my integrity. I went to a regional mgr and received no help";
- "This [Director of Rehabilitation] also committed [sic] unethical practices [sic] such as writing and back dating speech orders on numerous occasions,[] changing treatment grids to get patients in a higher rugs level and I attempted to tell [the Regional Rehabilitation Manager] but she stated she had complete faith in her [Director of Rehabilitation]";

- "Hard to leave [Director of Rehabilitation] and our immediate rehab team – easy to leave the 'corporate' push of HCR"; and
- "***It's all about getting minutes, minutes, minutes***."

99. ManorCare therapists were expected to do whatever it took to achieve the corporate goals for Ultra High billing. If a therapist requested permission to provide fewer minutes of therapy than ManorCare needed to meet its pre-existing goals, the therapist would often be told to "think creatively" about how to get the minutes. Moreover, if the number of minutes provided to a patient during a therapy session on an assessment day fell short of the amount needed for Ultra High reimbursement, therapists were instructed by management to "make up" those minutes later on, often causing them to return three times a day and late into the evening.

100. Pagoaga was acutely aware of the pressure that facility administrators placed on facility therapy staff. For example, Pagoaga testified that, in July and August 2011, he asked that the Divisional Rehabilitation Directors provide him with administrators' remarks to the therapy staff. In response, Divisional Rehabilitation Director Terri Russell sent an email containing the following remarks, among others: "***If they have a pulse, they can get an RU***"; "If that region can get high RU's, why can't we"; "Bring in all the staff you need, just get me the RU's"; "When the caseload of only 10 Medicare, there is no reason they can't ALL be RU's"; and "If they are all at RV, why can't you just add the few extra minutes to get them all to RU." Similarly, Divisional Rehabilitation Director Rick Grahn sent an email containing the following remarks: "I need more Rus"; "Everyone should be an RU when they come in"; "You need to keep him on (caseload) for at least two more weeks"; "We're the lowest in the division in Rus, what's wrong with that [Director of Rehabilitation]"?; "Can't they just give her 20 more minutes?"; and "Those therapists are playing the 'ethics card' again."

### 3. As a Result of These Pressure Tactics, ManorCare Therapists Were Forced to Provide Thousands of Hours of Unnecessary, Unreasonable, and/or Unskilled Therapy

101. From 2006 to 2012, ManorCare submitted thousands of claims to Medicare for reimbursement for non-covered services, resulting in the receipt of hundreds of millions of dollars in unwarranted payments, which ManorCare used to improperly generate revenue and drive profits.

#### a. Corporate Pressure Forced Therapists to Provide Unnecessary, Unreasonable, and/or Unskilled Therapy Throughout ManorCare's Regional Divisions

102. The Rehabilitation Services department, reporting to Guillard, was divided into six divisions: Central, Eastern, Mid-Atlantic, Midwest, Southeast, and West. Each Division was led by a Divisional Rehabilitation Director, each of whom had several Regional Rehabilitation Managers as direct reports. Directors of Rehabilitation at the ManorCare SNFs reported to a Regional Rehabilitation Manager. ManorCare's operations staff – composed of general managers, regional directors of operations, and facility administrators – also reported to Guillard. Documents and testimony from the DOJ Action show that pressure was applied at the corporate level to increase levels of Ultra High billing rates and that such pressure permeated throughout ManorCare's regional divisions.

103. For instance, in ManorCare's Eastern Division, Divisional Rehabilitation Director Terri Russell, who directly reported to Pagoaga, used a variety of the pressure tactics discussed above, including Medicare Power Ratings and numeric goals for Ultra High RUG billing. Russell described two ManorCare employees responsible for Medicare Power Ratings as "MY rehab $$ men," who told her "in 'formulas' what will make my [Medicare daily] rate move." Russell asserted that she could create a clinical justification for "mak[ing her] rate move": "I can translate that to clinical rationale any day." In September 2007, Eastern Division Vice President and General Manager Susan Morey gave a presentation titled "Driving the P&L." In this presentation, Morey

directed that therapists should "[c]onsider each patient Ultra High and work down, not up as needed," and set an "Upper RUGs Goal" of "at least 80+%," for ManorCare's Eastern Division.

104. In addition, an Eastern Division Regional Rehabilitation Manager instructed a subordinate Director of Rehabilitation to "***group the crap out of every Medicare A you have*** which will at least boost that number and DRIVE those part b federal residents."

105. In 2009, Terri Russell evaluated one of the Regional Rehabilitation Managers, writing that "[Ultra High billings] need to increase by 13.6% and [Rehab Power Rating] by 7.5% to at least match [company] average on these metrics." Russell insisted on this additional increase even though there had already been a 14 percentage point increase in Ultra High billings in that region in 2009.

106. In 2010, Russell also created and sent to Vice President of Rehab Pagoaga a presentation titled "HCR Manor Care Eastern 2010 Therapy Goals & Expectations." In this document, Russell set the Rehab Power Rating goal for the Eastern Division at 92% or greater, and the Ultra High goal at 80% or greater. These revised goals represented a ten percentage point increase over the Eastern Division's 2009 Ultra High goals, again ***without any clinically based determination that this increased therapy would be necessary for patients***.

107. Central and Midwest Division therapy managers also pressured therapists. Central and Midwest Divisional Rehabilitation Director Rick Grahn created and distributed Power Ratings and presentations explaining how to use them, all the while recognizing the risks of improper billing they created. Internal documents show that Regional Rehabilitation Manager Shelley Leverso pressured her facilities to exceed company goals for Power Ratings, Ultra High RUGs, group therapy, and length of stay, stating: "I have been more than patient regarding the development of group therapy, but I am now going to intervene directly"; and "Remember the commitment we have made for the 2009 year – to increase [length of stay] for the Division by 2 days."

108. Former ManorCare physical therapist Robert Halkovich further confirmed these practices, testifying that he was forced to provide unnecessary therapy to patients based on pressure from his facility's therapy manager, and stating: "I delivered a lot of therapy to patients that I did not feel was necessary . . . [b]ecause I was following orders from my supervisor to provide these minutes to the patient." Halkovich's manager specified the number of minutes of therapy he was to provide a patient each day, in order for the patient to reach the Ultra High level, even though Halkovich thought some of the therapy he was required to provide was "dangerous." Echoing the mantra of MET training, Halkovich was ordered to provide Ultra High therapy under the premise that patients "deserve[d] the full basket of services that Medicare can provide" because "patients have paid into Medicare their whole lives." Despite these pressures, Halkovich once assisted in the discharge of a patient who wanted to go home and testified that if his manager "ever found out that I did that, ***I'd have been fired on the spot***."

109. Indeed, prior to discharging a Medicare beneficiary, therapists were required to obtain approval, by telephone, from one of ManorCare's "Medicare Operations Specialists" who were often located out of state and had no firsthand knowledge of patients' needs. The stated purpose of the discharge policy was "[t]o assure that [therapists] maximize coverage for each resident/patient." One Midwest Division therapist was disciplined for discontinuing therapy for patients whose length of stay was less than 35 days without approval by the Regional Rehabilitation Manager or Director of Rehabilitation. The therapist was counseled to "follow ManorCare's policy and procedure regarding discontinuation of therapy services practices to achieve Medicare Entitlement," and was further notified that if her behavior continued, she would be subject to "further disciplinary action."

110. ManorCare's Regional Rehabilitation Managers used facility-level tracking software systems to assess individual patients' RUG categories. In September 2009, Midwest Division Regional Rehabilitation Manager Kathie Dell emailed the Director of Rehabilitation for the West

Des Moines, Iowa SNF demanding justification for why specific patients, whom she had likely never seen, met, or evaluated, did not receive enough minutes of therapy so that Medicare could be billed at the Ultra High level. Dell made no reference to whether the amount of therapy that would have triggered reimbursement at the Ultra High rate was actually necessary. Instead, she offered tips on how to reach the Ultra High level. For one patient, Dell wrote: "CAN'T [Occupational Therapy] DO AN INDIVIDUAL TREATMENT TODAY TO GET THE [Ultra High billing rate?] YOU WILL MISS IT BY 27 MINUTES AND THAT IS NOT COOL."

111. Managers in the West Division also pressured therapists. Raymond Acacio was a physical therapist at the West Division's Walnut Creek, California facility. Acacio testified that his Director of Rehabilitation determined the number of therapy minutes he was required to provide patients, that his Director of Rehabilitation rejected his recommendations for therapy provision at a level lower than Ultra High, that patients reached Ultra High at the MDS initial assessment because minutes not allowed under Medicare rules were counted toward the patients' total minutes, and that he was required to provide group therapy that did not benefit his patients.

112. Southeast and West Divisional Rehabilitation Director Delaine Rice-White pressured therapists with Medicare Power Ratings and RUG goals. In January 2010, Rice-White prepared a document titled "Therapy Strategic Plan Executive Summary 2010," which she sent to Pagoaga. In this document, Rice-White set a 94% Rehab Power Rating and 82% Ultra High as "Operational Targets" for the Southeast Division. In order to meet these targets, no more than 6% of the RUG codes for the entire Division in 2010 could be billed in a category lower than Very High. In other words, 94% of the patients in the entire Southeast Division would be required to receive more than 500 minutes of therapy per week.

113. In January 2009, the therapy manager at the Boynton Beach, Florida SNF was required to "[i]mprove Group percentage to meet company benchmark of 15%" in speech and

physical therapy. The next year, a Regional Rehabilitation Manager put the Boynton Beach therapy manager on action plans requiring an increase in group therapy billing from 15% to 20%.

114. Mid-Atlantic Division managers also pressured therapists. In deposition testimony, therapists from the Mid-Atlantic Division's Arlington, Virginia SNF described an environment in which they were pressured to provide therapy to fatigued and ill patients to meet regional RUG goals, to provide unnecessary minutes just to meet a RUG level targeted for the patient, and to provide more therapy to patients during their assessment period (*i.e.*, "ramping"). Ramping generally describes the practice of providing significantly more minutes of therapy during the assessment period than outside of that period in order to maximize the RUG level at which the SNF can bill for a patient.

115. In a May 2008 action plan, Mid-Atlantic Divisional Rehabilitation Director Kirsten Ferguson ordered the Director of Rehabilitation at one of the SNFs to "effectively manage patient assignment, scheduling and minutes planning for Med[icare Part] A patients to support full Medicare Entitlement as measured by achieving operations targets for Rehab Power Rating and [Highest Practicable Level Length of Stay]."

116. In 2010, Terri Russell also served as Divisional Rehabilitation Director for the Mid-Atlantic Division. Russell sent a presentation to Pagoaga titled the "HCR Manor Care Mid-Atlantic 2010 Therapy Goals & Expectations." The presentation set an Ultra High goal of 80% or higher and a Rehab Power Rating (Ultra High plus Very High) goal of 92% or higher. These goals meant that, prior to any determinations as to what particular patients actually needed, it was expected that at least 80% of the Division's Medicare rehabilitation days would be billed at the Ultra High level and that 12% would be billed at the Very High level.

117. A March 2010 action plan required the Arlington therapy staff to bill 15% of therapy as group therapy, to reach Ultra High RUG levels that "m[e]t or exceed[ed] the company average on

a consistent basis," and to "increase [length of stay] goal level by end of the month." Notably, the action plan required the therapy manager to approve the discharge of any Medicare patient within the first 35 days of the patient's stay.

**b. Corporate Pressure Led to Dramatically Increased Levels of Improper Ultra High Billing at ManorCare's Regional SNFs**

118. The intended result of ManorCare's pressure tactics was to dramatically increase Medicare reimbursements by increasing Ultra High billing levels throughout the regional divisions. These improper reimbursements artificially and unsustainably increased the profitability at ManorCare and its regional SNFs.

119. Between 2006 and 2012, Medicare Part A paid ManorCare ***over $6 billion*** for all inpatient SNF services. In October 2006, according to internal ManorCare data, ManorCare billed Medicare at the Ultra High level for ***38.8%*** of all days that it billed for rehabilitation therapy. By February 2010, ManorCare had ***more than doubled*** that percentage, billing ***81.3%*** of its rehabilitation days at the Ultra High level.

120. ManorCare's astonishing increase in Ultra High billing levels was undeniably the product of a deliberate corporate scheme that was designed to and did inflate ManorCare's revenue and profits. The deliberate nature of ManorCare's corporate scheme is evidenced by, among other things, the virtually identical dramatic increases in Ultra High billing levels of ManorCare facilities around the country. For example:

- In October 2006, ManorCare's Peoria, Illinois SNF billed 35.15% of its rehabilitation days at the Ultra High level, but this figure increased to ***93.9%*** in May 2012.
- During the same time period, ManorCare's Whitehall Borough facility in Pittsburgh, Pennsylvania increased its Ultra High billing rate ***from 17.4% to 95%***.
- In October 2006, ManorCare's Arlington, Virginia SNF billed 33.6% of its rehabilitation days at the Ultra High level. By April 2010, it had increased its Ultra High percentage to ***85%***.

- Similarly, ManorCare's Stratford Hall, Virginia SNF increased its Ultra High level billings from 23.7% in October 2006 to ***89.2%*** in March 2010.

- In October 2006, ManorCare's Sunnyvale, California SNF billed 52.9% of its rehabilitation days at the Ultra High level. By February 2010, this SNF had increased its Ultra High percentage to ***91%***, and by May 2012 it was billing ***94%*** of its rehabilitation days at the Ultra High level. In October 2010 the Sunnyvale SNF billed ***100%*** of its rehabilitation days at Ultra High.

- In October 2006, ManorCare's Wilmington, Delaware SNF billed only 14.4% of its rehabilitation days at the Ultra High level. By January 2010, the Wilmington SNF had increased this number to ***92.3%***.

- In October 2006, ManorCare's Muskegon, Michigan SNF billed 8.4% of its rehabilitation days at the Ultra High level. By October 2009, this facility had increased that number to ***93.3%***.

- In October 2006, ManorCare's Whitehall, Michigan SNF billed 6.7% of its rehabilitation days at the Ultra High level. By April 2010, this number had increased to ***81.1%***.

121. With billions of dollars on the table, the impact of these steep billing increases to ManorCare's bottom line was substantial. The ***over 100% increase*** in ManorCare's Ultra High RUG levels (from 38.8% to 81.3%) indicates that these revenues were a significant percentage of the $6 billion in Medicare reimbursements paid to ManorCare during this period. However, Defendants failed to tell investors that these substantial revenues were improper, unsustainable, and were soon to evaporate, leaving ManorCare much less profitable than investors were led to believe.

#### c. ManorCare's Provision of Unnecessary, Unreasonable, and/or Unskilled Therapy Did Not Improve Therapeutic Outcomes

122. As described above, ManorCare reported a substantial increase in the amount of therapy it provided between 2006 and 2012, including a substantial increase in the share of patients billed at the Ultra High RUG level. During this timeframe, ManorCare increasingly came to rely upon this very profitable, but improper and unsustainable revenue source, which was designed to and did only serve to benefit ManorCare's bottom line.

123. ManorCare's substantial increase in therapy reporting was not commensurate with small changes in ManorCare's patient population between 2006 and 2012. While ManorCare's therapy billing increased substantially, the clinical characteristics of ManorCare's patients barely changed. This discounts the possibility that ManorCare's substantial increase in therapy reporting resulted from increasing patient needs.

124. ManorCare's substantial increase in reported therapy was not reflected in substantial improvements in patient function. To the contrary, ManorCare's data showed that over the years ManorCare's therapy reporting led to a slower increase in patient function, meaning a slower recovery in the patient's ability to operate independently.

### D. Former Employees Blow the Whistle on ManorCare's Fraudulent Billing Practices, Sparking DOJ Investigation

125. On January 7, 2009, former ManorCare occupational therapist Christine Ribik filed under seal a *qui tam* complaint on behalf of the United States asserting FCA claims against ManorCare and several related entities. Ribik's complaint alleged an ongoing corporate fraud scheme concerning improper Medicare billing practices similar to those described in §IV.C., *supra*.

126. Shortly thereafter, the DOJ undertook an extensive investigation of ManorCare's billing practices. Specifically, on September 8, 2009, the DOJ issued its first subpoena, which was directed to an HCR ManorCare SNF in Fair Oaks, Virginia. The DOJ subsequently issued an additional 18 subpoenas to various SNFs in ManorCare's portfolio. As further detailed *infra*, the DOJ's investigation of ManorCare's billing practices sprawled several years, involving more than 260 civil investigative interviews and culminating with the DOJ's decision to formally intervene into the Ribik Action. *See* §IV.G., *infra*.

127. Ribik, however, was not the only former employee to blow the whistle on ManorCare. Similar complaints were subsequently filed under seal by other former ManorCare employees on August 20, 2010 and September 28, 2011, namely the Slough Action and the Carson

Action. The Slough Action and Carson Action were later consolidated with the Ribik Action in what ultimately became the DOJ Action.[6]

### E. ManorCare Sells All of Its Real Estate Assets and 10% of Its Equity to HCP – and Takes on More Debt

128. HCP became a public company listed on the NYSE in 1985. Its original portfolio was comprised of 24 SNFs and hospitals that were operated by National Medical Enterprises. By 2000, HCP became the largest diversified healthcare REIT, with $2.5 billion of assets under management. In 2008, HCP became the first healthcare REIT to be included in the S&P 500 Index.

129. As a REIT, at least 95% of HCP's gross income in any year must be derived from qualifying sources and it must make distributions to its stockholders aggregating annually at least 90% of its REIT taxable income, excluding net capital gains. HCP invests primarily in real estate serving the healthcare industry in the United States in the following segments: (i) senior housing; (ii) post-acute/skilled nursing; (iii) life science; (iv) medical office; and (v) hospital.

130. In 2011, in a sale/leaseback transaction, The Carlyle Group and ManorCare sold substantially all of ManorCare's brick-and-mortar real estate assets (334 facilities) to HCP for $6.1 billion. The acquisition was completed on April 7, 2011. According to a December 12, 2010 release, as well HCP's Form 10-K for the year ended December 31, 2010, the $6.1 billion paid by HCP was comprised of approximately $3.5 billion in cash, HCP stock worth $852 million, and $1.72 billion from the reinvestment of HCP's existing debt investments in ManorCare.[7] ManorCare then leased back the facilities while continuing to manage and operate them, in a move designed to "wipe out nearly all of its debt," including approximately $1.7 billion of ManorCare's debt held by HCP.

---

[6] On June 13, 2012, the court granted the Government's request to consolidate the Ribik and Carson Actions. On November 4, 2014, the court granted the Government's request to consolidate the Slough Action with the Ribik and Carson Actions.

