UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Boynton Beach Firefighters'
Pension Fund, On Behalf of Itself
and All Others Similarly Situated,

        Plaintiff,

v.

HCP, Inc., et al.,

        Defendants.

Case No. 3:16-cv-1106

MEMORANDUM OPINION
AND ORDER

## I. INTRODUCTION

Defendants HCP, Inc., Lauralee E. Martin, Timothy Schoen, and Darren A. Kowalske (the "HCP Defendants") have filed a motion to dismiss the Consolidated Amended Class Action Complaint, pursuant to Rule 9(b) and Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. No. 93). Lead Plaintiffs Société Générale Securities Services GmbH and the City of Birmingham Retirement and Relief System (collectively, "Lead Plaintiffs") filed a memorandum in opposition. (Doc. No. 97). The HCP Defendants filed a brief in reply. (Doc. No. 100). Pursuant to the parties' request, I held oral argument on October 23, 2018.

Defendants HCR ManorCare, Inc., Paul A Ormond, and Steven M. Cavanaugh (the "ManorCare Defendants") also filed a motion to dismiss Plaintiff's Complaint. (Doc. No. 95). After briefing on that motion was completed and oral argument was held, Defendants and Plaintiff

stipulated to the voluntary dismissal without prejudice of the claims against the ManorCare Defendants. (Doc. No. 110).

For the reasons stated below, the HCP Defendants' motion is granted.

## II. BACKGROUND

HCP is a real estate investment trust ("REIT") that primarily leases the real property it owns to companies involved in the healthcare industry. Martin previously served as HCP's Chief Executive Officer and President, while Schoen was HCP's Executive Vice President and Chief Financial Officer. Kowalske served first as the "Senior Vice President of Hospital and Post-Acute" and the "[Executive Vice President] of Asset Management, Senior Housing and Care." (Doc. No. 85 at 13).

On April 7, 2011, HCP entered into an agreement with HCR ManorCare in which HCP purchased substantially all of ManorCare's real estate assets and then leased those assets back to ManorCare. (Doc. No. 85 at 6-7). In connection with this transaction, HCP also acquired a 9.9% equity ownership interest in ManorCare (jointly, the "2011 Transactions"). (*Id.* at 7). Lead Plaintiffs allege ManorCare accounted for approximately 30% of HCP's revenue stream following these transactions. (*Id.*).

Lead Plaintiffs allege ManorCare was "heavily dependent upon revenue generated by unlawful and unsustainable billing practices," including alleged Medicare fraud. (Doc. No. 85 at 7). ManorCare, they allege, engaged in a variety of practices designed to increase revenues by increasing the percentage of services for which it could bill at Medicare's higher or highest reimbursement level, grouping patients together to permit physical and occupational therapists to bill for multiple therapy sessions at one time, and maximizing the length of a patient's stay in a ManorCare facility.

Lead Plaintiffs assert that, between 2009 and 2011, three individuals who previously worked as therapists for ManorCare each filed *qui tam* complaints to assert False Claims Act claims against

ManorCare as a result of these billing practices. Lead Plaintiffs further allege HCP had access to information concerning ManorCare's billing practices before completing the 2011 Transactions.

In early 2013, the Department of Justice served a Civil Investigative Demand at ManorCare's corporate headquarters. That investigation led to the United States intervening in the *qui tam* actions in December 2014.

Lead Plaintiffs allege all Defendants violated § 10(b) of the Exchange Act and Rule 10b-5, and that the individual Defendants violated § 20(a) of the Exchange Act. Lead Plaintiffs assert their securities fraud claims on behalf of a class of all individuals or entities who purchased or acquired HCP's common stock between March 30, 2015, and February 8, 2016, inclusive (the "Class Period"). (Doc. No. 85 at 115).

### III. STANDARD

A defendant may seek to dismiss a plaintiff's complaint on the ground the complaint fails to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). When ruling on a motion to dismiss, a court construes the complaint in the light most favorable to the plaintiff and accepts as true well-pleaded factual allegations. *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 896 (6th Cir. 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). Factual allegations must be sufficient to state a plausible claim for relief. *Iqbal*, 556 U.S. at 678. Legal conclusions and unwarranted factual inferences are not entitled to a presumption of truth. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In considering a Rule 12(b)(6) motion, the court may consider the allegations in the complaint as well as any exhibits attached to the complaint, as long as the complaint refers to the exhibit and the exhibit is central to the claims set forth in the complaint. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

Securities-fraud claims also "implicate the heightened pleading standards of Federal Rule of Civil Procedure 9(b)." *Doughtery v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 978 (6th Cir. 2018). A

3

plaintiff also must " 'allege the time, place, and content of the alleged misrepresentation [or omission] on which he or she relied [and] the fraudulent scheme . . . .' " *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 470 (6th Cir. 2014) (citation omitted).