[7] In subsequent Forms 10-K issued by the Company, HCP represented that it acquired substantially all of ManorCare's real estate assets "for a purchase price of $6.0 billion," which consisted of $4 billion in cash consideration and $2 billion in debt settlement.

HCP also exercised its option under the deal to acquire the Equity Ownership Investment – a 9.9% equity ownership interest in ManorCare. The Carlyle Group continued to own the remaining interest in ManorCare.

131. The leaseback component of the deal (the DFL Investment) was comprised of a triple-net lease agreement that initially provided for an annual rent payment of $472.5 million from ManorCare to HCP, which provided a 1.5x EBITDAR[8] coverage ratio, with annual rent increases of $16.5 million in 2012, $17.1 million in 2013, and $17.7 million in 2014. As further detailed *infra*, these amounts became unmanageable for ManorCare by 2014 as the company could no longer drive revenue increases after its fraudulent business practices came under scrutiny.

132. Prior to the deal, ManorCare's revenue accounted for approximately 9% of HCP's total revenue for fiscal year 2010. The following year, in 2011, that number grew to 27%, and remained between 26% and 30% between 2012 and 2014. Because of the fundamental importance of ManorCare to HCP's business and operations, the SEC in May 2013 directed HCP to go beyond disclosing only summary information concerning ManorCare's earnings, and provide its investors audited financial statements of ManorCare in connection with HCP's annual Form 10-K filings with the SEC, in addition to disclosing ManorCare's unaudited financial results in connection with HCP's quarterly filings with the SEC.

133. On a December 14, 2010 earnings conference call, James Flaherty ("Flaherty"), the CEO of HCP at the time of the sale, discussed HCP's relationship with ManorCare, and the due diligence conducted in connection with the deal, confirming that "***we know each other very well***. We are ***very well versed in terms of [ManorCare's] business strategy, business model*** . . . . I am

[8] "EBITDAR," which refers to "earnings before interest, taxes, depreciation, amortization, and restructuring or rent costs," is a commonly used indicator of a company's financial performance.

not sure there ha[ve] been more than a couple weeks where there haven't been some significant interactions."

134. In a December 13, 2010 HCP release announcing HCP's acquisition of ManorCare's real estate assets, Defendant Ormond stated:

> We at HCR are delighted to have the opportunity to help secure the future of HCR ManorCare's operations by partnering with HCP. Going forward, our company leadership remains the same, we will continue our high level of investment in training and facilities, and our employees will continue to provide the same high-quality care that our patients and residents expect. HCR ManorCare's priority has always been to focus on providing the highest quality care and caring possible to meet the needs and expectations of those we serve, and we selected HCP as our partner because of our shared vision and its industry leading franchise.

135. On February 16, 2011, CtW Investment Group ("CtW"), acting on behalf of long-term HCP shareholders, wrote to HCP's Board of Directors expressing concern about the pending mega-deal with ManorCare. Specifically, CtW noted concern over ManorCare's Medicare reimbursement rates, specifically noting that "ManorCare's current billing levels may be unsustainable and carry significant legal risk." As such, CtW's letter provided HCP with additional notice of the need to investigate the legitimacy of ManorCare's billing practices.

136. Based on the intimate due diligence described by Flaherty, HCP obviously would have conducted a review of ManorCare's revenue sources, which would have revealed ManorCare's absurdly high (and clearly unsustainable) Ultra High billing rates and other improper billing practices.

### F. No Longer Able to Depend on the Revenue from Its Fraudulent Billing Practices, ManorCare Becomes Financially Unviable

137. On January 2, 2013, the DOJ served a CID (Civil Investigative Demand) on ManorCare's corporate headquarters. Through the CID, the DOJ gave unequivocal notice to ManorCare that an investigation was ongoing and advancing. Specifically, the CID stated that the DOJ was conducting a "False Claims Act investigation" concerning "allegations that [ManorCare] . .

. submitted claims to the federal Medicare and TRICARE programs for medically unnecessary rehabilitative therapy services and for materially substandard care." Furthermore, the CID required the production of wide-ranging, voluminous information of ManorCare's practices, including, *inter alia*:

- full records for a specified list of residents;
- documents relating to quality of patient care, financial and operational performance, government payor billing, utilization of RUG codes, revenue enhancement or financial maximization, the company's strategic plan, Medicare entitlement, advertising, marketing, or census;
- employee compensation and evaluations;
- audits;
- any database used to track minutes of rehabilitation therapy administered to patients; and
- identification of any individual who had lodged a complaint with the company regarding therapy minutes, patient stays, or corporate targets.

138. HCP, however, concealed from investors the CID and the DOJ's investigation, declining to disclose either in the Company's 2012 Form 10-K , filed on February 12, 2013. Despite their public silence on the issue, however, Defendants understood internally that ManorCare needed to curtail its fraudulent billing practices given the heightened scrutiny from the federal government. As a result, according to SNF RUG data released by CMS in March 2016, the percentage of total days ManorCare billed at Medicare's Ultra High level declined each year from 2013 through 2015.

139. At the start of 2013, market participants were touting HCP as an attractive investment, specifically noting the appeal of HCP's relationship with, and investments in, ManorCare. For example, on February 5, 2013, Barclays issued a report on HCP that, among other things, extolled HCP's deal with ManorCare as "an investment in the real estate with a best in class operator," and further stated "[w]e think [ManorCare] has the best mix of business, the highest margins, and the best management team in the industry."

140. But ManorCare's performance and profitability soon fell off, because ManorCare was no longer able to drive profits through the revenue derived from its fraudulent billing practices. This inability to drive profits was particularly problematic for ManorCare given the significant fixed annual charges ManorCare carried from its previous deals with The Carlyle Group and HCP.

141. As noted in *supra*, both the $6.3 billion acquisition by The Carlyle Group in 2007 and the $6.1 billion sale/leaseback deal with HCP in 2011 created significant fixed annual charges for ManorCare. Specifically, the HCP deal imposed an annual rent payment that ***started at $472.5 million and escalated 3.5% each of the first five years thereafter***. Both the HCP and The Carlyle Group deals were executed at a time when ManorCare's profits and future estimated cash flows were inflated by the fraudulent billing practices detailed in §IV.C., *supra*. With ManorCare no longer able to drive margins via the highly profitable revenue from its fraudulent billing practices, the company was no longer able to continue growing at the rate required in order to manage the fixed charges from the deals with The Carlyle Group and HCP.

142. On October 3, 2013, HCP abruptly fired Flaherty, its Chairman, President, and CEO, replacing him with Defendant Martin. At the time, HCP attributed the firing to a "loss of confidence by the board in Mr. Flaherty's management style." Analysts, however, noted that the "change came out of the blue," and questioned "what formed the basis of the Board's concern about future shareholder value under Flaherty's leadership."

143. When HCP filed its 2013 Form 10-K a few months later on February 11, 2014, the Company continued to obscure the significance of the DOJ's investigation. Specifically, in the "Legal Proceedings" section of its 2013 Form 10-K, HCP described its litigation with Ventas, Inc. and stated that "the Company is not aware of any other legal proceedings or claims that it believes may have, individually or taken together, a material adverse effect on the Company's business, prospects, financial condition, results of operations or cash flows."

144. HCP, however, attached as an exhibit to the Form 2013 10-K an Ernst & Young LLP audit of ManorCare, which stated that "[m]anagement [of ManorCare] is currently responding to a Civil Investigative Demand, subpoenas, and other requests for information about the Company's skilled nursing facilities in connection with an inquiry coordinated by the U.S. Department of Justice, the Department of Health and Human Services, Office of Inspector General, and certain state attorneys general offices," while reiterating that "[t]he Company believes it is in material compliance with all applicable laws and regulations."

145. Despite HCP's efforts to downplay the significance of the DOJ investigation, ManorCare's performance continued to deteriorate throughout 2014, as the company's inability to drive profits via revenue derived from its fraudulent billing practices exacerbated problems with ManorCare's operational performance, including adverse trends in ManorCare's payer mix support and patient occupancy.

146. On August 6, 2014, Barclays issued a report which attached the following chart detailing ManorCare's steadily deteriorating performance, along with HCP's efforts to assure investors that all was well:

Barclays | HCP, Inc.

FIGURE 1

**HCR ManorCare Coverage versus HCP Commentary**




Source: Company Documents, Barclays Research

147. On December 22, 2014, HCP filed with the SEC a Form 8-K which disclosed that the Company was recording a non-cash impairment charge of approximately $36 million for the Equity Ownership Investment, reducing the carrying amount for the Equity Ownership Investment to approximately $39 million. HCP stated in the Form 8-K that:

> The impairment determination resulted from the Company's review of HCRMC's preliminary base financial forecast for 2015, which the Company received in December 2014, together with HCRMC's year-to-date operating results through November 2014. The operating results and preliminary base financial forecast primarily reflect a continued shift in patient payor sources from Medicare to Medicare Advantage, which negatively impact reimbursement rates and length of stay for HCRMC's skilled nursing segment.

148. Notably, however, HCP stated in the December 22, 2014 Form 8-K that ***"[ManorCare's] preliminary base financial forecast also indicates that [ManorCare] will continue to meet its contractual obligations under the master lease with certain subsidiaries of the Company***." But the truth, as detailed above, was that ManorCare had been experiencing rapidly deteriorating prospects and was no longer financially viable without the highly profitable revenue growth generated via its fraudulent Medicare billing practices, which ManorCare had been forced to curtail as a result of the DOJ investigation.

149. On February 10, 2015, HCP filed its Form 10-K with the SEC. In the "Risk Factors" section, HCP stated that ManorCare "has responded to a Civil Investigative Demand, subpoenas and other requests for information regarding their skilled nursing facilities in connection with an inquiry coordinated by the U.S. Department of Justice, the Department of Health and Human Services, Office of Inspector General, and certain state attorneys general offices." The Form 10-K further stated that ManorCare "believes it is in material compliance with all applicable laws and regulations," while emphasizing again that "[t]he Company is not aware of any legal proceedings or claims that it believes may have, individually or taken together, a material adverse effect on the Company's business, prospects, financial condition, results of operations or cash flows."

150. On February 10, 2015, the Company also disclosed that HCP and ManorCare had agreed to market for sale the real estate and operations associated with 50 underperforming facilities associated with the DFL Investment.

### G. The DOJ Intervenes in the Whistleblower Actions

151. By late 2014 – relying on the fruits of the extensive investigation described *supra*, which included, among other things, numerous investigative interviews – the DOJ decided to take official control of the Whistleblower Actions. On December 8, 2014, the DOJ filed under seal a Notice of Election to Intervene in Part (the "Intervention"). The Intervention signaled that the DOJ's

investigation had yielded considerable evidence of fraud. Indeed, the DOJ states the following regarding intervention in *qui tam* cases:

> Fewer than 25% of filed qui tam actions result in an intervention on any count by the Department of Justice.
>
> * * *
>
> Intervention by the Department of Justice in a qui tam case is not undertaken lightly. Intervention usually requires approval by the Department in Washington. As part of the decision process, the views of the investigative agency are solicited and considered, and a detailed memorandum discussing the relevant facts and law is prepared

The Ribik Action, therefore, was one of the more egregious cases warranting the DOJ's time and resources.

## V. DEFENDANTS' MATERIAL MISREPRESENTATIONS DURING THE CLASS PERIOD

### A. Defendants' False and Misleading Statements

152. The statements set forth below were each materially false and misleading when made, as they misrepresented and/or omitted material facts necessary to make the statements made not false or misleading. The true but undisclosed facts, which were known or recklessly disregarded by Defendants based upon, among other things, their review of internal HCP and ManorCare records and data, were that, from at least 2006 through 2012, ManorCare had engaged in a deliberate scheme whereby it used a variety of tactics to encourage its employees to fraudulently overbill the federal government for services that were ineligible for reimbursement under the Medicare skilled nursing facility benefit because they were unnecessary, unreasonable, and/or unskilled. As detailed *supra*, the true but undisclosed facts regarding ManorCare's fraudulent billing scheme included, among other things, the following:

(a) ManorCare improperly inflated the number of days it billed at Medicare's Ultra High level from 38.8% in October 2006 to 81.3% by February 2010 – ***an increase of more than 100%*** – without improving patient outcomes;

(b) Between 2006 and 2012, ManorCare employed a proprietary "Medicare Power Ratings" accounting system designed to "***maximize revenue***" derived from Medicare reimbursements by pressuring therapists to bill ManorCare's patients at the highest levels of therapy ***without regard*** for the patients' actual medical needs or the reasonableness of the treatment provided;

(c) from 2006 to 2011, ManorCare pressured its therapists to "***group the crap out of every Medicare [Part] A***" by requiring the therapists to deliver 25% of their therapy in non-individualized group therapy sessions – thereby billing up to four hours of therapy for a single hour of generic group therapy – and improperly inflating ManorCare's Medicare reimbursement revenue as a result;

(d) beginning in 2009, ManorCare designed and implemented a corporate directive known as "Project Reset," which pressured ManorCare's therapists to maximize patients' length of stay – ***without regard for patients' actual clinical needs*** – in order to drive Medicare revenue;

(e) from at least 2006 to 2012, ManorCare's "revenue strategy" included "Action Plans" and strict "performance evaluations," which were expressly designed to exert pressure on therapists to increase their Medicare billing rates and incorporated severe consequences "***up to and including termination***" for non-compliance;

(f) ManorCare therapists routinely complained to supervisors that they were pressured to carry out "inappropriate requirements," "unethical practices," and "institutionalized gouging," all in the pursuit of "***getting minutes, minutes, minutes***";

(g) HCP and the HCP Executive Defendants were aware of ManorCare's rampant billing fraud scheme by way of HCP's "partner[ship]" with ManorCare and HCP's extensive due diligence of ManorCare in 2011, which led HCP and ManorCare to "***know each other very well***,"

and led HCP to be "***very well versed in terms of [ManorCare's] business strategy [and] business model***";

(h) on February 16, 2011, investment group CtW advised HCP's Board of Directors that ManorCare had been implicated in questionable billing practices, and that a large portion of ManorCare's revenues might be inappropriate and unsustainable; and

(i) because ManorCare had been forced to curtail its fraudulent billing practices after receiving notice of the DOJ investigation in 2013 (which not only eliminated a significant source of highly profitable revenue for ManorCare, but also triggered other adverse developments), ManorCare's true financial position – along with the corresponding value of the ManorCare Investments – was far worse than Defendants stated publicly, as detailed in §IV.F., *supra*.

**1. Defendants' March 30, 2015 False and Misleading Statements**

153. The Class Period begins on March 30, 2015. On that day, HCP filed with the SEC a Form 8-K (the "March 30, 2015 Form 8-K"), which was signed by Defendant Schoen. In the March 30, 2015 Form 8-K and an accompanying press release, HCP disclosed that it had amended its lease with ManorCare to ensure that ManorCare would be able to meet its lease obligations to HCP, stating that "'[t]his amendment not only results in improved lease coverage, ***but positions [ManorCare] for growth by ensuring that adequate capital is available to advance their strategic business initiatives*** including continued investment in our real estate portfolio.'"

154. Likewise, Defendant Ormond, on behalf of ManorCare, stated: "'We appreciate our strong relationship with and continued support from HCP. ***This pivotal transaction will immediately improve our financial flexibility and allow us to continue to grow the HCR ManorCare franchise*** . . . . HCP is an experienced capital partner that understands the challenges faced by our industry in the current environment.'"

155. HCP's March 30, 2015 Form 8-K also incorporated a presentation titled "HCR ManorCare master lease amendment," in which HCP represented, *inter alia*, that the "***HCRMC master lease amendment strengthen[ed] lease coverage for HCP***," that the master lease amendment "[m]eaningfully [i]mprove[d] [l]ease [c]overage," and provided a corresponding "***[u]pgrade [in] [p]ortfolio [q]uality***." HCP also stated that it had acquired nine new ManorCare-owned and operated assets whose "[q]uality mix, skilled mix and operating margins [were] meaningfully above portfolio average."

156. HCP's March 30, 2015 Form 8-K also reported ***estimated diluted FFO for the full year 2015 as a range from $2.02-$2.08 per share***, and announced that HCP had "concluded that it will record an ***estimated impairment charge of approximately $481 million" for the DFL Investment***.

157. The statements in ¶¶153-156 above were materially false and misleading when made, as they misrepresented and/or omitted material facts necessary to make the statements made not misleading. The true but undisclosed facts, which were then known or recklessly disregarded by Defendants HCP, Schoen, and/or Ormond, based upon, *inter alia*, their review of internal HCP and ManorCare records and data, were that:

(a) for the majority of the prior decade, ManorCare's operations had been dependent upon revenue generated by unlawful and unsustainable billing practices, whereby ManorCare used a variety of corporate pressure tactics – including, *inter alia*, proprietary "Medicare Power Ratings" accounting systems, explicit therapy quotas, threats of job loss for non-compliance and directives that failed to consider patients' actual medical needs – to encourage its employees to fraudulently overbill the federal government for services that were ineligible for reimbursement under the Medicare skilled nursing facility benefit because they were unnecessary, unreasonable, and/or unskilled (*see* §IV.C., *supra*);

(b) ManorCare was not "position[ed] for growth," but rather, had been experiencing rapidly deteriorating prospects and was no longer financially viable without the revenue generated via the fraudulent billing practices described in ¶152 above, which ManorCare had been forced to curtail as a result of the DOJ investigation (*see* §IV.F., *supra*);

(c) contrary to HCP's statements that the Amended Master Lease had "strengthen[ed] lease coverage for HCP" and was "[u]pgrad[ing] [HCP's] [p]ortfolio [q]uality," the ManorCare Investments were significantly impaired – with the Equity Ownership Investment having ***no value at all*** and the DFL Investment being overvalued by approximately ***$817 million*** (*see* ¶207, *infra*) – due to the fact that ManorCare was no longer financially viable without the revenue derived from the improper Medicare billing practices described in ¶152 above, which ManorCare had been forced to curtail as a result of the DOJ investigation;

(d) HCP's reported FFO measures were ***overstated by at least 88%***, due to HCP's failure to use the correct value of the ManorCare Investment in estimating HCP's FFO (*see* ¶211, *infra*); and

(e) HCP's announcement of "an estimated impairment charge of approximately $481 million" for the DFL Investment was materially false and misleading because it failed to disclose that the DFL Investment was ***actually*** impaired by nearly $1.3 billion (*see* ¶207, *infra*).