## IV.    ANALYSIS

### A. SECTION 10(B) AND RULE 10(B)-5 CLAIMS

To state a claim for securities fraud under §10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Ohio Pub. Emp. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 383–84 (6th Cir. 2016) (citations omitted).

A plaintiff who alleges "the defendant made a false or misleading statement must: (1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' 15 U.S.C. § 78u–4(b)(1); and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' § 78u–4(b)(2)." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007). A court must consider collectively all of the facts the plaintiff alleges to determine whether the allegations give rise to a "cogent and compelling" inference that the defendant acted with the intent to deceive, manipulate, or defraud. *Id.* at 324.

Lead Plaintiffs identify a variety of statements made by Martin, Schoen, and Kowalske about ManorCare's future prospects and its ability to pay what it owed to HCP which Lead Plaintiffs claim are false or misleading. (Doc. No. 85 at 54-56, 55-71). They allege ManorCare's future prospects were dismal because from "at least 2006 through 2012, ManorCare had engaged in a deliberate scheme whereby it used a variety of tactics to encourage its employees to fraudulently overbill the federal government for services that were ineligible for reimbursement under the Medicare skilled nursing facility benefit because they were unnecessary, unreasonable, and/or unskilled." (*See, e.g.,*

4

Doc. No. 85 at 52). Lead Plaintiffs offer two primary avenues[1] by which the HCP Defendants obtained information which provided the HCP Defendants with the knowledge that their statements were false: (1) in connection with HCP's due diligence review prior to entering into the 2011 Transactions, and (2) as a result of their knowledge of the DOJ investigation. (*See, e.g.,* Doc. No. 85 at 55-56).

"To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 323–24. Plaintiffs must show "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

For the purposes of a motion to dismiss, a plaintiff may sufficiently plead the scienter element by alleging facts which would show a defendant acted with deliberate recklessness. *See, e.g., Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011) (assuming, without deciding, "the scienter requirement may be satisfied by a showing of 'deliberate recklessness'"); *Dougherty*, 905 F.3d at 980 ("In a securities-fraud case, an inference of recklessness is sufficient to satisfy a plaintiff's pleading burden on the scienter element.") (citation omitted). Recklessness involves "highly unreasonable conduct which is an extreme departure from the standards of ordinary care ... akin to conscious disregard." *Id.* (quoting *PR Diamonds Inc. v. Chandler*, 364 F.3d 671, 681 (6th Cir. 2004)). "Before drawing an inference of recklessness, courts typically require 'multiple, obvious red flags,'

---

[1] Lead Plaintiffs also allege the HCP Defendants were put on notice of the possibility that companies like ManorCare might be overbilling, pursuant to a letter dated February 16, 2011 from CtW Investment Group to HCP's Board of Directors, in which Lead Plaintiffs claim "CtW stated that '[w]e are deeply concerned with the heightened reimbursement risk to the company's portfolio from the proposed acquisition of ManorCare's real estate assets, especially in light of recent studies spotlighting questionable billing practices at [skilled nursing facilities].'" (Doc. No. 85 at 99).

5

demonstrating an 'egregious refusal to see the obvious, or to investigate the doubtful.'" *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016) (citations omitted).

Lead Plaintiffs allege the HCP Defendants offered or failed to correct their false or misleading statements with the intent to deceive, manipulate, or defraud the market so that HCP could sell approximately $1.35 billion of newly-issued securities to investors. (Doc. No. 85 at 64, 71). A court seeking to determine whether the plaintiff has adequately pled scienter reviews all of the plaintiff's allegations collectively and considers "a non-exhaustive list of nine factors:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs."

*Doshi*, 823 F.3d at 1039-40 (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001) (en banc)). "The more of these factors that are present, the stronger the inference that the defendant made his statement with the requisite state of mind." *In re Omnicare*, 769 F.3d at 473.

Lead Plaintiffs assert "the Complaint alleges facts implicating the first, second, third, fifth, sixth, seventh, and ninth *Helwig* factors." (Doc. No. 97 at 53). Lead Plaintiffs implicitly concede the Complaint does not include allegations which would implicate the fourth or eighth *Helwig* factors. (*Id.*).