### 2. Defendants' April 21, 2015 False and Misleading Statements

158. On April 10, 2015, the DOJ filed the United States' Consolidated Complaint in Intervention ("DOJ Complaint"), which laid out allegations derived from more than five years of investigation. The DOJ Complaint raised four causes of action – (1) False or Fraudulent Claims under the FCA; (2) False Statements under the FCA; (3) Unjust Enrichment; and (4) Payment by Mistake – against HCR ManorCare, Inc., Manor Care Inc., Heartland Employment Services, LLC, and HCR ManorCare Services, LLC (in the DOJ Complaint, the DOJ collectively referred to these

entities as "ManorCare"). The DOJ alleged that ManorCare had billed federal healthcare programs for services that did not meet the federal requirements for SNF care or the receipt of SNF benefits from the government. More specifically, the DOJ alleged that ManorCare operated a national chain of approximately 281 SNFs through which ManorCare:

- provided patients with unnecessary, unreasonable, unskilled, and sometimes even harmful treatment;
- kept patients in the SNFs for longer times than were medically necessary;
- without regard to patients' clinical needs, set internal corporate goals for providing the "Ultra High" level of therapy, which would be reimbursed by Medicare at a more lucrative rate than lower levels of therapy;
- enforced those goals by praising SNFs and directors that provided sufficient amounts of "Ultra High" therapy and by implementing "action plans" for SNFs and directors not meeting those goals;
- mandated group therapy so that the simultaneous therapy could be billed to Medicare multiple times, once for each patient;
- without clinical justification, increased therapy during the seven-day assessment days during which the levels of therapy provided to a given patient are used to determine the Medicare reimbursement rate to be paid for that therapy;
- without regard to patients' needs, limited treatments after patients had reach the Ultra High therapy level (and no additional Medicare payments were possible);
- increased Ultra High billing by more than 100%, from 38.8% of all rehabilitation days in October 2006 to 80.3% of all rehabilitation days in November 2009;
- successfully billed Medicare for therapy that was unreasonable, unnecessary, and/or excessive in frequency, duration, or intensity; and
- through this conduct, received over $6 billion from Medicare Part A and over $5.6 million from Tricare for Life from January 2006 through May 31, 2012.

159. On April 20, 2015, the court in the DOJ Action unsealed the DOJ Complaint and the previously filed Whistleblower Actions' complaints, and those allegations were made public for the first time. The following day, April 21, 2015, ManorCare posted a message on its website regarding the DOJ Action. In the message, ManorCare stated, *inter alia*, "[w]e believe this lawsuit is unjust"

and that ManorCare had "produc[ed] information that we believe refutes the basic claims contained in the lawsuit." ManorCare further stated that it "vehemently disagree[d]" with the allegations in the DOJ Action and also noted that:

> ***[T]his lawsuit is the result of a billing dispute between our company and the federal government that stems from the government's view that our industry as a whole is providing a level of care to Medicare rehabilitation patients that exceeds the government's expectations, despite the fact that these services*** were ***ordered by licensed physicians and delivered by licensed therapists***.
>
> * * *
>
> ***When we have identified billing issues through our controls and compliance activities, we have taken appropriate action***, including at times terminating employees for misconduct and voluntarily repaying monies received for inaccurate billings. . . . However, we categorically reject any attempt by the government to have our company and its employees portrayed as engaging in a systematic, corporate-wide fraud scheme.

160. The statements in ¶159 above were materially false and misleading when made, as they misrepresented and/or omitted material facts necessary to make the statements made not false or misleading. The true but undisclosed facts, which were then known or recklessly disregarded by Defendant ManorCare based upon, *inter alia*, its review of internal ManorCare records and data, were that:

(a) ManorCare had not "taken appropriate action" when it had identified "billing issues." To the contrary, for the majority of the prior decade, ManorCare's operations had been dependent upon revenue generated by unlawful and unsustainable billing practices, whereby ManorCare used a variety of corporate pressure tactics – including, *inter alia,* proprietary "Medicare Power Ratings" accounting systems, explicit therapy quotas, threats of job loss for non-compliance, and directives that failed to consider patients' actual medical needs – to encourage its employees to fraudulently overbill the federal government for services that were ineligible for reimbursement under the Medicare skilled nursing facility benefit because they were unnecessary, unreasonable, and/or unskilled (*see* §IV.C., *supra*);

(b) the DOJ Action was ***not*** a simple "billing dispute," but rather, as detailed in §IV.C., *supra*, it was the result of a deliberate scheme whereby ManorCare used a variety of corporate pressure tactics to encourage its employees to fraudulently overbill the federal government for services that were ineligible for reimbursement under the Medicare skilled nursing facility benefit because they were unnecessary, unreasonable, and/or unskilled; and

(c) because ManorCare had knowingly engaged in the deliberate billing fraud scheme described above, the DOJ Action was ***not*** "unjust."

**3. Defendants' May 5, 2015 False and Misleading Statements**

161. On May 5, 2015, HCP filed with the SEC a Form 8-K (the "May 5, 2015 Form 8-K") and a Form 10-Q for the first quarter of 2015 (the "1Q15 Form 10-Q"). The 1Q15 Form 10-Q was signed by Defendants Martin and Schoen, and the May 5, 2015 Form 8-K was signed by Defendant Schoen. In the 1Q15 Form 10-Q, the Company reported that:

(a) the ***Equity Ownership Investment was valued at $51 million*** and represented a 9.4% ownership interest in ManorCare;

(b) HCP was recording a non-cash impairment of $478 million related to the DFL Investment, which ***reduced the carrying value of the DFL Investment from $6.6 billion to $6.1 billion***;

(c) notwithstanding the impairment, "***collection of the amended rent payments [from the DFL Investment] is reasonably assured***";

(d) HCP's ***diluted FFO for 1Q15 was a loss of $0.26 per share***; and

(e) HCP's ***diluted EPS for 1Q15 was a loss of $0.52 per share***.

162. The statements in ¶161 above were materially false and misleading when made, as they misrepresented and/or omitted material facts necessary to make the statements made not false or misleading. The true but undisclosed facts, which were then known or recklessly disregarded by

Defendants HCP, Martin, and Schoen based upon, *inter alia*, their review of internal HCP and ManorCare records and data, were that:

(a) the value of the ManorCare Investments was materially overstated – with the Equity Ownership Investment having ***no value at all*** and the DFL Investment being overvalued by approximately ***$817 million***, even ***after*** the $478 million impairment (*see* ¶207, *infra*) – as ManorCare had experienced rapidly deteriorating prospects and was no longer financially viable without the revenue generated via the fraudulent billing practices described in ¶152 above, which practices ManorCare had been forced to curtail as a result of the DOJ investigation (*see* §IV.F., *supra*);

(b) the "collection of the amended rent payments" was ***not*** "reasonably assured," because ManorCare had been experiencing rapidly deteriorating prospects and was no longer financially viable without the revenue generated via the fraudulent billing practices described in ¶152 above, which ManorCare had been forced to curtail as a result of the DOJ investigation (*see* §IV.F., *supra*); and

(c) HCP's reported FFO and EPS measures were ***overstated by 713% and 358%, respectively***, due to HCP's failure to use the correct value of the ManorCare Investment in estimating HCP's FFO and EPS (*see* ¶¶212-213, *infra*).

163. On May 5, 2015, Defendant HCP also convened an earnings call with analysts, on which Defendants Martin and Schoen were present. During the call, Defendant Martin had the following exchange with analysts:

> **Nick Yulico** – UBS – Analyst: Okay. Just one other HCR question and I think Ross had a follow-up on something else. Are you spending much time these days with hiring your own counsel or doing your own due diligence on what the ultimate outcome of this complaint might be and how it impacts HCP? And if so, are you actually accruing expenses for that today? And where would that be showing up on your P&L?

> **[Martin:]** ***The complaint is against HCR, not HCP.*** So, no, we don't need legal counsel. We always keep track of what goes on in the industry, but that is **not** any different expense than we would have on a normal basis.
>
> * * *
>
> **Derek Bower** – Evercore ISI – Analyst: I just wanted to follow up on ManorCare. Can you speak to any recourse that you may have to, as part of your leased ManorCare, if they are found at fault by the DOJ?
>
> **[Martin:]** We have a lease to ManorCare. This is a civil investigation. So, I think ***you're probably stretching a little bit too far*** with the question.

164. Additionally, when asked whether the other actions in which the DOJ did not intervene were "officially over," HCP's Chief Investment Officer stated "***Yes***." Defendant Schoen did not correct these misstatements.

165. The statements in ¶¶163-164 above were materially false and misleading when made, as they misrepresented and/or omitted material facts necessary to make the statements made not misleading. The true but undisclosed facts, which were then known or recklessly disregarded by Defendants HCP, Martin, and Schoen based upon, *inter alia*, their review of internal HCP and ManorCare records and data, were that:

(a) the other actions were ***not*** "officially over," because the DOJ had not yet consented to the voluntary dismissal of Ribik's separate action (which named HCP as a defendant). Indeed, the DOJ did not file its consent until November of 2015. And a few days after the conference call, Relator Carson sought leave to file a separate second amended complaint;

(b) analysts were ***not*** "stretching a little bit too far" in seeking answers regarding HCP's lease with ManorCare. Indeed, because ManorCare had knowingly engaged in the deliberate billing fraud scheme described in ¶152, *supra*, the underlying allegations of the DOJ Action ***did*** have merit. Moreover, because ManorCare had been experiencing rapidly deteriorating prospects and was no longer financially viable without the revenue generated via the fraudulent billing practices

ManorCare had been forced to curtail as a result of the DOJ investigation, the value and future prospects of the ManorCare Investments had been placed in serious jeopardy.

**4. Defendants' May 11, 2015 False and Misleading Statements**

166. On May 11, 2015, HCP held an investor day. During the presentation, which was attended by Defendants Martin, Schoen, Kowalske, and Cavanaugh, Defendant Martin stated:

> First, HCR ManorCare. ***Due to changes in Medicare reimbursements and a consumer trend towards managed care, HCR profits have declined since 2012, impacting our lease coverage***. With the recently amended HCR master lease on terms we feel are fair and positive to HCP, we are providing increased financial flexibility to HCR to grow its business and increase our lease coverage commencing this quarter.

167. Also during the presentation, Defendant Kowalske, the leader of HCP's Post-Acute/Hospital segment, stated:

> Furthermore, 93% of their rehab patients eventually return home with an average day of less than 30 days. ***These results have enabled HCR to increase admissions and gain market share while navigating a series of challenging reimbursement changes, therapy cuts, sequestration, and the ongoing trend towards managed care.***
>
> As Lauralee [Martin] mentioned, ***while HCR continued to meet its lease obligations, ongoing pressure in the post-acute environment resulted in a decline in HCR's profitability.*** . . .

168. Defendant Kowalske added:

> While the post-acute industry remains challenging, ***HCR is off to a strong start in 2015***. As reported, HCR's first quarter was up over budget and ahead of last year, representing momentum across all operating metrics, including admissions, census, Q mix, and margin.
>
> Asset sales are also proceeding well. Six properties are already under LOI and we've just received initial bids on the remaining 44 properties from a robust group of both national, regional, and local operators.
>
> * * *
>
> Of note, the majority of the nine assets being transferred to us under the recent lease amendment were developed over the last four years, ***showing HCR's ability to both grow and create value. With a more stable reimbursement outlook, solid growth strategies in place and increased liquidity, HCR is in position to***

> ***further grow their business*** and in turn, that growth will improve our facility level coverage and operations.

169. During the question-and-answer session that followed, Defendant Martin stated:

> Let's start with the HCR ManorCare. One of the important factors that we were thinking about when we did the amended lease, besides just a coverage on our lease, was to make sure that HCR had financial flexibility to grow their business. . . . So, we've profiled it with what Darren [Kowalske] covered today. ***They continue to take market share, but as they get back to being a growth viable entity, it gives us a lot more flexibility to think about what's the next step with HCR***. So I mean, clearly, we are taking it in and bits and pieces. Working with them on the 50 assets around their strategy to make them a more optimum business was step number one and we'll continue to work through that.

170. The statements in ¶¶166-169 above were materially false and misleading when made, as they misrepresented and/or omitted materially facts necessary to make the statements made not misleading. The true but undisclosed facts, which were then known or recklessly disregarded by Defendants HCP, Martin, and Kowalske based upon, *inter alia*, their review of internal HCP and ManorCare records and data, were that:

(a) ManorCare's profits had ***not*** declined "[d]ue to changes in Medicaid reimbursements and a consumer trend towards managed care," but rather, because ManorCare was no longer able to rely on revenue generated via the fraudulent billing practices described in ¶152 above, which ManorCare had been forced to curtail as a result of the DOJ investigation (*see* §IV.F., *supra*); and

(b) ManorCare was ***neither*** "off to a strong start in 2015" ***nor*** "in position to further grow their business," as ManorCare had been experiencing rapidly deteriorating prospects and was no longer financially viable without the revenue generated via the fraudulent billing practices described in ¶152 above, which ManorCare had been forced to curtail as a result of the DOJ investigation (*see* §IV.F., *supra*);

171. During the May 11, 2015 presentation, Defendant Cavanaugh stated the following:

> You know, when I think about HCR ManorCare and the future of HCR ManorCare, it is very, very exciting. ***This transformation that's going on in healthcare is going to be a tremendous opportunity for our company. We believe we have all the capabilities that we need to be successful in that new market*** and we are really excited about the opportunity to take advantage of that. And we are very excited to work with HCP as we move forward and try and really make that vision and that strategy a reality in the years to come. So we couldn't be happier to have them as a partner.

172. The statements in ¶171 above were materially false and misleading when made, as they misrepresented and/or omitted material facts necessary to make the statements made not misleading, which were then known or recklessly disregarded by Defendant Cavanaugh. Specifically, contrary to Defendant Cavanaugh's statements, ManorCare did ***not*** have a "tremendous opportunity" in the healthcare market and did ***not*** "have all the capabilities . . . need[ed] to be successful in that new market." Rather, ManorCare had been experiencing rapidly deteriorating prospects and was no longer financially viable without the revenue generated via the fraudulent billing practices described in ¶152 above, which ManorCare had been forced to curtail as a result of the DOJ investigation (*see* §IV.F., *supra*).

173. On May 14, 2015, just three days after Defendants HCP, Martin, Kowalske, and Cavanaugh made the materially false and misleading statements described in ¶¶166-171 above, HCP successfully completed the sale of $750 million of 4.00% senior unsecured notes due in 2025 (the "May 2015 Bond Offering"). The May 2015 Bond Offering was issued pursuant to a Registration Statement filed by HCP on July 24, 2012, which was signed by Defendants Schoen and Martin. One month later, on June 26, 2015, HCP initiated an "at-the-market" equity offering, which authorized the sale of HCP common stock having an aggregate gross sales price of up to $750 million in common stock (the "June 2015 Equity Offering"). The June 2015 Equity Offering was issued pursuant to a Registration Statement filed by HCP on June 26, 2015, which was signed by Defendants Schoen and Martin. The May 2015 Bond Offering and June 2015 Equity Offering provided additional incentive for Defendants to conceal the true state of ManorCare's financial

viability and future prospects in order to raise as much capital as possible before the truth was revealed.

**5. Defendants' August 4, 2015 False and Misleading Statements**

174. On August 4, 2015, HCP filed a Form 10-Q with the SEC for the second quarter of 2015 (the "2Q15 Form 10-Q"), which was signed by Defendants Martin and Schoen. In the 2Q15 Form 10-Q, Defendant HCP continued to represent that "***collection of the amended rent payments [from the DFL Investment] is reasonably assured***."

175. The statement in ¶174 above was materially false and misleading when made, as it misrepresented and/or omitted material facts necessary to make the statements made not misleading. The true but undisclosed facts, which were then known or recklessly disregarded by Defendants HCP, Martin, and Schoen based upon, *inter alia*, their review of internal HCP and ManorCare records and data, were that the "collection of the amended rent payments" was ***not*** "reasonably assured," because ManorCare had been experiencing rapidly deteriorating prospects and was no longer financially viable without the revenue generated via the fraudulent billing practices described in ¶152 above, which ManorCare had been forced to curtail as a result of the DOJ investigation (*see* §IV.F., *supra*).

176. HCP's 2Q15 Form 10-Q also reported the Company's ***diluted FFO for 2Q15 and diluted EPS for 2Q15 as $0.65 per share and $0.36 per share, respectively***. HCP's reported FFO and EPS measures were ***overstated by 277% and 507%, respectively***, due to HCP's failure to use the correct value of the ManorCare Investment in estimating HCP's FFO and EPS (*see* ¶¶214-215, *infra*).

177. On August 4, 2015, Defendant HCP also convened an earnings call with analysts, during which Defendant Schoen reiterated: "***Our balance sheet continues to be in excellent shape***."

178. During the question-and-answer portion of HCP's August 4, 2015 earnings call, Defendant Martin engaged in the following exchange:

> **Juan Sanabria – BofA Merrill Lynch – Analyst**: Good afternoon at this point, I was just hoping you could speak to sort of the current trends into August now on ManorCare and Four Seasons and how you see both of those situations evolving?
>
> **[Martin:]** ***We discussed HCR and we continue to be pleased that they're ahead of their budget***. Just some more details on the stats for them. They continue to see their admissions go up, so their admissions were up 3% in the second quarter. That was higher than their first quarter at 2.7%. ***So that, I think, reinforces the fact that they are a quality care provider that can give outcomes to hospital systems and to payors, which is definitely the trend and where healthcare is going***.
>
> ***So we're pleased with what's going on there. Obviously we'll continue to improve the coverage of that portfolio both at facility and fixed charge coverage***. The numbers that we've talked about for both of those at the completion of the asset sales will be about a 1.3 on a fixed charge coverage, and trending up to 1.07, 1.08 at the facility level, puts us all the way back at where we were with HCR ManorCare in the third quarter of 2012. ***So, we have definitely positioned ourselves to feel comfortable with our lease, and with where ManorCare is going***.

179. The statements in ¶¶177-178 above were materially false and misleading when made, as they misrepresented and/or omitted material facts necessary to make the statements made not misleading. The true but undisclosed facts, which were then known or recklessly disregarded by Defendants HCP, Martin, and Schoen based upon, *inter alia*, their review of internal HCP and ManorCare records and data, were that:

(a) HCP's balance sheet was ***not*** "in excellent shape," as the value of the ManorCare Investments was materially overstated – with the Equity Ownership Investment having ***no value at all*** and the DFL Investment being overvalued by approximately ***$817 million*** (*see* ¶207, *infra*) – due to the fact that ManorCare had been experiencing rapidly deteriorating prospects and was no longer financially viable without the revenue generated via the fraudulent billing practices described in ¶152 above, which ManorCare had been forced to curtail as a result of the DOJ investigation (*see* §IV.F., *supra*); and

(b) HCP was ***not*** "pleased with what's going on" at ManorCare, and it had ***not*** "positioned [itself]," such that Defendants HCP and Martin were "comfortable with [the Company's] lease, and with where ManorCare is going," because ManorCare had been experiencing rapidly deteriorating prospects and was no longer financially viable without the revenue generated via the fraudulent billing practices described in ¶152 above, which practices ManorCare had been forced to curtail as a result of the DOJ investigation (*see* §IV.F., *supra*).