### 1. Insider Trading

The Complaint does not contain allegations of insider trading. A corporate employee or insider may violate "Section 10(b) and Rule 10b–5 if he has breached his fiduciary duty to the corporation and its shareholders by making use of material nonpublic information about the

6

company to attain a personal benefit either by trading in the company's securities himself or by providing tips to allow others to do so." *U.S. Sec. & Exch. Comm'n v. Blackwell*, 291 F. Supp. 2d 673, 687 (S.D. Ohio 2003) (citing *Dirks v. S.E.C.*, 463 U.S. 646, 654-55 (1983)). Lead Plaintiffs do not identify any instances in which the individual defendants made use of material nonpublic information for personal benefit.

Moreover, their citation to *Frank v. Dana Corp*, 646 F.3d 954, 962 (6th Cir. 2011) offers no help, as that case involved allegations that the individual defendants stood to personally benefit for the alleged scheme. *See id.* ("Burns and Richter only appear more culpable when considering . . . the bonuses that [they] stood to earn."). As the HCP Defendants' note, Lead Plaintiffs "make no attempt to refute the HCP Defendants' showing that Martin, Schoen[,] and Kowalske continued to acquire HCP stock during the Class Period, and did not sell HCP stock for a profit." (Doc. No. 100 at 21-22).

**2. Divergence Between Internal Reports and External Statements and Disregard of the Most Current Factual Information**

The second *Helwig* factor applies to allegations which highlight the contrast between information a corporation knew or had access to at the time it made inconsistent outward-facing statements and the content of those statements on the same subject. *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 684 (6th Cir. 2005). The Sixth Circuit has described this factor as "the key factor," *id.* at 688, as well as the "most significant[ one]." *Doughtery*, 905 F.3d at 981.

The sixth *Helwig* factor considers what information the defendants possessed at the time they made their public statements and whether the defendants disregarded the "most current" information. *Id.* at 979. Lead Plaintiffs point to the same allegations for both of these factors, (Doc. No. 97 at 53-54), so I will analyze the second and sixth factors together. *See In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 970 (S.D. Ohio 2009).

7

Lead Plaintiffs' allegations here depend upon their assertion that HCP must have known that ManorCare's billing practices were fraudulent because the 2011 Transactions required ManorCare to provide HCP access to its "properties, books, Contracts, commitments, Tax Returns, records and appropriate officers and employees . . . [and] all financial and operating data," as well as a balance sheet, and an earnings and profits report from a nationally-recognized independent accounting firm. (Doc. No. 85 at 97-99). Lead Plaintiffs, however, fail to connect those documents with the documents they allege contain the details of ManorCare's purportedly fraudulent billing scheme:

- An agenda of a November 2008 meeting attended by ManorCare executives and ownership representatives. (Doc. No. 85 at 23).
- An undated presentation by ManorCare's Chief Operating Officer to its Board of Directors. (*Id.* at 23-24).
- Training presentations to ManorCare therapists. (*Id.* at 24-25).
- Billing goals for therapists set by ManorCare's "Divisional Rehabilitation Directors and Regional Rehabilitation Managers." (*Id.* at 25-27).
- Emails sent in 2009 by a Divisional Rehabilitation Director to a Vice President of Reimbursement. (*Id.* at 26).
- Reports from Directors of Rehabilitation to Regional Rehabilitation Managers. (*Id.* at 27).
- A 2008 exit interview survey from a former ManorCare therapist. (*Id.* at 28-29).
- Length of stay instructions from ManorCare executives to divisional operations staff. (*Id.* at 29-30).
- Action plans for ManorCare therapy staff who failed to meet internal billing targets. (*Id.* at 31-32).
- Employee performance evaluations. (*Id.* at 32-33).

Lead Plaintiffs do not connect these internal ManorCare documents and communications, or others described in the Complaint, to the categories of information HCP could access during its due diligence review prior to the 2011 Transaction. Nor do they explain the connection between information HCP hypothetically had access to in 2011 and statements made by HCP executives two, four, and five years later. *Cf. Bridgestone*, 399 F.3d at 684 (describing the current-in-time data and reports the defendant had in its possession or had access to at the time defendant made its public

statements). A defendant's "fraudulent intent cannot be inferred merely from . . . alleged access to information." *PR Diamonds*, 91 F. App'x at 432 ("[T]he Complaint must allege specific facts or circumstances suggestive of [an individual defendant's] knowledge."); *see also In re Huntington Bancshares*, 674 F. Supp. 2d at 971 (concluding allegations of scienter based upon a corporate defendant's due diligence period prior to its merger with another bank who had extended $1.5 billion in financing to a company issuing subprime mortgages were "little more than an assumption"); *D.E. & J. Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 740 (E.D. Mich. 2003) ("Conclusory allegations of access to unspecified 'internal records' are insufficient to support a claim of 'knowledge' or 'reckless disregard . . . .'").