### 6. Defendants' September 17, 2015 False and Misleading Statements

180. On September 17, 2015, Defendants Martin and Schoen attended the Bank of America Merrill Lynch Global Real Estate Conference. During the presentation, Defendant Martin engaged in the following exchange:

> **[Unidentified Participant:]** Great. And maybe just switching gears, ManorCare, I'd be remiss if I didn't it bring up. Latest thoughts or how do you see things progressing there? Any updates on how they're trending from a fundamental occupancy perspective, any labor cost pressures or anything you could kind of give us some color on how that business is performing?
>
> **[Martin:]** ***ManorCare started the year really, really strong***. I mean while there was negative impacts of the flu season to the senior housing space, those were actually positive dynamics to the post-acute space in a medical sense. ***So ManorCare started out very, very strongly***.
>
> * * *
>
> ***They're positive on their business***. ***We're positive on their business***.
>
> If we've had – if we end up having any softness, the offset to that is we are on the high side of our guidance in terms of asset sales. So, that's been a very good outcome. And just to remind everybody, the assets that are being sold actually had negative EBITDA consequences. So, they end up with a business that . . . hasn't lost EBITDA and, matter of fact, maybe has improved it while they've had a lower rent cost because of the credit we're giving them for that repayment of that capital which we then recycle into our other opportunities. ***So, we think we're in a good place***. If anything, we're on the high side of the various guidances we've given.

181. The statements in ¶180 above were materially false and misleading when made, as they misrepresented and/or omitted material facts necessary to make the statements made not

misleading. The true but undisclosed facts, which were then known or recklessly disregarded by Defendants HCP and Martin based upon, *inter alia*, their review of internal HCP and ManorCare records and data, were that:

(a) for the majority of the prior decade, ManorCare's operations had been dependent upon revenue generated by unlawful and unsustainable billing practices, whereby ManorCare used a variety of corporate pressure tactics – including, *inter alia*, proprietary "Medicare Power Ratings" accounting systems, explicit therapy quotas, threats of job loss for non-compliance, and directives that failed to consider patients' actual medical needs – to encourage its employees to fraudulently overbill the federal government for services that were ineligible for reimbursement under the Medicare skilled nursing facility benefit because they were unnecessary, unreasonable and/or unskilled (*see* §IV.C., *supra*); and

(b) ManorCare was ***not*** "in a good place" and had ***neither*** "started the year really, really strong" ***nor*** "very, very strongly," but rather, had been experiencing rapidly deteriorating prospects and was no longer financially viable without the revenue generated via the fraudulent billing practices described in ¶152 above, which practices ManorCare had been forced to curtail as a result of the DOJ investigation (*see* §IV.F., *supra*).

**7. Defendants' November 3, 2015 False and Misleading Statements**

182. On November 3, 2015, HCP filed with the SEC a Form 10-Q for the third quarter 2015 (the "3Q15 Form 10-Q"), which was signed by Defendants Martin and Schoen. In the 3Q15 Form 10-Q, the Company reported that:

(a) HCP was recording an impairment of $27 million for the Equity Ownership Investment, which ***reduced the carrying value of the Equity Ownership Investment from $48 million to $21 million*** and represented a 9.0% ownership interest in ManorCare;

(b) "***the collection and timing of all amounts owed by [ManorCare] under [the DFL Investment] are reasonably assured***";

(c) HCP's ***diluted FFO for 3Q15 was $0.57 per share***; and

(d) HCP's ***diluted EPS for 3Q15 was $0.25 per share***.

183. The statements in ¶182 above were materially false and misleading when made, as they misrepresented and/or omitted material facts necessary to make the statements made not false or misleading. The true but undisclosed facts, which were then known or recklessly disregarded by Defendants HCP, Martin, and Schoen based upon, *inter alia*, their review of internal HCP and ManorCare records and data, were that:

(a) the value of the Equity Ownership Investment was materially overstated, as ManorCare had been experiencing rapidly deteriorating prospects and was no longer financially viable without the revenue generated via the fraudulent billing practices described in ¶152 above, which practices ManorCare had been forced to curtail as a result of the DOJ investigation. *See* §IV.F., *supra*. As a result of ManorCare's deteriorating condition, the Equity Ownership Investment did ***not*** have a value of $21 million, but rather, had ***no value at all*** (*see* ¶207, *infra*);

(b) the "collection and timing of all amounts owed by [ManorCare] under [the DFL Investment]" was ***not*** "reasonably assured," because ManorCare had been experiencing rapidly deteriorating prospects and was no longer financially viable without the revenue generated via the fraudulent billing practices described in ¶152 above, which practices ManorCare had been forced to curtail as a result of the DOJ investigation. *See* §IV.F., *supra*; and

(c) HCP's reported FFO and EPS measures were ***overstated by 298% and 686%, respectively***, due to HCP's failure to use the correct value of the ManorCare Investment in estimating HCP's FFO and EPS (*see* ¶¶216-217, *infra*).

184. On November 3, 2015, Defendant HCP also convened an earnings call with analysts, in which Defendants Martin and Schoen participated. During the call, Defendant Martin stated the following (which Defendant Schoen did not correct):

> ***Operationally, HCR's third-quarter performance, despite maintaining strong market share, was impacted by the broader market declining trends in admissions from hospitals and continuing trends in mix and length of stay driven by Medicare Advantage and other managed care plans***.
>
> * * *
>
> ***But as we think about HCR, they are adapting to changes in mix shift. The Medicare Advantage, I actually think they're doing that quite well***. If we think about their results year to date, year over year, with revenues of just a little bit less than $3.1 billion, they have managed a Medicare to Medicare Advantage shift, which lowers rate, length of stay and yet their comparable revenues year-over-year are only down 0.3%.
>
> So clearly, they're responding to the marketplace, its market share and other actions. And with our lease amendment, we've given them more cash flow flexibility to start growing their business.

185. The statements in ¶184 above were materially false and misleading when made, as they misrepresented and/or omitted material facts necessary to make the statements made not false or misleading. The true but undisclosed facts, which were then known or recklessly disregarded by Defendants HCP, Martin, and Schoen based upon, *inter alia*, their review of internal HCP and ManorCare records and data, were that:

(a) for the majority of the prior decade, ManorCare's operations had been dependent upon revenue generated by unlawful and unsustainable billing practices, whereby ManorCare used a variety of corporate pressure tactics – including, *inter alia*, proprietary "Medicare Power Ratings" accounting systems, explicit therapy quotas, threats of job loss for non-compliance and directives that failed to consider patients' actual medical needs – to encourage its employees to fraudulently overbill the federal government for services that were ineligible for reimbursement under the

Medicare skilled nursing facility benefit because they were unnecessary, unreasonable, and/or unskilled (*see* §IV.C., *supra*); and

(b) ManorCare was ***not*** doing "quite well," and its deteriorating performance was ***not*** a result of "broader market declining trends," but rather, ManorCare had been experiencing rapidly deteriorating prospects and was no longer financially viable without the revenue generated via the fraudulent billing practices described in ¶152 above, which ManorCare had been forced to curtail as a result of the DOJ investigation (*see* §IV.F., *supra*).

186. Less than a month later, on November 23, 2015, HCP priced an offering of $600 million of 4.00% senior unsecured notes due in 2022 (the "November 2015 Bond Offering"). The November 2015 Bond Offering was issued pursuant to a Registration Statement filed by HCP on June 26, 2015, which was signed by Defendants Schoen and Martin. Like the May 2015 Bond Offering and June 2015 Equity Offering, the November 2015 Bond Offering provided additional incentive for the HCP Defendants to conceal the true state of ManorCare's financial viability and future prospects in order to raise as much capital as possible before the truth was revealed.[9]

**8. The Truth Revealed**

187. On February 9, 2016 – a mere ***three months*** after Defendants HCP, Martin, and Schoen last assured investors that "the collection and timing of ***all amounts*** owed by [ManorCare] under [the DFL Investment] are ***reasonably assured***" and that ManorCare was doing "***quite well***" and sold more than $600 million of newly issued securities to investors – HCP disclosed in its Form 10-K for the year ended December 31 2015 (the "2015 Form 10-K"), that it was ***writing down the Equity Ownership Investment to zero and recording an additional impairment charge of $817***

[9] The May 2015 Bond Offering, June 2015 Equity Offering, and November 2015 Bond Offering are collectively referred to herein as the "2015 Offerings."

***million in connection with the DFL Investment***.[10] In addition, HCP put its entire ManorCare real estate portfolio on "Watch List" status, and disclosed a change to the way it accounted for lease revenue from ManorCare to a "cash basis," due to HCP's determination "that the timing and amounts owed under the [ManorCare] [lease] investments are ***no longer reasonably assured***."

188. Three months later, on May 9, 2016, HCP filed a Form 10-Q for the quarterly period ended March 31, 2016, in which it announced that the Company's Board of Directors had unanimously approved a plan to spin off its ManorCare portfolio of SNFs and assisted living assets, as well as certain other assets, into an independent, publicly traded REIT named HCP SpinCo, Inc. ("SpinCo").

189. Amidst the news regarding its spin-off, on July 11, 2016, HCP abruptly announced that Defendant Martin was leaving her position as CEO and President and that Michael D. McKee ("McKee") was replacing her in the interim. McKee stated that "'[w]ith the completion of our strategic portfolio review and the resulting spin-off transaction that is well underway, the Board felt now is the appropriate time to advance the process of developing HCP's next generation of leadership.'"

190. On October 31, 2016, HCP announced that the spin-off of its ManorCare portfolio of SNFs and assisted living assets – formerly SpinCo – had been completed, with SpinCo taking the name QCP (as defined above).

191. Following the spin-off, ManorCare's financial position continued to worsen. On April 5, 2017, QCP announced that it entered into a forbearance agreement with ManorCare. Under the terms of the agreement, ManorCare agreed to make cash rent payments of $32 million for each

10 Although HCP initially announced on February 9, 2016 that it was recognizing an $817 million impairment charge for HCP's DFL Investment, the Company subsequently reported in its 2015 Form 10-K that the actual amount of the net impairment it recorded was $810.932 million, because the $817 million DFL Investment impairment charge was offset by a $6 million impairment recovery related to a loan payoff in HCP's hospital segment.

of April, May, and June of 2017, with a deferral of the additional $7.5 million per month until the earlier of July 5, 2017 or the early termination of the agreement.

192. Shortly thereafter, on April 14, 2017, QCP released an amended Form 10-K for the period ended December 31, 2016, in which QCP detailed the significant deterioration of ManorCare's financial situation. QCP indicated that, because 94% of its total revenues for the year ended December 31, 2016 were attributed to ManorCare, ManorCare's inability to pay QCP would "materially reduce [QCP's] liquidity, cash flow, net operating income and results of operations, which would in turn reduce the amount of dividends [QCP] pays to [its] stockholders, cause [its] stock price to decline and have other materially adverse effects on [the] business, results of operations and financial condition." Furthermore, in light of ManorCare's financial condition, QCP's auditors had "substantial doubt[s] about [ManorCare's] ability to continue as a going concern."

193. On June 2, 2017, *The New York Post* reported that Defendant Ormond was demanding the $100 million in deferred compensation that was promised to him as part of the $6.3 billion acquisition by The Carlyle Group in 2007. The article reported that QCP "'says it cannot pay that kind of money to Ormond now in the face of a DOJ investigation,'" but that Ormond "wants to be paid fully in exchange for agreeing to a restructuring, or he is willing to take his chances in a bankruptcy that could end up shuttering many of HCR's nursing homes."

194. In July 2017, HCP announced that the Company's Chief Accounting Officer, Scott A. Anderson, was leaving.

195. On or about August 17, 2017, QCP filed a complaint in the Superior Court of California seeking to transfer its ManorCare SNFs, assisted living, and other care properties to the control of an independent receiver. QCP contended that ManorCare contractually owed it $385

million in future rent and that the lease allowed it to seek receivership should ManorCare default on its rent obligations.

196. On September 25, 2017, Defendant Ormond left his position as ManorCare's President and CEO and was replaced by Defendant Cavanaugh.

197. Although it had monthly rent obligations of approximately $39.5 million, QCP alleged that ManorCare paid only $23 million in August, $17.6 million in September, $21 million in October, and $19 million in November of 2017. In December 2017, QCP extended ManorCare's deadline to respond to its receivership complaint to January 15, 2018 – the fourth extension since the complaint was filed.

198. In December 2017, QCP agreed to reduce ManorCare's monthly rent payments from about $39.5 million to $23.5 million through November 2018. Despite the rent reduction, ManorCare, which already owed QCP more than $300 million in back rent, acknowledged that it would struggle to pay the reduced amount and that its operations are expected to trend significantly downward in 2018.

199. On January 26, 2018, ManorCare responded to QCP's receivership claim, seeking a dismissal of certain claims. That litigation remains ongoing.

**B. SOX Certifications Executed Throughout the Class Period**

200. In connection with each quarterly report HCP filed with the SEC during the Class Period, Defendants Martin and Schoen (*see* ¶¶161, 174, 182, *supra*), signed certifications pursuant to the Sarbanes-Oxley Act ("SOX"). Pursuant to §302 of SOX, and also covered by §§304 and 906 of SOX, Defendants Martin and Schoen certified that they had designed and evaluated effective internal and disclosure controls over financial reporting, which assured the reliability of financial reporting, and also that HCP's financial statements fairly and accurately presented the financial

condition of the Company. For example, in connection with the Form 10-Q filed by HCP on May 5, 2015, Defendants Martin and Schoen certified as follows:

> 1. I have reviewed this quarterly report on Form 10-Q of HCP, Inc. for the period ended March 31, 2015;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> 5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the

registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

201. Similarly, in connection with the Form 10-Q filed by HCP on May 5, 2015, Defendants Martin and Schoen certified that:

> Pursuant to 18 U.S.C. §1350, as created by Section 906 of the Sarbanes-Oxley Act of 2002, the undersigned officer of HCP, Inc., a Maryland corporation (the "Company"), hereby certifies, to [her/his] knowledge, that:
>
> (i) the accompanying quarterly report on Form 10-Q of the Company for the period ended March 31, 201 5 (the "Report") fully complies with the requirements of Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934, as amended; and
>
> (ii) the information contained in the report fairly presents, in all material respects, the financial condition and results of operations of the Company.

202. Defendants Martin and Schoen filed similar certifications to those in ¶¶200-201 in connection with every other Form 10-Q filed by HCP during the Class Period.

203. The SOX certifications signed by Defendants Martin and Schoen during the Class Period were materially false and misleading when made because HCP did not maintain an effective control environment as of the date of the filings, as HCP failed to report that ManorCare had been experiencing rapidly deteriorating prospects and was no longer financially viable without the revenue generated via the fraudulent billing practices described in ¶152 above, which ManorCare had been forced to curtail as a result of the DOJ investigation (*see* §IV.F., *supra*) and that HCP's interest in the ManorCare Investments was misstated as a result (*see* ¶¶205-238, *infra*).

204. Additionally, each of the SOX certifications signed during the Class Period was materially false and misleading because contrary to the representation that HCP's SEC filings did "not contain any untrue statement of a material fact" or omission, the SEC filings to which the certifications were appended contained numerous false and misleading statements and omissions, as set forth herein.

**C. Defendants' Accounting Violations**

205. Throughout the Class Period, Defendants HCP, Martin, and Schoen violated Generally Accepted Accounting Principles ("GAAP")[11] and SEC rules by knowingly or recklessly failing to incorporate and account for information that had a materially adverse impact on the value of the ManorCare Investments. Specifically, Defendants HCP, Martin, and Schoen violated GAAP by failing to timely recognize necessary impairments in connection with HCP's DFL Investment and Equity Ownership Investment assets. Those assets were impaired under GAAP, respectively, because Defendants HCP, Martin, and Schoen knew that it was probable that the Company was not be able to collect all the contractual payments from ManorCare as scheduled in their amended agreement, and the present value of ManorCare's cash flows was less than the carrying value of the investment. Consequently, Defendants HCP, Martin, and Schoen also knowingly or recklessly failed to provide accurate and complete disclosures of non-GAAP financial measures, as required by SEC rules, discussed below.

206. GAAP requires that those assets be valued based on their expected future cash flows. Defendants HCP, Martin, and Schoen, however failed to properly reduce their estimations of

[11] GAAP comprises the standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices. The SEC has the statutory authority for the promulgation of GAAP for public companies and has generally delegated that authority to the Financial Accounting Standards Board ("FASB"). The FASB's promulgated standards are generally contained within the FASB Accounting Standards Codification ("ASC"), which are considered to be the highest standards of GAAP. SEC Regulation S-X, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP are presumed to be misleading, despite footnotes or other disclosures.

ManorCare's future cash flows and lease payments by, *inter alia*, knowingly or recklessly failing to: (i) properly consider information pertaining to known adverse trends and key available data regarding, among other things, ManorCare's payer mix support, MediCare reimbursement rates, and patient occupancy; and (ii) acknowledge that projected revenue increases were unattainable. As a result, Defendants HCP, Martin, and Schoen overstated the value of the ManorCare Investments' assets throughout the Class Period.

207. Prior to the start of the Class Period, Defendants HCP, Martin, and Schoen knew or were reckless in disregarding that the Equity Ownership Investment was impaired by approximately $45.9 million and the DFL Investment was impaired by nearly $1.3 billion. Instead of recognizing the required impairments at the start of the Class Period, however, Defendants HCP, Martin, and Schoen decided to record only a portion of the ManorCare Investments' impairments throughout the Class Period. Specifically, as detailed *supra*, during the Class Period, Defendants HCP, Martin, and Schoen only: (i) announced an impairment of approximately $481 million for the DFL Investment (as opposed to the nearly $1.3 billion required) in HCP's Form 8-K filed on March 30, 2015;[12] and (ii) an impairment of approximately $27 million for the Equity Ownership Investment (approximately $19 million less than the required $45.9 million) in HCP's Form 8-K and 3Q15 Form 10-Q filed on November 3, 2015. HCP's failure to properly and timely record the required impairments for the ManorCare Investments violated GAAP and SEC rules, as further detailed below.