Further, Lead Plaintiffs' allegations do not show the HCP Defendants disregarded the most current factual information – information concerning the DOJ investigation – before making public statements. Rather, the allegations in the Complaint show the HCP Defendants acknowledged the DOJ was investigating ManorCare and offered reasons why HCP believed that investigation would not adversely impact HCP's ability to collect lease payments. While this belief ultimately proved to be incorrect, Lead Plaintiffs cannot allege scienter simply through hindsight.

### 3. Closeness in Time

The relative temporal proximity of a purportedly fraudulent statement to a later disclosure of inconsistent information affects the strength of the inference which may be drawn from that information. The longer the gap between those two events, the less likely it is that this factor will be probative of the scienter element. While the passage of one week between an allegedly fraudulent statement and a subsequent inconsistent disclosure supports an inference of scienter, the passage of four months does not. *Bridgestone*, 399 F.3d at 684, 688; *see also Miss. Pub. Emps' Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 91 (1st Cir. 2008) (concluding the passage of one week between public remarks

and a later disclosure was "strong evidence" of scienter). In a recent case, the passage of six weeks weighed "minimally" in the plaintiffs' favor. *Doughtery*, 905 F.3d at 981.

Lead Plaintiffs allege HCP made adverse disclosures approximately two and three months after offering positive evaluations of ManorCare's business and the likelihood ManorCare would continue to pay its lease payments on time. (Doc. No. 85 at 67-71). At best, the temporal proximity of these statements could be considered "minimal" evidence of scienter.

Lead Plaintiffs, however, fail to plead allegations which rise even to that level. Lead Plaintiffs speculate the HCP Defendants knew, or recklessly disregarded facts that would show that ManorCare's revenues previously had been driven by a fraudulent billing scheme in place from 2006 until 2012, and that it was this knowledge, or reckless disregard of certain information, which motivated the statements the HCP Defendants made in late 2015 and early 2016. (*See* Doc. No. 97 at 53-54). These allegations "rest on nothing more than hindsight." *Fidel v. Farley*, 392 F.3d 220, 232 (6th Cir. 2004), overruled on other grounds by *Tellabs*, 551 U.S. 308.

### 4. Existence of an Ancillary Lawsuit

A plaintiff may create a strong inference of scienter in part by alleging the defendant company has quickly settled a lawsuit alleging fraud or asserting non-fraud claims supported by "closely related evidence." *Bridgestone*, 399 F.3d at 685. While Lead Plaintiffs argue they have alleged facts implicating this factor, (Doc. No. 97 at 53), they do not identify any in their brief in opposition to the motion to dismiss. Further, any reference to a lawsuit in the Complaint is to a lawsuit against ManorCare, not HCP.

### 5. Misleading Disclosure of Accounting Information

The seventh *Helwig* factor takes into consideration a defendant's "disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication." *Helwig*, 251 F.3d at 552. Lead Plaintiffs assert they have alleged

10

facts to support a finding this factor exists because they alleged "the HCP Defendants engaged in multifaceted accounting violations . . . [and] HCP's financial statements consistently reported historical revenues for ManorCare that had been revised downward from their previously reported amounts, without explanation." (Doc. No. 97 at 54). The accounting violations Lead Plaintiffs point to primarily involve the HCP Defendants' alleged failure to record impairments soon enough. (*See, e.g.,* Doc. No. 85 at 77 ("Defendants HCP, Martin, and Schoen violated GAAP by failing to timely recognize necessary impairments in connection with HCP's DFL Investment and Equity Ownership Investment assets.")).

"It is well-settled that violations of GAAP and GAAS, standing alone, do not create an inference of scienter, much less a strong one." *PR Diamonds*, 91 F. App'x at 439. Even if I assume Lead Plaintiffs have sufficiently alleged the HCP Defendants violated GAAP and GAAS, Lead Plaintiffs fail to show these errors were "so simple, basic, or pervasive in nature . . . [or] so great in magnitude," that they should have been obvious to the HCP Defendants. *Ley v. Visteon Corp.*, 543 F.3d 801, 813 (6th Cir. 2008) ("[W]hat Plaintiffs want is for Defendants to couch the financial health of Visteon in the negative terms of their choosing, but that is not required under the federal securities laws."), *abrogated on other grounds by Matrixx Initiatives*, 563 U.S. 27; *see also In re United Am. Healthcare Corp. Sec. Litig.*, No. 2:05-CV-72112, 2007 WL 313491, at *20 (E.D. Mich. Jan. 30, 2007) ("Without an intent to deceive, violations of accounting principles are closer to corporate mismanagement, which the federal securities laws do not govern.").