208. Moreover, HCP's failure to properly and timely impair the ManorCare Investments also caused HCP's financial statements to overstate at least two critical measures of HCP's Class

[12] HCP formally recorded this impairment in the Company's May 5, 2015 Form 8-K and 1Q15 Form 10-Q, which officially recognized an impairment of approximately $478 million for the DFL Investment (as opposed to the required amount of nearly $1.3 billion).

Period financial performance: GAAP EPS and non-GAAP FFO.[13] Both financial measures were widely reported and closely followed by investors and financial analysts. Investors and Wall Street financial analysts commonly used HCP's GAAP EPS and non-GAAP FFO to analyze HCP's performance both prior to and throughout the Class Period. Both EPS and FFO measures were falsely reported in the Company's financial statements throughout the Class Period, as summarized by the following chart and further detailed *infra*:

**HCP, Inc.**
**Summary of Overstatements**
**GAAP Diluted Earnings Per Share (EPS) and**
**Non-GAAP Diluted Funds From Operations (FFO)**

| | 30-Mar-15 | 31-Mar-15 | 30-Jun-15 | 30-Sep-15 |
|---|---|---|---|---|
| Diluted EPS Overstated Amount | N/A | $ 1.86 | $ 1.82 | $ 1.72 |
| **Diluted EPS Overstated Percentage** | **N/A** | **358%** | **507%** | **686%** |

| | | | | |
|---|---|---|---|---|
| Diluted FFO Overstated Amount | $1.83 | $ 1.85 | $ 1.80 | $ 1.70 |
| **Diluted FFO Overstated Percentage** | **91% - 88%** | **713%** | **277%** | **298%** |

### 1. Defendants HCP, Martin, and Schoen Violated GAAP by Materially Misstating the Value of HCP's ManorCare Investments

209. As noted above, by the start of the Class Period, on March 30, 2015, Defendants HCP, Martin, and Schoen knew or recklessly disregarded that the Equity Ownership Investment was impaired by approximately $45.9 million and the DFL Investment was impaired by nearly $1.3 billion. Instead of recognizing the required impairments at the start of the Class Period, however, Defendants HCP, Martin, and Schoen improperly waited until February 9, 2016 to do so. As a result, each of HCP's financial statements filed with the SEC throughout the Class Period violated

[13] GAAP EPS serves as an indicator of a company's profitability. EPS is the portion of a company's profit allocated to each outstanding share of common stock. Non-GAAP FFO is a measure of profitability for REITs. FFO is defined by the National Association of Real Estate Investment Trusts ("NAREIT") as net income applicable to common shares (computed in accordance with GAAP), excluding gains or losses from sales of property, impairments of, or related to, depreciable real estate, plus real estate and DFL depreciation and amortization, and after adjustments for joint ventures. Adjustments for joint ventures are calculated to reflect FFO on the same basis.

GAAP by materially overstating the value of those assets on the Company's balance sheet. The details of these material misstatements throughout the Class Period are set forth below:

**HCP, Inc.**
**Summary of Overstatements of GAAP Asset Accounts**
**DFL Investment and Equity Ownership Investment**
**(In thousands, except for percentages)**

| | 3/31/2015[1] | 6/30/2015[2] | 9/30/2015[3] |
|---|---|---|---|
| DFL Investment | $ 6,100,000 | $ 6,100,000 | $ 6,000,000 |
| Overstatement of DFL Investment | $ 810,932 | $ 810,932 | $ 810,932 |
| ***% Overstatements*** | **13%** | **13%** | **14%** |

| | | | |
|---|---|---|---|
| Equity Ownership Investment | $ 51,649 | $ 50,958 | $ 21,238 |
| Overstatement of Equity Ownership Investment | $ 45,895 | $ 45,895 | $ 18,661 |
| ***% Overstatements*** | **89%** | **90%** | **88%** |

[1]HCP 10-Q filed May 5, 2015
[2]HCP 10-Q filed August 4, 2015.
[3]HCP 10-Q filed November 3, 2015 and HCP 10-K filed February 9, 2016

### 2. In Violation of GAAP and SEC Rules, Defendants HCP, Martin, and Schoen Overstated HCP's GAAP EPS and Non-GAAP FFO

210. In addition to violating GAAP, Defendants HCP, Martin, and Schoen also knowingly or recklessly violated SEC rules by providing inaccurate and incomplete disclosures of the Company's non-GAAP financial measures. Specifically, Defendants HCP, Martin, and Schoen violated the SEC's Regulation G, which applies to all non-GAAP disclosures as of March 28, 2003.

> Regulation G includes the requirement that a registrant, or a person acting on its behalf, shall not make public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure, in light of the circumstances under which it is presented, not misleading."

SEC Final Rule, *Conditions for Use of Non-GAAP Financial Measures* (Mar. 28, 2003); 17 C.F.R. §244.100(b).

211. On March 30, 2015, HCP filed a Form 8-K with the SEC, which knowingly or recklessly overstated HCP's estimated non-GAAP FFO for future operations for fiscal year 2015, by failing to recognize the required impairments for the ManorCare Investments. The magnitude of HCP's material FFO misstatements in HCP's March 30, 2015 Form 8-K are demonstrated below:[14]

**HCP, Inc.**
**Corrected Estimated Future Operations for Full Year 2015**
**Non-GAAP Basis**
**HCP, Inc.'s Diluted FFO Per Common Share Corrected for All Impairments**

| | Full Year 2015 | |
|---|---|---|
| | **Low** | **High** |
| Diluted earnings per common share (HCP estimated) | $ 0.87 [1] | $ 0.93 [1] |
| **Add: DFL investment impairment (HCP estimated)** | **$ 1.03** [1] | **$ 1.03** [1] |
| **Subtract: Corrected $1.29 billion DFL investment impairment** | **$ (2.76)** [2] | **$ (2.76)** [2] |
| **Subtract: Corrected $45.89 million equity ownership investment impairment** | **$ (0.10)** [2] | **$ (0.10)** [2] |
| Corrected diluted earnings per common share | $ (0.96) | $ (0.90) |
| Other (HCP estimated) | $ 1.15 [1] | $ 1.15 [1] |
| ***Corrected* diluted FFO per common share** | **$ 0.19** | **$ 0.25** |
| Diluted FFO per common share as reported | $ 2.02 [1] | $ 2.08 [1] |
| ***Overstatement* of diluted FFO per common share** | **$ 1.83** | **$ 1.83** |
| **Percentage overstatement** | **91%** | **88%** |

[1]HCP, Inc. 8-K filed March 30, 2015, p. 5

[2]*See* HCP, Inc. 8-K filed February 9, 2016, pp. 2, 9 for impairments.

212. On May 5, 2015, HCP filed Forms 8-K and 10-Q with the SEC, setting forth HCP's financial results for the first quarter of 2105. As noted above, the May 5, 2015 Forms 8-K and 10-Q materially understated the impairment of the DFL Investment by recognizing an impairment of only

14 The overstatements set forth in this section are all computed by (i) calculating the EPS or FFO that HCP should have properly reported for each quarter throughout the Class Period had Defendants HCP, Martin, and Schoen complied with GAAP by recording the proper impairments for the ManorCare Investments at each period, and (ii) comparing the corrected figures for each quarter to the overstated EPS and FFO figures that Defendants HCP, Martin, and Schoen actually reported.

approximately $478 million (compared to the nearly $1.3 billion impairment that was required), and they failed to record any impairment for the Equity Ownership Investment. As a result, Defendants HCP, Martin, and Schoen knowingly or recklessly overstated the Company's reported EPS, as demonstrated below:

**HCP, Inc.**
**Corrected Consolidated Statements of Operations**
**For Three Months Ended March 31, 2015**
**GAAP Basis**
**(in thousands, except per share data)**

| | | | |
|---|---|---|---|
| (Loss) income before income taxes and equity income from unconsolidated joint ventures as reported | $ | (251,181) | [1] |
| **Add: DFL investment impairment as reported** | **$** | **478,464** | **[1]** |
| **Subtract: Corrected $1.29 billion DFL investment impairment** | **$** | **(1,289,396)** | **[2]** |
| Corrected (loss) income before income taxes and equity income from unconsolidated joint ventures | $ | (1,062,113) | |
| Income tax benefit (provision) estimate | $ | 326 | |
| Equity income from unconsolidated joint ventures as reported | $ | 13,601 | [1] |
| **Subtract: Corrected $45.89 million equity ownership investment impairment** | **$** | **(45,895)** | **[2]** |
| Other as reported | $ | (3,446) | [1] |
| ***Corrected* net (loss) income applicable to common shares** | **$** | **(1,097,527)** | |
| Diluted earnings per common share as reported | $ | (0.52) | [1] |
| Corrected diluted earnings per common share | $ | (2.38) | |
| ***Overstatement* of diluted earnings per common share** | **$** | **1.86** | |
| **Percentage overstatement** | | **358%** | |

[1]HCP, Inc. 10-Q for three months ended March 31, 2015, filed May 5, 2015, p. 4.
[2]*See* HCP, Inc. 8-K filed February 9, 2016, pp. 2, 9 for impairments.

213. Moreover, by materially understating the impairment of the DFL Investment and failing to record any impairment for the Equity Ownership Investment, Defendants HCP, Martin, and Schoen – in connection with HCP May 5, 2015 Forms 8-K and 10-Q – also knowingly or recklessly overstated the Company's FFO, as demonstrated below:

**HCP, Inc.**
**Corrected Diluted Funds From Operations (FFO)**
**For Three Months Ended March 31, 2015**
**Non-GAAP Basis**
**(in thousands, except per share data)**

| | | | |
|---|---|---|---|
| ***Corrected* net (loss) income applicable to common shares** | **$** | **(1,097,527)** | **1** |
| Other as reported | $ | 123,377 | 2 |
| ***Corrected* diluted FFO applicable to common shares** | **$** | **(974,150)** | |
| | | | |
| Diluted FFO per common share as reported | $ | (0.26) | 2 |
| Corrected diluted FFO per common share | $ | (2.11) | |
| | | | |
| ***Overstatement* of diluted FFO per common share** | **$** | **1.85** | |
| **Percentage overstatement** | | **713%** | |

[1]*See* "Corrected consolidated statement of operations for three months ended March 31, 2015" and HCP, Inc. 8-K filed February 9, 2016, pp. 2, 9 for impairments.
[2]HCP, Inc. 10-Q for three months ended March 31, 2015, filed May 5, 2015, p. 47.

214. On August 4, 2015, HCP filed Forms 8-K and 10-Q with the SEC, setting forth the Company's financial results for the second quarter ended June 30, 2015. Like the filings described above, the August 4, 2015 Forms 8-K and 10-Q materially understated the impairment of the DFL Investment and failed to record any impairment for the Equity Ownership Investment. As a result, Defendants HCP, Martin, and Schoen knowingly or recklessly overstated the Company's reported EPS, as demonstrated below:

**HCP, Inc.**
**Corrected Consolidated Statements of Operations**
**For Three Months Ended June 30, 2015**
**GAAP Basis**
**(in thousands, except per share data)**

| | | | |
|---|---|---|---|
| (Loss) income before income taxes and equity income from unconsolidated joint ventures as reported | $ | 151,184 | [1] |
| **Subtract: Corrected $810.93 million DFL investment impairment** | **$** | **(810,932)** | [2] |
| Corrected (loss) income before income taxes and equity income from unconsolidated joint ventures | $ | (659,748) | |
| Income tax benefit (provision) estimate | $ | 19,912 | |
| Equity income from unconsolidated joint ventures as reported | $ | 12,001 | [1] |
| **Subtract: Corrected $45.89 million equity ownership investment impairment** | **$** | **(45,895)** | [2] |
| Other as reported | $ | (3,233) | [1] |
| ***Corrected* net (loss) income applicable to common shares** | **$** | **(676,963)** | |
| | | | |
| Diluted earnings per common share as reported | $ | 0.36 | [1] |
| Corrected diluted earnings per common share | $ | (1.46) | |
| | | | |
| ***Overstatement* of diluted earnings per common share** | **$** | **1.82** | |
| **Percentage overstatement** | | **507%** | |

[1]HCP, Inc. 10-Q for three months ended June 30, 2015, filed August 4, 2015, p. 4.
[2]*See* HCP, Inc. 8-K filed February 9, 2016, pp. 2, 9 for impairments.

215. Moreover, by materially understating the impairment of the DFL Investment and failing to record any impairment for the Equity Ownership Investment, Defendants HCP, Martin, and Schoen – in the August 4, 2015 Forms 8-K and 10-Q – also knowingly or recklessly overstated HCP's FFO, as demonstrated below:

**HCP, Inc.**
**Corrected Diluted Funds From Operations (FFO)**
**For Three Months Ended June 30, 2015**
**Non-GAAP Basis**
**(in thousands, except per share data)**

| | | | |
|---|---|---|---|
| ***Corrected* net (loss) income applicable to common shares** | **$** | **(676,963)** | **1** |
| Other as reported | $ | 137,419 | 2 |
| ***Corrected* diluted FFO applicable to common shares** | **$** | **(539,544)** | |
| | | | |
| Diluted FFO per common share as reported | $ | 0.65 | 2 |
| Corrected diluted FFO per common share | $ | (1.15) | |
| | | | |
| ***Overstatement* of diluted FFO per common share** | **$** | **1.80** | |
| **Percentage overstatement** | | **277%** | |

[1]*See* "Corrected consolidated statement of operations for three months ended June 30, 2015" and HCP, Inc. 8-K filed February 9, 2016, pp. 2, 9 for impairments.
[2]HCP, Inc. 10-Q for three months ended June 30, 2015, filed August 4, 2015, p. 54.

216. On November 3, 2015, HCP filed Forms 8-K and 10-Q with the SEC, setting forth the Company's financial results for the third quarter ended September 30, 2015. Like the filings described above, the November 3, 2015 Forms 8-K and 10-Q continued to materially understate the impairment of HCP's DFL Investment. In addition, the November 3, 2015 Forms 8-K and 10-Q materially understated the impairment of the Equity Ownership Investment by recognizing only an impairment of approximately $27 million, instead of the full $45.9 million required under GAAP. As a result, Defendants HCP, Martin, and Schoen knowingly or recklessly overstated the Company's reported EPS, as demonstrated below:

**HCP, Inc.**
**Corrected Consolidated Statements of Operations**
**For Three Months Ended September 30, 2015**
**GAAP Basis**
**(in thousands, except per share data)**

| | | | |
|---|---|---|---|
| (Loss) income before income taxes and equity income from unconsolidated joint ventures as reported | $ | 134,894 | [1] |
| **Subtract: Corrected $810.93 million DFL investment impairment** | **$** | **(810,932)** | [2] |
| Corrected (loss) income before income taxes and equity income from unconsolidated joint ventures | $ | (676,038) | |
| Income tax benefit (provision) estimate | $ | 9,923 | |
| Equity income from unconsolidated joint ventures as reported | $ | 8,314 | [1] |
| **Add: Equity ownership investment impairment as originally reported** | **$** | **27,234** | [2] |
| **Subtract: Corrected $45.89 million equity ownership investment impairment** | **$** | **(45,895)** | [2] |
| Other as reported | | (2,908) | [1] |
| ***Corrected* net (loss) income applicable to common shares** | | **(679,370)** | |
| | | | |
| Diluted earnings per common share as reported | $ | 0.25 | [1] |
| Corrected diluted earnings per common share | $ | (1.47) | |
| | | | |
| ***Overstatement* of diluted earnings per common share** | **$** | **1.72** | |
| **Percentage overstatement** | | **686%** | |

[1]HCP, Inc. 10-Q for three months ended September 30, 2015, filed November 3, 2015, p. 4.
[2]*See* HCP, Inc. 8-K filed February 9, 2016, pp. 2, 9 for impairments.

217. Moreover, by materially understating the impairment of the ManorCare Investments, Defendants HCP, Martin, and Schoen – in the November 3, 2015 Forms 8-K and 10-Q – also knowingly or recklessly overstated the Company's FFO, as demonstrated below:

**HCP, Inc.**
**Corrected Diluted Funds From Operations (FFO)**
**For Three Months Ended September 30, 2015**
**Non-GAAP Basis**
**(in thousands, except per share data)**

| | | | |
|---|---|---|---|
| ***Corrected* net (loss) income applicable to common shares** | **$** | **(679,370)** | [1] |
| Other as reported | | 150,689 | [2] |
| ***Corrected* diluted FFO applicable to common shares** | | **(528,681)** | |
| | | | |
| Diluted FFP per common share as reported | $ | 0.57 | [2] |
| Corrected diluted FFO per common share | $ | (1.13) | |
| | | | |
| ***Overstatement* of diluted FFO per common share** | **$** | **1.70** | |
| **Percentage overstatement** | | **298%** | |

[1]*See* "Corrected consolidated statement of operations for three months ended September 30, 2015" and HCP, Inc. 8-K filed February 9, 2016, pp. 2, 9 for impairments.
[2]HCP, Inc. 10-Q for three months ended September 30, 2015, filed November 3, 2015, p. 59.

### 3. HCP's Financial Statements Violated FASB ASC 323 (Investments – Equity Method and Joint Ventures), ASC 310 (Receivables), ASC 450 (Contingencies), ASC 820 (Fair Value Measurements), and SEC Rules

218. In HCP's Form 8-K as of March 30, 2015 and in each of HCP's Forms 10-Q and 8-K as of March 31, 2015, June 30, 2015, and September 30, 2015, Defendants HCP, Martin, and Schoen failed to comply with the pertinent GAAP. In particular, with respect to HCP's required accounting for the impairment of HCP's Equity Ownership Investment, Defendants HCP, Martin, and Schoen were required to comply with the FASB's GAAP pronouncements ASC 323 (Investments – Equity Method and Joint Ventures) and ASC 820 (Fair Value Measurement). And with respect to HCP's required accounting for the impairment of HCP's DFL Investment, Defendants HCP, Martin, and Schoen were required to comply with GAAP pronouncements ASC 310 (Receivables) and ASC 450 (Contingencies). The pertinent GAAP is detailed below:

### a. GAAP Applicable to HCP's Equity Ownership Investment

219. For HCP's Equity Ownership Investment, ASC 323 (Investments – Equity Method and Joint Ventures) applies because "[t]he procedures set forth in this Subtopic [ASC 323] shall be followed by an investor in applying the equity method of accounting to investments in common stock of corporate joint ventures and other investees that qualify for the equity method (that is, are within the scope of this Subtopic.)" ASC 323-10-35-3. "A series of operating losses of an investee or other factors may indicate that a decrease in value of the investment has occurred that is other than temporary and that shall be recognized even though the decrease in value is in excess of what would otherwise be recognized by application of the equity method." ASC 323-10-35-31. "A loss in value of an investment that is other than a temporary decline shall be recognized. Evidence of a loss in value might include, but would not necessarily be limited to, absence of an ability to recover the carrying amount of the investment or inability of the investee to sustain an earnings capacity that would justify the carrying amount of the investment. A current fair value of an investment that is less than its carrying amount may indicate a loss in value of the investment." ASC 323-10-35-32.

220. Consequently, ASC 820 (Fair Value Measurement) also applies to HCP's Equity Ownership Investment. "A fair value measurement is for a particular asset or liability. Therefore, when measuring fair value a reporting entity shall take into account the characteristics of the asset or liability if market participants would take those characteristics into account when pricing [or valuing] the asset or liability at the measurement date." ASC 820-10-35-2B. "A reporting entity shall measure the fair value of an asset or a liability using the assumptions that market participants would use in pricing the asset or liability, assuming that market participants act in their economic best interest." ASC 820-10-35-9.

### b. GAAP Applicable to HCP's DFL Investment

221. In a direct financing lease, such as the DFL Investment, the lessor (in this case, HCP) provides property while the lessee (in this case, ManorCare) provides regular payments in exchange for the use of that property. The lessor only earns a profit on interest, charging payment amounts that directly equate to the value of the property in question.

222. Direct financing leases and the net investment in such leases are subject to the impairment guidance in ASC 310 and ASC 450. As noted in ASC 310-10-35-2, ASC 450 "provides the basic guidance for recognition of impairment losses for all receivables" and for all direct financing leases, the net investment is subject to the impairment guidance in ASC 310 and ASC 450. Under ASC 450, "[a]n estimated loss from a loss contingency shall be accrued by a charge to income if both of the following conditions are met: a. Information available before the financial statements are issued . . . indicates that it is probable that an asset had been impaired or a liability has been incurred at the date of the financial statements [and;] b. [t]he amount of loss can be reasonably estimated." ASC 450-20-25-2. Under GAAP, "probable" means "[t]he future event or events are likely to occur," which means a likelihood of greater than 50%. ASC 450-20-20, Glossary. ASC 310 "provides more specific guidance on [the] measurement" of impairments. ASC 310-10-35-2.

223. For the DFL Investment, as required by ASC 310, "[i]f a creditor bases its measure of . . . impairment on a present value amount [as HCP has stated that it does], the creditor shall calculate the present value amount based on an estimate of the expected future cash flows of the impaired [investment], discounted at the . . . effective interest rate." ASC 310-10-35-25. "[T]he estimates of expected future cash flows shall be the creditor's best estimate based on reasonable and supportable assumptions and projections." ASC 310-10-35-26. "If a creditor estimates a range for either the amount or timing of possible cash flows, the likelihood of the possible outcomes shall be

considered in determining the best estimate of expected future cash flows." *Id.* Impairment occurs when "it is probable that the creditor will be unable to collect all the contractual interest payments and contractual principal payments as scheduled in [the] agreement [between the lessor and the lessee]." ASC 310-10-35-25.

224. GAAP also provides: "In addition, a creditor shall consider all available information reflecting past events and current conditions when developing the estimate of expected future cash flows. All available information would include existing environmental factors, for example, existing industry, geographical, economic, and political factors that are relevant to the collectability of that loan and that indicate that it is probable that an asset had been impaired at the date of the financial statements." ASC 310-10-35-27.

#### c. Defendants HCP, Martin, and Schoen Failed to Comply with GAAP and SEC Rules

225. With regard to the Company's Equity Ownership Investment, HCP recorded a $36 million impairment charge as of the year ended December 31, 2014, reducing the carrying value of HCP's asset to $39 million from $75 million. However, HCP failed to take any additional writedown in the Company's Equity Ownership Investment until the quarter ended September 30, 2015 because HCP deliberately or recklessly ignored many critical factors affecting the present value of the Company's estimated future cash flows.

226. Defendants HCP, Martin, and Schoen recognized only a few factors and ignored other critical factors that adversely affected the fair value of HCP's Equity Ownership Investment and DFL Investment assets. And for the few factors that the HCP Defendants did consider, they did so in an incomplete and faulty manner. ManorCare described the few factors they considered as follows, in HCP's Form 10-K for December 31, 2014, filed February 10, 2015:

> We made this conclusion [to recognize a $36 impairment charge for the Equity Ownership Investment] principally based on the receipt and review of HCRMC's preliminary base financial forecast for 2015, together with HCRMC's year-to-date

> operating results through November 2014. HCRMC's preliminary base financial forecast and operating results primarily reflected a continued shift in patient payor sources from Medicare to Medicare Advantage, which negatively impacts reimbursement rates and length of stay for HCRMC's skilled nursing segment. HCRMC has indicated that its 2015 preliminary base financial forecast does not include the effect of any dispositions, acquisitions or other initiatives HCRMC may undertake to improve financial performance in 2015.

227. Although Defendants HCP, Martin, and Schoen admitted in the Form 10-K for fiscal year 2014 that ManorCare "has not been able to reverse the decline in their financial performance," Defendants HCP, Martin, and Schoen falsely and misleadingly stated that "we remain confident in [ManorCare's] ongoing adjustments to their business model" and "we continue to believe that the collection and timing of all amounts owed by [ManorCare] under our Master Lease are reasonably assured." Defendants HCP, Martin, and Schoen had no reasonable basis for their purported optimism. Indeed, from fiscal year 2012 to fiscal year 2014, ManorCare's net losses had increased as ManorCare was no longer able to rely on the revenue generated via the fraudulent billing practices described in §IV.C., *supra*, which ManorCare had been forced to curtail as a result of the DOJ investigation. Specifically, the net losses accelerated from a net loss of $16.7 million in fiscal year 2012, to a net loss of $358.7 million in fiscal year 2013, to a net loss of $393.9 million in fiscal year 2014. Given the red flags and leading indicator described above, Defendants HCP, Martin, and Schoen knew that ManorCare could not reverse the ongoing decline in its financial performance.

228. Moreover, because ManorCare could no longer rely on the highly profitable revenue generated via the fraudulent billing practices that ManorCare had been forced to curtail as a result of the DOJ investigation, Defendants HCP, Martin, and Schoen knew throughout the Class Period that their estimated future cash flows for ManorCare were unrealistic and unattainable. Specifically, by at least March 30, 2015, Defendants HCP, Martin, and Schoen knew that HCP did not properly account for declining future cash flows, and adverse trends in ManorCare's payer mix support, Medicare billing reimbursement rates and patient occupancy.

229. Defendants HCP, Martin, and Schoen knowingly failed to address the above adverse trends and key available data, and to properly incorporate the risk that estimated revenue increases were not sustainable. Defendants HCP, Martin, and Schoen were required by GAAP to incorporate these known adverse facts and circumstances existing at the start of the Class Period into their estimated future cash flows and lease payments. Further, there were no mitigating facts or circumstances that Defendants HCP, Martin, and Schoen could reasonably use to offset the adverse impacts of all of the above factors in the estimates of future cash flows and lease payments.

230. Defendants HCP, Martin, and Schoen also failed to perform any assessment of whether or not ManorCare's own preliminary base financial forecast for 2015, its year-to-date operating results through November 2014, and their purported optimism, together, were a sufficient and reliable basis for estimating ManorCare's future cash flows and lease payments. Defendants HCP, Martin, and Schoen, for example, failed to properly take into account the fact that ManorCare had itself recorded a $203.1 million pretax impairment charge for its intangible assets as of October 1, 2014. Defendants HCP, Martin, and Schoen failed to consider that ManorCare based this substantial impairment charge not only on its ***current*** poor operating results, but, more important, on its ***future*** cash flows, ***extending beyond fiscal year 2015***, as ManorCare described below in HCP's Form 10-K for December 31, 2014, filed February 10, 2015:

> The fair values of the indefinite-lived intangible assets are derived from current publicly available market data and projections for each reporting unit developed using management's best estimate of economic and market conditions over the projected future period. Management expects that future revenue growth in long-term care will be increasingly tied to achievement of desired clinical outcomes and has accordingly adjusted its marketing focus, placing less reliance on its historical tradenames. ***Based on this marketing shift as well as the continued expected pressure on future revenue growth, as of the October 1, 2014 assessment date, the carrying value of the historical long-term care trademarks and tradenames was determined to be in excess of its fair value.*** The Company recorded a pre-tax impairment charge related to trademarks and tradenames of $203.1 million ($123.4 million net of taxes) in 2014.

231. Defendants HCP, Martin, and Schoen, however, chose to rely only on ManorCare's "preliminary base financial forecast for 2015," and failed to even consider ManorCare's own estimates of revenues and future cash flows for fiscal years extending beyond 2015. Since ManorCare's impairment of its own intangibles was based on its estimated future cash flows extending several years into the future beyond fiscal year 2015 in a discounted cash flow model, in accordance with ASC 820, ManorCare's recorded $203.1 million intangibles impairment necessarily indicated that, in addition to its lowered fiscal year 2015 expectations, ManorCare expected lower cash flows ***after*** fiscal year 2015 as well.

232. Furthermore, HCP's estimated future cash flows and lease payments analysis was also incomplete and faulty because Defendants HCP, Martin, and Schoen failed to consider the lack of reliability of ManorCare's base financial forecast for 2015 that they relied on for HCP's estimates of its own future cash flows. Defendants HCP, Martin, and Schoen knew that ManorCare's estimated future cash flows were not reliable because they knew that ManorCare continually revised its historical reported revenues downward in subsequent reporting periods. Defendants HCP, Martin, and Schoen knew that obtaining reliable historical revenues was critical to making reliable estimates of future revenues and cash flows.

233. ManorCare's historical reported revenues were consistently revised downward in subsequent financial reports without explanation. For example, when ManorCare first reported its fiscal year 2012 results in HCP's Form 10-K for fiscal year 2012, ManorCare reported revenues of $4,165 million. However, in HCP's Form 10-K for fiscal year 2013, ManorCare reported revenues of $4,154 million for fiscal year 2012, ***or about $10.5 million less*** than reported the previous year for the same period. Then, in HCP's Form 10-K for fiscal year 2014, ManorCare reported revenues of $4,107 million for fiscal year 2012, ***or about another $48.3 million less*** than reported the previous year for the same period. Similarly, when ManorCare first reported its fiscal year 2013

results in HCP's Form 10-K for fiscal year 2013, ManorCare reported revenues of $4,167 million. However, in HCP's Form 10-K for fiscal year 2014, ManorCare reported revenues of $4,117 million for fiscal year 2013, ***or about $50 million less*** than reported the previous year for the same period.

234. These material revenue discrepancies and revisions were a red flag and required Defendants HCP, Martin, and Schoen to investigate the reasons for the revenue discrepancies and revisions, and to consider their adverse impact on the present value of estimated future cash flows and lease payments that HCP used to value the subject assets. Defendants HCP, Martin, and Schoen failed to consider the lack of reliability of ManorCare's actual financial reports and expected future cash flows, and the resulting adverse impact on the valuation measurements of HCP's Equity Ownership Investment and the DFL Investment assets.

235. Defendants HCP, Martin, and Schoen also knew, but failed to consider, that ManorCare's goodwill, intangibles, and other assets declined by more than $462 million or by more than 9% from $5,084 million as of September 30, 2014 to $4,622 million as of December 31, 2014, an unprecedented level of deterioration. Defendants HCP, Martin, and Schoen knew that market participants consider such impairment losses to be a leading indicator of a decline in future profitability due to a slowdown in sales, higher operating costs, or both. As noted in one academic study, "evidence suggests that investors as well as financial analysts revise their expectations downward on the announcement of a goodwill impairment loss and the downward revision is related to the magnitude of the loss. . . . ***[T]he impairment loss serves as a leading indicator of a decline in future profitability due to a slow-down in sales and/or higher operating costs***."[15] ManorCare's own impairments based on its own discounted estimated future cash flows demonstrated that ManorCare lowered its own estimated future cash flows not only for fiscal year 2015, but for several

---

15 Zining Li, Pervin Shroff, Ramgopal Venkataraman & Ivy Xiying Zhang, *Causes and Consequences of Goodwill Impairment Losses*, Review of Accounting Studies (May 2010).

years into the future. Consequently, since Defendants HCP, Martin, and Schoen failed to consider ManorCare's own reduced estimated future cash flows for fiscal years after 2015, they failed to incorporate the adverse impact of ManorCare's reduced estimated future cash flows on Defendants' own estimates of future cash flows that was necessary to produce reliable estimates to measure impairments.

236. As a result, Defendants HCP, Martin, and Schoen violated GAAP and deliberately or recklessly recorded impairment charges in increments over a period of time when all of the evidence demonstrated that they knew or recklessly disregarded that their estimated future cash flows and lease payments were unrealistic and unattainable at the start of the Class Period. Defendants HCP, Martin, and Schoen violated GAAP by failing to timely recognize necessary impairments in connection with HCP's DFL Investment and Equity Ownership Investment assets. Those assets were impaired under GAAP, respectively, because Defendants HCP, Martin, and Schoen knew that it was probable that the Company would not be able to collect all the contractual payments from ManorCare as scheduled in their amended agreement, and the present value of ManorCare's cash flows was less than the carrying value of the investment.

237. Defendants HCP, Martin, and Schoen also violated the SEC's Regulation G, which includes the

> requirement that a registrant, or a person acting on its behalf, shall not make public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure, in light of the circumstances under which it is presented, not misleading.

SEC Final Rule, *Conditions for Use of Non-GAAP Financial Measures* (Mar. 28, 2003); 17 C.F.R. §244.100(b).

238. Consequently, at the start of the Class Period, Defendants HCP, Martin, and Schoen violated GAAP and SEC rules and knew or recklessly disregarded that the Equity Ownership

Investment was fully impaired because the present value of estimated future cash flows was less than the carrying value of that asset, taking all of the above factors into account. Defendants HCP, Martin, and Schoen also violated GAAP and SEC rules and knew or recklessly disregarded that their $478 million impairment of the DFL Investment as of the quarter ended March 31, 2015 was insufficient because they knew that it was not probable that HCP would collect the future lease payments even after they amended the Master Lease with ManorCare. For all of the reasons described above, GAAP required Defendants HCP, Martin, and Schoen to record impairment charges of $45.9 million and nearly $1.3 billion for the Equity Ownership Investment and the DFL Investment, respectively, as of March 30, 2015. Similarly, Defendants HCP, Martin, and Schoen also knowingly or recklessly failed to provide accurate and complete disclosures of non-GAAP financial measures, as required by SEC rules. In failing to comply with GAAP and SEC rules, Defendants HCP, Martin, and Schoen knowingly or recklessly misled investors during the Class Period.

## VI. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

239. As detailed throughout this complaint, Defendants engaged in a scheme to defraud investors by issuing numerous false and misleading statements concerning ManorCare's dependence upon revenue generated by fraudulent billing practices, the present and future value of the ManorCare Investments (*i.e.*, HCP's core business), the merits of the DOJ's case against ManorCare, and the reputational risk and litigation exposure ManorCare faced as a result.

240. At all relevant times, Defendants were aware or recklessly disregarded that their representations to investors were materially false and misleading and omitted material information necessary to properly evaluate the Company and its financial condition and prospects. In addition, at all relevant times, Defendants were aware or recklessly disregarded that the financial statements

HCP filed with the SEC throughout the Class Period violated GAAP and were materially misleading to investors, as detailed *supra*.

241. The facts alleged throughout this complaint provide powerful evidence of Defendants' scienter. Additional facts evidencing Defendants' scienter are also alleged below.

### A. HCP's In-Depth Due Diligence in Connection with Its 2011 Acquisition of ManorCare's Real Estate Assets Supports an Inference of Scienter

242. In connection with HCP's 2011 acquisition of the ManorCare Investments, HCP represented to investors that the Company conducted in-depth due diligence, thereby confirming HCP's knowledge of (or severe recklessness in not knowing of) ManorCare's dependence on revenue from Medicare billing fraud.

243. Specifically, on December 13, 2010, HCP and ManorCare concluded a purchase agreement ("Purchase Agreement") that was signed by Executive Vice President and Chief Investment Officer, Paul Gallagher, on behalf of HCP, and Defendant Ormond on behalf of ManorCare.

244. The Purchase Agreement confirmed that, prior to closing the deal in April 2011, HCP received unbridled access to all aspects of ManorCare's records. More specifically, the Purchase Agreement stated, *inter alia*, that:

> [ManorCare] shall, and shall cause its Subsidiaries to, afford to [HCP] and its accountants, counsel, consultants, financial advisors and other representatives reasonable access, during normal business hours, in such manner as to not unreasonably interfere with the normal operation of [ManorCare] and its Subsidiaries, to all of their respective properties, books, Contracts, commitments, Tax Returns, records and appropriate officers and employees of [ManorCare] and its Subsidiaries, and shall furnish such representatives with all financial and operating data and other information concerning the affairs of [ManorCare] and its Subsidiaries, in each case, as such representatives may reasonably request.
>
> * * *
>
> [ManorCare] shall use commercially reasonable efforts to cause to be delivered, on or prior to February 1, 2011, to [HCP], an audited consolidated balance sheet of [ManorCare] and its consolidated Subsidiaries at December 31, 2010 and audited

> statements of income and cash flows of [ManorCare] and its consolidated Subsidiaries for 2010 . . . . If the Closing has not occurred prior to such date, [ManorCare] shall use commercially reasonable efforts to cause to be delivered, (i) on or prior to April 25, 2011, to [HCP], an unaudited consolidated balance sheet of [ManorCare] and its consolidated Subsidiaries at March 31, 2011 and unaudited statements of income and cash flows of [ManorCare] and its consolidated Subsidiaries for the three months ending on March 31, 2011 . . . .
>
> * * *
>
> Prior to the Closing Date, [ManorCare] shall deliver to [HCP] the formal report of a nationally-recognized independent accounting firm (the "Final E&P Report") regarding the calculation of the aggregate current and accumulated earnings and profits of the Company and its Subsidiaries through December 31, 2010. The Final E&P Report shall be consistent in all material respects with such accounting firm's earnings and profits analysis provided to [HCP] prior to the date of this Agreement. [HCP] shall be permitted to provide the Final E&P Report to its auditors and in response to a governmental inquiry.
>
> * * *
>
> [ManorCare] shall promptly provide Buyer with copies of all books and records owned or controlled by the Company to the extent that such books and records are related to the REIT Entities, the REIT Business or the Assets or Liabilities thereof, to the extent they already exist, including upon either Party's reasonable request.

245. Additionally, the Purchase Agreement specified that, until the transaction closed, neither ManorCare nor its subsidiaries could engage in any of the following activities without HCP's consent:

- "change in any material manner any of its methods, principles or practices of accounting";
- amend the organizational documents fort or change the legal form of ManorCare's subsidiaries;
- pay or settle liabilities over $2,000,000 in the aggregate; or
- modify existing material contracts or enter into new material contracts.

246. Accordingly, the extensive due diligence that HCP and the HCP Executive Defendants implemented as part of this transaction provides further confirmation of Defendants' knowledge of (or, at a minimum, extreme recklessness as to) ManorCare's conduct and the allegations herein.

247. Between the signing of the Purchase Agreement in December 2010 and the closing in April 2011, moreover, HCP and the HCP Executive Defendants received additional notice of ManorCare's improper conduct. On February 16, 2011, CtW – which represented pension funds that were substantial long-term HCP shareholders – sent HCP's Board of Directors a letter outlining certain significant concerns. Among other things, CtW stated that "[w]e are deeply concerned with the heightened reimbursement risk to the company's portfolio from the proposed acquisition of ManorCare's real estate assets, especially in light of recent studies spotlighting questionable billing practices at SNFs."

248. As such, the CtW letter – in conjunction with HCP's extensive due diligence – confirms that HCP and the HCP Executive Defendants possessed knowledge of (or, at a minimum, consciously disregarded) ManorCare's fraudulent billing practices.

### B. The Individual Defendants Were Directly Involved in and Aware of Matters Directly Related to the Alleged Misleading Information, Which Concerned the Most Critical and Highly Scrutinized Aspects of Both HCP and ManorCare's Businesses

249. Following the closing of the ManorCare Investments in 2011, the most important aspect of HCP's business was, by far, ManorCare's performance. As demonstrated by the following chart, ManorCare accounted for over 23% of HCP's total (not segment) revenue on an annual basis:

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|
| **HCR ManorCare<br>% of Total Revenue** | **27%** | **30%** | **28%** | **26%** | **23%** | spun-off |

250. No other entity or relationship was nearly as important to HCP:

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|
| **Brookdale Senior Living, Inc.<br>% of Total Revenue** | 7% | 5% | 4% | 14% | 10% | 12% |
| **Emeritus Corporation<br>% of Total Revenue** | 7% | 8% | 13% | 0% | 0% | 0% |
| **Sunrise Senior Living, Inc.<br>% of Total Revenue** | 6% | 5% | 5% | 0% | 0% | 0% |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Genentech, Inc.**<br>**% of Total Revenue** | 3% | 3% | 3% | 3% | 2% | 2% |
| **Amgen, Inc.**<br>**% of Total Revenue** | 3% | 3% | 3% | 2% | 2% | 2% |
| **Hospital Corporation of America ("HCA")**<br>**% of Total Revenue** | 4% | 4% | 3% | 4% | 3% | 4% |
| **Tenet Healthcare Corporation**<br>**% of Total Revenue** | 1% | 1% | 1% | 1% | 1% | 0% |

251. Acknowledging ManorCare's importance, HCP reported publicly that: "The real estate portfolio that we have master leased to HCRMC accounts for a significant portion of our assets and revenues. Adverse regulatory and operational developments in HCRMC's business and financial condition have had, and could continue to have, an adverse effect on us."

252. Furthermore, the SEC explicitly confirmed that ManorCare's financial performance was an indispensable element of HCP's performance. After HCP filed its 2012 Form 10-K, the SEC sent the Company correspondence stating: "It appears that HCR ManorCare is a significant lessee of properties under a long-term triple-net lease. Please tell us how you determined it was not necessary to provide audited financial statements of HCR ManorCare." HCP responded that "we believe our historical periodic reports have provided sufficient financial information regarding [ManorCare], for investors to evaluate the risk to us from our asset concentration in [ManorCare]." The SEC, however, disagreed, and eliminated any ambiguity on the subject by instructing HCP to "amend your filing to provide audited financial statements for HCR ManorCare." HCP complied by filing an amended Form 10-K. Every year thereafter HCP appended to its Forms 10-K the "Consolidated Financial Statements of HCR ManorCare, Inc." with a "Report of Independent Auditors" drafted by Ernst & Young LLP.

253. Defendants Martin and Schoen signed all of those Forms 10-K, which incorporated ManorCare's consolidated financial statements.

254. Furthermore, consistent with these SEC filings (which unequivocally confirmed that ManorCare was integral to HCP), HCP's leadership – before and during the Class Period – repeatedly and specifically spoke to investors about ManorCare, often referring to ManorCare as a "partner":

- ***February 14, 2012 Conference Call – James Flaherty, HCP, Inc. – Chairman and CEO at the time***: "But, we feel obviously very, very good with the operating ***partner*** that is HCR. And, we work with them very, very closely. And so, I'm optimistic that there will be some opportunities that present themselves that are good opportunities from a standpoint of HCR and from a standpoint of HCP."

- ***October 29, 2013 Conference Call – Lauralee Martin – HCP, Inc. – President and CEO***: "First, our relationship with HCR management is solid, characterized by open communication and alignment for our mutual business success. I have had the opportunity to meet with management and discuss, firsthand, the actions they are taking to address their business challenges."

- ***March 3, 2014 Conference Call – Lauralee Martin – HCP, Inc. – President and CEO***: "There is really three key areas I'm focused on, and I would call each of them having a potential for catalyst in terms of enhancing the confidence in HCP's future. The first one I would put as HCR ManorCare. HCR is our largest operator. They represent 30% of our revenue. We continue to be solidly in HCR's camp as a leader in the post-acute space. . . . So number one catalyst is to watch HCR."

- ***June 4, 2014 REITWeek: NAREIT's Investor Forum – Lauralee Martin – HCP, Inc. – President and CEO***: "I would say the most important thing is, as we look at it, I look at it having run operating businesses for a number of years, management always has the most knowledge of their business and management invests in their business when they see opportunities. The ManorCare management has not only invested to the level required in our leases, they've significantly invested more. What does that mean? Well, they've added more care capabilities with high returns into some of their facilities. They've added some facilities that are outside of our leases, but we get the benefit from – because we have a corporate guarantee. They continue to grow their hospice and home care business at a very significant rate. And now, with a little bit safer environment, I actually think that they will start to look at being a consolidator in a space that needs consolidation by good operators and we would support them in that. So, that's a long answer to we're a big believer in ManorCare and feel comfortable with them in our portfolio."

- ***May 11, 2015 Investor Day***: "[W]e would like to show a short video of Steve Cavanaugh highlighting HCR ManorCare's clinical capabilities and development initiatives."

- ***November 3, 2015 Conference Call:***

  ***Lauralee Martin – HCP, Inc. – President and CEO***: "Now let me provide a few highlights for the quarter for our two largest partners. HCR ManorCare."

  * * *

  ***Justin Hutchins – HCP, Inc. – CIO of Senior Housing and Care***: "In that regard, you've heard a lot of talk about it on the call, we're mostly focused on partnering with HCR ManorCare to help them improve the credit quality of the Company, and obviously the dispositions have played a key role. Some acquisitions and developments that we've both been a part of. They're the developer and we're an acquirer in some cases. And that helps improve the credit quality of HCR ManorCare."

- ***February 9, 2016, Conference Call***:

  ***Michael Carroll – RBC Capital Markets – Analyst***: "Can you highlight what actually occurred in the second half of 2015 that drove the weakness for HCR ManorCare? Was that largely driven by the temporary disruptions mentioned in the ***prepared*** remarks, or was there another core operating issue that occurred?"

  * * *

  ***Tim Schoen – HCP, Inc. – CFO***: "That was part of it. But it was really the census and the shorter – driven as a result of the shorter length of stay, Michael."

255. Moreover, the ManorCare Executive Defendants were directly and intimately involved with ManorCare's improper conduct, and that involvement confirms that those individuals acted with knowledge (or, at a minimum, severe recklessness). *See* §IV.C., *supra*. Indeed, it was ManorCare's corporate leadership that pressured therapists to provide unnecessary services to increase profits. In other words, lower-level employees did not implement the improper conduct without management's knowledge; rather, management mandated that the employees engage in that conduct.

256. Defendant Cavanaugh, for example, testified that he knew of ManorCare's Power Ratings (which were meant to pressure facility-level therapy staff to provide patients more therapy) and MET (which was meant to maximize the amount of therapy patients could tolerate). Similarly, Vice President of Rehabilitation Pagoaga directly reported to Defendant Ormond that Project Reset

(which was meant to extend patients' length of stay without regard to whether there was an actual clinical need) had led 30 SNFs to record higher revenues and improved Ultra High levels.

257. The repeated and specific statements – and conduct – set forth above reflect the fact that the HCP Executive Defendants and the ManorCare Executive Defendants were in receipt of information regarding the fraud. The only other plausible inferences that can be drawn from the repeated and specific pronouncements set forth above is that Defendants either fabricated the information that they provided to investors and the market or they ignored information they possessed regarding such matters. Either of those inferences represent at least a conscious disregard for the truth.

### C. Defendants Martin and Schoen's SOX Certifications Are Probative of Scienter

258. The certification requirements set forth in SOX were designed to prevent senior executives from adopting a "head in the sand" defense to actions for securities fraud committed on their watch. The SEC has expressly warned corporate officers that "a false certification potentially could be subject to . . . both Commission and private actions for violating Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5."

259. As one commentator explained:

> The usual route for officers and directors facing 10b-5 liability is to plead lack of knowledge or specific intent by relying on failures in the PSLRA's proof of scienter requirement to avoid liability for having signed off on deficient reports. In an effort to counter such arguments, the SEC implemented rules pursuant to the certification provision of section 302, which specifically mandated that false certifications would expose the CEO and/or CFO to private causes of action under 10b-5.

Kourtney T. Cowart, *The Sarbanes-Oxley Act: How Current Model in the Law of Unintended Consequences May Affect Securities Litigation*, 42 Duq. L. Rev. 293, 310-11 (2004).

260. During the Class Period, HCP's Forms 10-Q referenced herein included materially false and misleading SOX certifications signed by Defendants Martin and Schoen. *See* ¶¶200-204, *supra*.

261. Defendants Martin and Schoen, as signatories to the SOX certifications in question, represented, among other things, that they had reviewed the respective quarterly report for which they supplied the certification, and, further, that:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

262. These signatories also represented that they were "responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting" and had, among other things:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

263. The SOX certifications signed by Defendants Martin and Schoen were materially false and misleading because, at the time they were executed, these individuals were aware of, or recklessly disregarded, the facts described above. *See* ¶¶200-204, *supra*. For the same reasons, HCP's financial statements throughout the Class Period were materially misleading to investors, and the Company's financial statements also violated GAAP and SEC accounting and disclosure rules. As such, Defendants Martin and Schoen's SOX certifications (and their signatures on SEC filings containing the false and misleading financial statements) provide additional evidence of scienter.

### D. HCP and ManorCare Are Legally Responsible for the Conduct of the HCP Executive Defendants and ManorCare Executive Defendants

264. HCP and ManorCare acted with scienter because the knowledge of their most senior executives – which include each of the HCP Executive Defendants and ManorCare Executive Defendants – is imputed to HCP and ManorCare, respectively. Indeed, the cumulative knowledge of all members of HCP's and ManorCare's management teams regarding these matters is properly imputed to the respective corporate defendants.

265. Defendant Martin was HCP's CEO and President throughout the Class Period. Defendant Schoen was, at all relevant times, the Company's EVP and CFO. Defendant Kowalske served in senior level management positions for HCP, at all relevant times, including as an SVP and EVP. Likewise, Defendant Ormond was ManorCare's CEO, Chairman of the Board, and President throughout the Class Period. Defendant Cavanaugh was, at all relevant times, ManorCare's CFO and Vice President. As HCP's and ManorCare's most important executives and corporate representatives, the HCP Executive Defendants and ManorCare Executive Defendants' scienter, as detailed herein, is indisputably imputed to those companies.

### E. Defendants Were Motivated to Conceal ManorCare's Fraudulent Billing Practices and the True State of ManorCare's Financial Outlook in Order to Sell $1.4 Billion of New Securities Through HCP's 2015 Offerings

266. The HCP Defendants were also motivated to misrepresent and conceal HCP's and ManorCare's true financial condition in order to raise ***more than $1.4 billion*** from the sale of equity and debt securities to unsuspecting investors through HCP's 2015 Offerings. *See* ¶¶173, 186, *supra*.

267. Specifically, HCP raised $750 million via the sale of 4.00% senior unsecured notes due in 2025 in the May 2015 Bond Offering; $73 million via the sale of 1.8 million shares of common stock at a weighted average price of $40.14 through the June 2015 Equity Offering; and $600 million via the sale of 4.00% senior unsecured notes due in 2022 in the November 2015 Bond Offering, which HCP desperately needed to complete in order to meet its existing obligation "to prefund [HCP's] $500 million 3.750% senior notes due February 2016." None of the 2015 Offerings could have been completed had Defendants disclosed the true financial condition of HCP and ManorCare prior to the offerings.

268. As such, the HCP Defendants used the 2015 Offerings to sell ***more than $1.4 billion worth of securities*** during the Class Period, while concealing the truth regarding the material omitted facts described herein. Indeed, the truth emerged in 2016, just months after HCP raised substantial capital through the 2015 Offerings. In 2016, HCP wrote down its Equity Ownership Investment to zero, recorded an additional $811 million impairment charge for the DFL Investment, spun-off its entire ManorCare portfolio of SNFs, and abruptly appointed an interim CEO to replace Defendant Martin. Had investors known the truth, the HCP Defendants would have been unable to close the 2015 Offerings.

269. In sum, the suspiciously timed 2015 Offerings are strong additional indicia of Defendants' scienter.

### F. The Departure of Multiple Key Executives Supports a Strong Inference of Scienter

270. Scienter is further substantiated by the successive "resignations" of multiple HCP and ManorCare executives – including various HCP Executive Defendants and ManorCare Executive Defendants – before, during, and after the Class Period.

271. On June 18, 2015, HCP announced that its Executive Vice President and Chief Investment Officer, Paul Gallagher, was resigning, effective June 30, 2015. The Company did not announce a replacement but stated that Gallagher would "provide consulting services until March 15, 2016."

272. On March 23, 2016, Defendant Schoen provided notice that he intended to resign as HCP's EVP and CEO, effective May 22, 2016. At the time of his announcement, HCP had not identified a successor.

273. On July 11, 2016, HCP announced that Defendant Martin would be stepping down as the Company's President and CEO. The Company's Executive Chairman, Michael McKee, explained that "the Board felt now is the appropriate time to advance the process of developing HCP's next generation of leadership"; that "[w]e have made substantial progress towards rebuilding our executive team to align with our strategic vision for the future"; and that "identifying our next CEO represents the cornerstone of that effort." At the time of the announcement, HCP had not identified a permanent replacement. Consequently, the Company announced that Defendant Martin would be replaced on an interim basis by McKee. Subsequently, on February 5, 2018, HCP announced that McKee would step down as Executive Chairman, effective March 1, 2018, and retire from HCP's Board of Directors at the Company's annual meeting in April 2018.

274. Defendant Kowalske joined QCP as its EVP in January 2017, following HCP's spin-off of its ManorCare portfolio of SNFs and assisted living assets. In June 2017, a mere six months after joining QCP, Defendant Kowalske's employment with the Company ended.

275. On July 11, 2017, HCP announced that Scott A. Anderson, its SVP and Chief Accounting Officer since July 2009, was leaving "to pursue other career opportunities." Anderson's area of expertise had included oversight of the Company's accounting function.

276. ManorCare faced a similar stream of high-level departures. In or around June 2017, Vice President John Graham, Vice President Mike Ferguson, and Pagoaga, the head of ManorCare's rehabilitation division, resigned. On September 25, 2017, Defendant Ormond left his position as ManorCare's President and CEO and was replaced by Defendant Cavanaugh.

277. These multiple successive executive departures – which occurred surrounding the fallout from Defendants' material misrepresentations and often before replacement executives had been identified – were highly suspicious and constitute further evidence of Defendants' recklessness and conscious misconduct.

### G. The Underlying Merits of the DOJ Action Support an Inference of Scienter

278. As detailed above, the DOJ spent years amassing evidence that ManorCare had provided unnecessary and unreasonable therapy as a means to improperly bill Medicare for billions of dollars. The substance of the DOJ Action provides additional evidence of Defendants' fraudulent course of conduct and intent to deceive.

279. As detailed below, moreover, that litigation was voluntarily dismissed because of procedural issues with expert discovery. There was not an adverse ruling on the ultimate merits of the DOJ's causes of action.

## VII. LOSS CAUSATION

280. Lead Plaintiffs and the Class were damaged as a result of Defendants' materially false and misleading statements, as set forth herein. As described further above, during the Class Period, Defendants issued a series of false and misleading statements. As a result of Defendants' material

misrepresentations and omissions of material facts, the price of HCP common stock was artificially inflated throughout the Class Period.

281. As such, Lead Plaintiffs (and/or their Funds) and members of the Class purchased HCP common stock at artificially inflated prices during the Class Period. But for Defendants' misrepresentations and omissions, members of the Class would not have purchased HCP common stock at artificially inflated prices.

282. As Defendants' various material misstatements and omissions were gradually revealed through a series of partial corrective disclosures, the price of HCP common stock declined. The corrective impact of the disclosures alleged herein was tempered, however, by Defendants' continued misstatements and omissions as detailed above.

283. Lead Plaintiffs and the Class suffered economic losses as the price of HCP common stock fell in response to the issuance of partial disclosures, as set forth below. However, the disclosures set forth below do not necessarily represent an exhaustive list of all stock price declines attributable to Defendants' fraudulent conduct, given that fact and expert discovery in this case has not yet begun. Lead Plaintiffs expressly reserve the right to identify additional relevant disclosures and price declines following the conducting of fact and expert discovery in this case.

284. On April 10, 2015, the DOJ intervened in the Whistleblower Actions and filed a consolidated complaint. On April 20, 2015, the court unsealed the DOJ consolidated complaint and the previously filed whistleblower complaints, and those allegations were made public for the first time. In a Form 8-K and press release filed prior to the start of trading on April 21, 2015, HCP stated:

> The United States intervened against [ManorCare] in the parts of the civil actions alleging that they submitted false claims to Medicare for therapy services that were not covered by the skilled nursing facility benefit, were not medically reasonable and necessary, were not skilled in nature, and therefore not entitled to Medicare reimbursement.

285. In response to this news, HCP's shares declined from a closing price of $43.33 per share on April 20, 2015, to a closing price of $42.19 per share on April 22, 2015, a decline of approximately 2.63%.

286. In an April 21, 2015 posting on ManorCare's website, ManorCare similarly asserted with regard to the DOJ Action: "We believe this lawsuit is unjust, and we will vigorously defend ourselves in court." In the same website posting, ManorCare represented that in connection with the DOJ investigation, ManorCare had "produc[ed] information that we believe refutes the basic claims contained in the lawsuit." ManorCare further stated that it "vehemently disagree[d]" with the allegations in the DOJ lawsuit, and that "in no instance is HCR ManorCare accused of billing or receiving reimbursements for services it did not provide."

287. Analysts concerned about the impact of the DOJ intervention in the Whistleblower Actions and the substance of the DOJ's allegations were assuaged by HCP's and ManorCare's assurances. For example, in an analyst report dated April 21, 2015, UBS Research reported: "[ManorCare] plans to fight the DOJ lawsuit and posted a letter on its website saying the complaint is 'unjust.'"

288. As a result, HCP's shares continued to trade at artificially inflated levels, as HCP reported during the Company's May 5, 2015 earnings conference call that ManorCare had "completed a very positive first quarter," and that ManorCare's "results were also ahead of their 2015 budget." HCP further stated that the DOJ's intervention in the Whistleblower Actions would not impact ManorCare's profitability. For example, during that earnings call, Defendant Martin represented: "[W]e do not anticipate a significant impact to HCR's profitability in the near future." Similarly, in response to analysts who were concerned about such impact, Defendant Martin reiterated that HCP was not aware of "any potential revenue lost that the Company might have going forward."

289. HCP also continued to represent that ManorCare had not engaged in any wrongdoing. Specifically, during HCP's May 5, 2015 earnings conference call, Defendant Martin stated:

> [T]he investigation by the Department of Justice has been ongoing for about three years. HCR has maintained their business practices throughout that time and, in fact, has continued to increase market share and provider relationships who are focused on the outcomes that they achieve in terms of think [sic] about hospital and readmissions and so forth.
>
> I would also add that – and we mentioned this on a prior call – that in conjunction with winning some of those relationships, ***HCR actually had their billing practices*** – and this was, again, several years ago – ***audited by a CMS recommended audit firm, passed it, and felt that their practices are definitely to the standard that one would want***.

290. On November 3, 2015, in a Form 10-Q for the third quarter of 2015 filed prior to the start of trading, HCP disclosed that it had recorded an impairment charge of $27 million related to the Equity Ownership Investment.

291. On this news, HCP's stock price declined from a closing price of $37.71 per share on November 2, 2015, to a closing price of $36.12 per share on November 4, 2015, a decline of approximately 4.22%.

292. However, in the same Form 10-Q, the HCP Defendants represented that the impairment was due to "a declining trend in admissions from hospitals and continuing trends in mix and length of stay driven by Medicare Advantage and other managed care plans."

293. On February 9, 2016, in its Form 10-K for the year ended December 31, 2015, filed during the trading day, HCP disclosed that it had written down its equity interest in ManorCare to zero, and taken an additional $817 million non-cash impairment on its ManorCare real estate assets. In total, HCP had written down those assets by over $1.3 billion since the start of the Class Period, or roughly 20% of their prior carrying value. HCP further put its entire ManorCare real estate portfolio on "Watch List" status. In addition, HCP disclosed a change to the way it accounted for lease revenue from ManorCare to a "cash basis" due to HCP's determination "that the timing and

amounts owed under the [ManorCare] [lease] investments are no longer reasonably assured." Lastly, HCP revealed that legal costs from ManorCare's defense against the DOJ Action had skyrocketed, reaching upwards of $1 million per month.

294. In response to this news, HCP's stock price declined from a closing price of $33.99 per share on February 8, 2016, to a closing price of $27.21 per share on February 10, 2016, a decline of approximately 19.95%.

## VIII. RELEVANT POST-CLASS PERIOD DEVELOPMENTS FROM THE DOJ ACTION

295. In 2017, despite the substantial evidence of fraud that the DOJ had amassed through years of investigation, the DOJ's case unraveled because of improper discovery conduct relating to the agency's key expert, Dr. Rebecca L. Clearwater.

296. In February 2013, the DOJ retained Dr. Clearwater – who had over 30 years of experience performing medical reviews of Medicare fee-for-service claims – as an expert to review medical records for 180 Medicare beneficiaries treated at ManorCare's SNFs. As part of the project, Dr. Clearwater supervised a team of four nurses, all of whom collectively reviewed hundreds of thousands of pages of records connected to 760 claims submitted by ManorCare to Medicare from October 1, 2006 through May 31, 2012. The final product of the review was an expert report to be used by the DOJ in the litigation to establish the falsity of the claims submitted by ManorCare.

297. In September 2016, the DOJ instructed Dr. Clearwater that she would need to collect and eventually disclose to the defendants in the case certain documents connected to the review. On November 4, 2016, Dr. Clearwater and the DOJ submitted an expert report.

298. On June 27, 2017, the defendants in the Whistleblower Actions served a deposition subpoena for Dr. Clearwater, including a request for production of "[a]ny and all reports, notes, memos, models, work sheets, data compilations, supporting data, and statistical programs utilized in conjunction with the formulation of your opinion in this Litigation and/or provided to, reviewed by,

relied on, or prepared by or for you in connection with your investigation and review of this Litigation, except any draft reports or disclosures protected from disclosure by Rule 26(b)(4)(B)." On behalf of Dr. Clearwater, the DOJ agreed to produce non-protected, responsive documents, but did not produce any notes taken by Dr. Clearwater during her preparation of the expert report.

299. The defendants subsequently deposed Dr. Clearwater for three days, on August 23, 24, and 25, 2017. During the deposition, Dr. Clearwater testified that she did not recall taking notes, had searched for notes, and had found none.

300. On September 13, 2017, the defendants deposed one of Dr. Clearwater's nurse reviewers. At the deposition, the DOJ produced approximately 1,300 pages of notes taken by that nurse reviewer, who, in turn, testified that she had not previously been asked to collect or produce those notes. That production prompted the defendants to ask the DOJ to confirm whether there were any other notes from Dr. Clearwater or the other nurse reviewers relating to the expert report.

301. On September 18, 2017 – in order to comply with the court-ordered deadline – the defendants filed a motion to exclude Dr. Clearwater's testimony. Two days later, on September 20, 2017, the DOJ confirmed that some notes existed and would be produced, but the DOJ did not provide further details. In the interim, the DOJ filed its opposition to the motion to exclude on October 2, 2017, and the defendants filed their reply on October 10, 2017.

302. ***Finally, on October 15, 2017 – after the briefing on the defendants' motion to exclude Dr. Clearwater's testimony had concluded – the DOJ produced 131 pages of handwritten notes that had been taken by Dr. Clearwater in preparation for drafting her expert report***.

303. Thus, the DOJ's key expert had taken 131 pages of relevant notes, had failed to produce those notes during discovery, had stated under oath that she did not recall taking and could not find any such notes, and had failed to ask her team of nurses to search for and produce their own notes. The DOJ exacerbated the matter by failing to produce the notes for nearly one month after

their existence had been discovered. Although the DOJ was reviewing the notes for privileged information, the delay deprived the defendants of information they could have used in their motion to exclude. Complicating these matters, the DOJ had also promised to produce beneficiary profiles – *i.e.*, internal documents used by Dr. Clearwater and her team in the preparation of Dr. Clearwater's report – by October 2, 2017, but had failed to do so.

304. In response, on October 18, 2017, the defendants filed a motion for sanctions for expert discovery violations, and the court held a hearing on October 27, 2017. During the hearing, the court held that Dr. Clearwater should be excluded from testifying. In so holding, the court eliminated the 700-page expert report on which the DOJ relied to prove the defendants' liability. Consequently, the DOJ was forced to voluntarily dismiss its case with prejudice on November 17, 2017. In sum, the DOJ's discovery violations extinguished any possibility of the court or a jury reviewing the voluminous evidence of ManorCare's massive fraud, and there was ***never a ruling on the merits of the DOJ's causes of action***.

## IX. THE PRESUMPTION OF RELIANCE

305. Lead Plaintiffs and the Class are entitled to a presumption of reliance established by the fraud-on-market doctrine in that, among other things:

(a) Defendants made false and misleading public statements during the Class Period;

(b) The false and misleading statements were material;

(c) The Company's stock traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e) Lead Plaintiffs (and/or their Funds) and other members of the Class purchased HCP common stock between the time Defendants made material misstatements or failed to disclose

material facts and the time the true facts were disclosed, without knowledge of the misstated or omitted facts.

306. At all relevant times, the market for HCP common stock was efficient for the following reasons, among others:

(a) HCP met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, HCP filed periodic public reports with the SEC; and

(c) HCP regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

307. A class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated in part upon omissions of material fact for which there is a duty to disclose.

## X. CLASS ACTION ALLEGATIONS

308. Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all those who purchased or otherwise acquired the common stock of HCP between March 30, 2015 and February 8, 2016, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of HCP and ManorCare at all relevant times, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors, or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

309. The members of the Class are so numerous that joinder of all members is impracticable. As of January 29, 2016, there were more than 465 million shares of HCP common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by HCP or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

310. There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members. Questions of law and fact that are common to the Class include, among other things:

(a) Whether Defendants violated the Exchange Act;

(b) Whether Defendants publicly omitted and/or misstated material facts concerning, *inter alia*, the value and viability of ManorCare and the underlying allegations in the DOJ Action;

(c) Whether Defendants knew or deliberately disregarded that their statements were materially false and misleading;

(d) Whether Defendants' material false statements and/or omissions artificially inflated the price of HCP common stock during the Class Period; and

(e) The extent and appropriate measure of damages sustained by members of the Class.

311. Lead Plaintiffs' claims are typical of those of the Class, as all Class members were similarly damaged by Defendants' unlawful conduct alleged herein.

312. Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel who are competent and experienced in class action securities litigation. Moreover, Lead Plaintiffs have no interests that conflict with those of the Class.

313. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for all members of the Class to redress the wrongs done to them individually. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**For Violations of §10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

314. Lead Plaintiffs incorporate by reference and expressly reallege all allegations set forth in ¶¶1-313, *supra*, as if fully set forth herein.

315. This cause of action is brought pursuant to §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

316. During the Class Period, Defendants made or were responsible for the materially false and misleading statements specified above, which they knew were, or recklessly disregarded as, false and/or misleading in that they contained misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not false or misleading.

317. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that, by the use of means and instrumentalities of interstate commerce, the mails, and/or the facilities of a national securities exchange, they:

(a) Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of HCP common stock during the Class Period.

318. Defendants did not have a reasonable basis for their alleged false statements and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of HCP common stock during the Class Period.

319. As described above, Defendants, individually and in concert, directly and indirectly, engaged and participated in a fraudulent scheme and wrongful course of business that was designed to and did conceal adverse material information concerning, *inter alia*, ManorCare's financial viability and future prospects and the merits of the underlying allegations in the DOJ Action.

320. HCP is liable for the materially false and misleading statements made during the Class Period listed in ¶¶152-238, as alleged above, including the materially false and misleading statements made by Defendants Martin, Schoen, and Kowalske, as alleged above, as the maker of such statements and under the principle of *respondeat superior*.

321. ManorCare is liable for the materially false and misleading misstatements and omissions made during the Class Period listed in ¶¶152-238, as alleged above, including the materially false and misleading statements made by Defendants Ormond and Cavanaugh, as alleged above, as the maker of such statements and under the principle of *respondeat superior*.

322. The allegations above establish a strong inference that both HCP and ManorCare, as entities, acted with the requisite scienter throughout the Class Period, as their officers and agents had actual knowledge of the misstatements and omissions of material facts set forth *supra*, or acted with

reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. The materially false and misleading statements were made knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the truth about, *inter alia*, the value and viability of ManorCare and the underlying merits of the DOJ Action. By concealing these material facts from investors, HCP's stock price was artificially inflated during the Class Period.

323. Lead Plaintiffs (and/or their Funds) and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for HCP common stock. Lead Plaintiffs (and/or their Funds) and the Class would not have purchased HCP common stock at the prices they paid if they had been aware that the market prices had been artificially and falsely inflated by Defendants' material misstatements and omissions.

324. As a direct and proximate result of the wrongful conduct of Defendants, Lead Plaintiffs (and/or their Funds) and the other members of the Class suffered damages in connection with their purchases of HCP common stock during the Class Period.

**COUNT II**

**For Violations of §20(a) of the Exchange Act**
**Against Defendants Martin, Schoen, Kowalske, Ormond, and Cavanaugh**

325. Lead Plaintiffs incorporate by reference and expressly reallege all allegations set forth in ¶¶1-324, *supra*, as if fully set forth herein.

326. This cause of action is brought pursuant to §20(a) of the Exchange Act, 15 U.S.C. §78t(a).

327. As detailed *supra*, Defendants Martin, Schoen, Kowalske, Ormond, and Cavanaugh each violated §10(b) and Rule 10b-5, and Lead Plaintiffs (and/or their Funds) and other members of the Class suffered damages in connection with their purchases of HCP common stock as a direct and proximate result of Defendants' wrongful conduct.

328. In addition, during the Class Period, Defendants Martin, Schoen, and Kowalske acted as controlling persons of HCP within the meaning of §20(a) of the Exchange Act. Specifically, by virtue of their high-level positions and their ability to control and influence the Company's decision-making and day-to-day operations, Defendants Martin, Schoen, and Kowalske had the power and ability to control and influence – and, in fact, did control and influence, directly or indirectly – the wrongful conduct alleged herein, including, without limitation, the content and dissemination of the materially false and misleading misstatements and omissions set forth *supra*. As a result, Defendants Martin, Schoen, and Kowalske are liable pursuant to §20(a) of the Exchange Act.

329. Further, during the Class Period, the Defendants Ormond and Cavanaugh acted as controlling persons of ManorCare within the meaning of §20(a) of the Exchange Act. Specifically, by virtue of their high-level positions and their ability to control and influence ManorCare's decision-making and day-to-day operations, Defendants Ormond and Cavanaugh had the power and ability to control and influence – and, in fact, did control and influence, directly or indirectly – the wrongful conduct alleged herein, including, without limitation, the content and dissemination of the materially false and misleading statements set forth *supra*. As a result, Defendants Ormond and Cavanaugh are liable pursuant to §20(a) of the Exchange Act.

330. As a direct and proximate result of the wrongful conduct of Defendants Martin, Schoen, Kowalske, Ormond, and Cavanaugh, Lead Plaintiffs and the other members of the Class suffered damages in connection with their (and/or their Funds') purchases of HCP common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A. Declaring the action to be a proper class action, certifying Lead Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiffs' counsel as Class Counsel;

B . Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Granting such other and further relief, including equitable and/or injunctive relief, as the Court deems just and proper.

## JURY DEMAND

Lead Plaintiffs demand a trial by jury.

DATED: February 28, 2018

THE KERGER LAW FIRM, LLC

s/ RICHARD M. KERGER
RICHARD M. KERGER (0015864)
33 S. Michigan Street, Suite 100
Toledo, OH 43604
Telephone: 419/255-5990
419/255-5997 (fax)
rkerger@kergerlaw.com

LANDSKRONER GRIECO MERRIMAN, LLC
JACK LANDSKRONER (0059227)
1360 West 9th Street, Suite 200
Cleveland, OH 44113
Telephone: 216/522-9000
216/522-9007 (fax)
jack@lgmlegal.com

Local Counsel

ROBBINS GELLER RUDMAN
& DOWD LLP
DARREN J. ROBBINS
NATHAN R. LINDELL
SARA B. POLYCHRON
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
& DOWD LLP
PAUL J. GELLER
JACK REISE
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)

MOTLEY RICE LLC
WILLIAM H. NARWOLD
GREGG S. LEVIN
CHRISTOPHER F. MORIARTY
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone: 843/216-9000
843/216-9450 (fax)

Lead Counsel for Lead Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 28, 2018.

s/ RICHARD M. KERGER

RICHARD M. KERGER

THE KERGER LAW FIRM, LLC
33 S. Michigan Street, Suite 100
Toledo, OH 43604
Telephone: 419/255-5990
419/255-5997 (fax)

E-mail: rkerger@kergerlaw.com

# Mailing Information for a Case 3:16-cv-01106-JJH Boynton Beach Firefighters' Pension Fund v. HCP, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Rebecca E. Boon**
  Rebecca.Boon@blbglaw.com,Errol.Hall@blbglaw.com
- **John R. Climaco**
  jrclim@climacolaw.com
- **Katherine C. Ferguson**
  kferguson@kgmlaw.com,hkittle@kgmlaw.com
- **Jessie M. Gabriel**
  jgabriel@bakerlaw.com,bhlitdocket@bakerlaw.com
- **Avi Josefson**
  avi@blbglaw.com,Errol.Hall@blbglaw.com
- **Richard M. Kerger**
  rkerger@kergerlaw.com,jreuling@kergerlaw.com
- **James A. King**
  jking@porterwright.com
- **Daniel J. Kramer**
  DKramer@paulweiss.com,mao_fednational@paulweiss.com
- **Jack Landskroner**
  jack@lgmlegal.com,julie@lgmlegal.com
- **Gregg S. Levin**
  glevin@motleyrice.com,erichards@motleyrice.com,kweil@motleyrice.com,jhughes@motleyrice.com
- **Nathan R. Lindell**
  nlindell@rgrdlaw.com,e_file_sd@rgrdlaw.com,susanw@rgrdlaw.com
- **Tricia L. McCormick**
  tmccormick@rgrdlaw.com
- **Michael D. Meuti**
  mmeuti@bakerlaw.com
- **Christopher F. Moriarty**
  cmoriarty@motleyrice.com,kweil@motleyrice.com
- **William H. Narwold**
  bnarwold@motleyrice.com,vlepine@motleyrice.com,ajanelle@motleyrice.com

- **Jack Reise**
  jreise@rgrdlaw.com,e_File_FL@rgrdlaw.com,e_File_SD@rgrdlaw.com

- **Joseph F. Rice**
  jrice@motleyrice.com,gdirkes@motleyrice.com

- **Darren J. Robbins**
  darrenr@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Ross M. Shikowitz**
  ross@blbglaw.com

- **Gerald H. Silk**
  jerry@blbglaw.com,Errol.Hall@blbglaw.com,scott.foglietta@blbglaw.com,ross@blbglaw.com

- **Scott D. Simpkins**
  sdsimp@climacolaw.com

- **Audra J. Soloway**
  ASoloway@paulweiss.com,mao_fednational@paulweiss.com

- **Thomas D. Warren**
  twarren@bakerlaw.com,kpeto@bakerlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)