Moreover, the allegation that ManorCare failed to explain the reason for its correction of its historical revenues does not identify a disclosure of accounting information which requires a high degree of sophistication to understand and is not evidence of the intent of the HCP Defendants. To the contrary, a downward revision of that information would be plainly evident to an investor who

reviewed that disclosure. Further, Lead Plaintiffs do not allege HCP failed to accurately report either the initial revenue number or the corrected revenue number.

I conclude the alleged GAAP and GAAS violations do not support an inference of scienter.

### 6. Defendants' Self-Interested Motivations

The ninth *Helwig* factor anticipates allegations that the individual defendants acted with the "self-interested motivation . . . of saving their salaries or jobs." *Helwig*, 251 F.3d at 552. Lead Plaintiffs do not allege any of the individual defendants acted to save their salaries or jobs. Instead, they claim "the striking number of departures by high level executives at HCP in and around the Class Period . . . is further evidence of scienter." (Doc. No. 97 at 54). Lead Plaintiffs point to the voluntary resignations of five high level executives, including the Executive Chairman of the Board of Directors, between July 2016 and April 2018. (Doc. No. 85 at 107-08).

Other than through their conclusory allegations, Lead Plaintiffs offer no reason to believe that these departures – each of which, Lead Plaintiffs admit, was voluntary – constitute evidence that the HCP Defendants made false or misleading statements concerning HCP's financial viability with the deliberate intent to manipulate, deceive, or defraud the market. A strong inference of scienter involves "deductive reasoning . . . [and its] strength depends on how closely a conclusion of misconduct follows from a plaintiff's proposition of fact." *Bridgestone*, 399 F.3d at 683 (quoting *Helwig*, 251 F.3d at 553). Lead Plaintiffs identify no evidence of a connection between the departures and an inference of misconduct. Nor do they provide factual support for their argument that the departure of five executives over two years from a large, publicly-traded corporation is unusual, much less "striking."

Lead Plaintiffs' citation to an unreported district court case offers no help, as the defendant's CEO acknowledged terminating two high-level executives within two weeks of each other, as well as a third executive approximately a year later. *See Willis v. Big Lots, Inc.*, Civil Action 2:12-cv-604, 2017

12

WL 2608690, at *3 (S.D. Ohio June 16, 2017). As I noted above, Lead Plaintiffs allege the individuals who resigned from HCP did so voluntarily. Moreover, they do not offer any allegations which would show these individuals were motivated to resign by a desire to save their salaries or potential bonuses.

### 7. The Holistic Approach

While the *Helwig* factors are a helpful analytical tool, those factors are not exhaustive and must be evaluated in the greater assessment of "all the allegations holistically." *Ashland, Inc. v. Oppenheimer & Co., Inc.*, 648 F.3d 461, 469 (6th Cir. 2011) (quoting *Tellabs*, 551 U.S. at 326); *see also Doughtery*, 905 F.3d at 982 (noting the Supreme Court stated in *Tellabs* that "the absence of a motive allegation is not fatal" (citation omitted)).

Even when taken "collectively," *Tellabs*, 551 U.S. at 326, Lead Plaintiffs' allegations fail to establish a strong inference of scienter. Lead Plaintiffs have not offered any facts which support their argument that the HCP Defendants must have known ManorCare's revenues were irreversibly declining and it was on its way to bankruptcy.

Lead Plaintiffs fail to show a reasonable person would deem the inference of scienter to be at least as strong as the countervailing inference that the HCP Defendants had no knowledge of or reason to suspect the allegedly fraudulent billing scheme ManorCare used from 2006 to 2012 had improperly inflated ManorCare's past revenues and had undermined the reliability of those past revenues as a data point for ManorCare's future viability. HCP's heavy reliance on income from ManorCare, while perhaps a poor business strategy, is not evidence of scienter which could support Lead Plaintiffs' securities fraud claims.

Because I have concluded Lead Plaintiffs fail to allege sufficient facts to create a strong inference of scienter, I find it unnecessary to consider the parties' arguments concerning the remaining elements of Lead Plaintiffs' Section 10(b) and Rule 10b-5 claims.

B.  SECTION 20(A) CLAIMS

Lead Plaintiffs also claim Martin, Schoen, and Kowalske violated § 20(a) of the Exchange Act.  When a plaintiff's § 10(b) claims have been dismissed, the plaintiff's related § 20(a) claims also are subject to dismissal.  *Doshi*, 823 F.3d at 1045.  Therefore, I also grant the HCP Defendants' motion as to these claims.

V.  CONCLUSION

For the reasons stated above, the HCP Defendants' motion to dismiss the complaint for failure to state a claim, (Doc. No. 93), is granted.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge